IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

| | | |
|---|---|---|
| CURTIS ALLEN GAMBILL, | ) | |
| PETE ARMENTA, JR., | ) | United States Courts |
| JESSE WADE HOLT, | ) | Southern District of Texas |
| MARK ANTHONY REYNA, | ) | F I L E D |
| EDDIE RAY FOWLER, JR., | ) | MAR 3 0 2021 |
| PRESCILLIANO MARTINEZ, | ) | |
| JUAN ANTONIO DE LEON, | ) | Nathan Ochsner, Clerk of Court |
| JOSEPH MICHEAL MARTINEZ, | ) | |
|     Plaintiffs, | ) | Case No._____ |
| vs. | ) | |
| BRYAN COLLIER, | ) | CIVIL RIGHTS COMPLAINT |
| STEPHEN BRYANT, | ) | (§ 1983) |
| TARA BURSON, | ) | |
| JOHN WERNER, | ) | |
| ROCKY N. MOORE, | ) | |
| ASHLEY L. HASTINGS, | ) | Trial by Jury Demanded |
| VIRGINIA S. STEVENS, | ) | |
|     Defendants. | ) | |

COMES NOW, Curtis A. Gambill, plaintiff pro se, who presents the following joint-plaintiff civil rights complaint and claim for declaratory and injunctive relief.

I.           INTRODUCTION

1.    This is a civil rights action filed by plaintiffs Curtis Gambill, Pete Armenta, Jesse Holt, Mark Reyna, Eddie Fowler, Prescilliano Martinez, Juan DeLeon, and Joseph Martinez on behalf of themselves and other similarly effected state prisoners in the custody of the Texas Department of Criminal Justice.

2.    Plaintiffs are seeking declaratory and injunctive relief under 42 U.S.C. § 1983, alleging current and long-standing abuses in violation of their rights to be free from cruel and unusual punishment, and to be afforded due

(1)

process and equal protections under the law, as protected by the Fifth, the
Eighth, and the Fourteenth Amendments to the United States Constitution.

II.     <u>JURISDICTION and VENUE</u>

3.     Jurisdiction is asserted pursuant to the United States Constitution
and 42 U.S.C. § 1983, to redress the deprivation of those rights secured by the
United States Constitution, deprived by persons acting under color of state law.
This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343 (a)(3).

4.     Plaintiff's claims for declaratory and injunctive relief is autho-
rized pursuant to 28 U.S.C. §§ 2201, 2202 and 28 U.S.C. §§ 2283, 2284.

5.     The United States District Court for the Southern District of Texas,
Houston Division is the appropriate venue for trial pursuant to 28 U.S.C. § 1391
(b)(2); the county of Walker is where claim is being presented, and is where
plaintiffs and defendants currently reside and/or are employed.

III.     <u>PARTIES</u>

<u>Plaintiffs:</u>

6.     Plaintiff CURTIS ALLEN GAMBILL, TDCJ # 805886, 810 F.M. 2821, Hunts-
ville, Tx. 77349.

7.     Plaintiff PETE ARMENTA, JR., TDCJ # 2255553, 810 F.M. 2821, Hunts-
ville, Tx. 77349.

8.     Plaintiff JESSE WADE HOLT, TDCJ # 1362684, 810 F.M. 2821, Huntsville,
Tx. 77349.

9.     Plaintiff MARK ANTHONY REYNA, TDCJ # 1213971, 810 F.M. 2821, Hunts-
ville, Tx. 77349.

10.     Plaintiff EDDIE RAY FOWLER, JR., TDCJ # 2231555, 810 F.M. 2821,
Huntsville, Tx. 77349.

11.     Plaintiff PRESCILLIANO MARTINEZ, TDCJ # 2323270, 810 F.M. 2821,
Huntsville, Tx. 77349.

12.     Plaintiff JUAN ANTONIO DE LEON, TDCJ # 2060521, 810 F.M. 2821,

(2)

Huntsville, Tx. 77349.

13.     Plaintiff JOSEPH MICHAEL MARTINEZ, TDCJ # 1960242, 810 F.M. 2821, Huntsville, Tx. 77349.

14.     All plaintiffs are presently serving criminal sentences in the care and custody of the Texas Department of Criminal Justice, and all named plaintiffs currently reside at the John M. Wynne unit in Huntsville, Texas.

**Defendants:**

15.     Defendant BRYAN COLLIER, ("Director Collier"), P.O. Box 99, Huntsville, Tx. 77342-0099. At all times relevant to this action was/is employed by TDCJ as Executive Director. Director Collier is TDCJ's highest authority and is responsible for all operations, oversight, and the creation, implementation, and review of all TDCJ policies and directives. It is Director Collier's duty to ensure compliance with all state and federal law within TDCJ.

16.     Defendant STEPHEN BRYANT, ("Director Bryant"), 1225 Avenue G, Huntsville, Tx. 77340. At all times relevant to this action was/is employed by TDCJ as Regional Director. Director Bryant oversees all daily operations within the Region One district. Director Bryant is the final authority on classification decisions within Region One, and is also responsible for investigating and resolving offender Step Two grievance concerns. Director Bryant is a key voting member of the Security Precaution Designator Review Committee (SPDRC).

17.     Defendant TARA BURSON, ("Chairwoman Burson"), P.O. Box 99, Huntsville, Tx. 77342-0099. At all times relevant to this action was/is employed by TDCJ as Chairperson of Central Classification and Records. Chairwoman Burson's duties are outlined in the TDCJ Classification Plan. She is a member of the SPDRC committee in accordance with the Administrative Directive 04.11.

18.     Defendant JOHN WERNER, ("Deputy Director Werner"), P.O. Box 99, Hunstville, Tx. 77342-0099. At all times relevant to this action was/is employed by TDCJ as Deputy Director of Support Operations. Deputy Director Werner is part

of the SPDRC committee and is tasked with making the final determination on SPD review decisions if a unanimous decision is not made by other SPDRC members in accordance with the A.D. 04.11 and TDCJ's Classification Plan.

19.   Defendant ROCKY N. MOORE, ("Warden Moore"), 810 F.M. 2821, Huntsville, Tx. 77349. At all times relevant to this action was/is employed by TDCJ as Senior Warden of John M. Wynne unit and is responsible for the care, safety, and housing of all Wynne unit inmates, and the employment, training, and oversight of all unit staff. Warden Moore is the final authority over Step One grievances and classification decisions. Warden Moore is the initial voter on the SPDRC committee pursuant to the A.D. 04.11.

20.   Defendant ASHLEY L. HASTINGS, ("Ms. Hastings"), 810 F.M. 2821, Huntsville, Tx. 77349. At all times relevant to this action was/is employed by TDCJ as Program Supervisor I on the Wynne unit. Ms. Hastings is chief of unit classification and is responsible for training staff pursuant to TDCJ's Classification Plan and other related policies and directives. It is Ms. Hastings duty to maintain accurate records and schedule timely review hearings. Ms. Hastings is a voting member on unit classification committees ("UCC").

21.   Defendant VIRGINIA S. STEVENS, ("Ms. Stevens"), 810 F.M. 2821, Huntsville, Tx. 77349. At all times relevant to this action was/is employed by TDCJ as classification Manager II at John Wynne unit. Ms. Stevens is tasked with keeping accurate records, scheduling UCC review hearings, and notifying inmates of their dates and/or decisions. Ms. Stevens is a voting member on UCC committees.

22.   All named defendants have acted under color of state law at all times relevant to this complaint. The defendants are all hereby sued in their official capacity for those acts and omissions described fully below.

IV.          EXHAUSTION OF REMEDIES

23.   Plaintiff has timely exhausted all available remedies prior to filing this complaint and attaches Step Two grievance with institutional response.

(4)

V.                    PREVIOUS LAWSUITS

24.     Plaintiff has never before filed a civil suit, nor has there been previous litigation regarding the series of issues described within this complaint.

VI.               STATEMENT OF FACTS

25.     In 2003, the Texas Department of Criminal Justice (TDCJ) instituted a new administrative directive that authorized the use of Security Precaution Designators (SPD codes).

26.     The procedures, definitions, and criteria necessary for placement and/or removal of the various SPD codes are governed solely by TDCJ's Administrative Directive 04.11 ("A.D. 04.11").

27.     The A.D. 04.11 is a statutory directive deriving its authority from the Texas Government Code §§ 494.002(a) and 498.002. This directive uses explicitly mandatory language in establishing specific substantive predicates to limit official discretion. This directive provides plaintiffs a legitimate expectation of a specific result once certain criteria is met, with the statutory presumption for the eligible inmate being slanted heavily towards the removal of these codes upon meeting the necessary criteria.

28.     The defendants and their predecessors have failed in their duties regarding this policy. From inception, it has been arbitrarily carried out at the operational levels within TDCJ. Defendant's negligent disregard for the plaintiffs' due process rights has created a de facto policy of indefinite punishment unique to TDCJ, and has cultivated an environment where additional abuses have been overlooked and/or promoted.

29.     The series of acts described henceforth are common to all plaintiffs and arise out of the defendants' arbitrary and indefinite application of these ultra punitive SPD codes, without which, plaintiffs would have avoided such harm.

DENIAL OF DUE PROCESS

(5)

30.    Upon SPD implementation, TDCJ officials retroactively applied this policy. Offenders who received an SPD code at this time were stripped of their jobs, removed from educational, vocational, and rehabilitational programs, then transferred to punitive custody housing assignments that were previously reserved for those found guilty of major rule violations.

31.    Plaintiffs were provided no due process. Plaintiffs were given no advance notice of new SPD policy, and were never informed that an SPD code had been placed upon them. Plaintiffs received no hearings, were afforded no opportunity to be heard, present evidence, or dispute the SPD's placement. Plaintiffs were provided no formal or informal justification for the SPD placed upon them.

32.    This calculated system-wide denial of due process encouraged a pattern of failures to enforce and/or adhere to policy definitions and guidelines by defendants that led directly to erroneous, retaliatory, and/or indefinite placement of SPD codes upon plaintiffs.

33.    Attachment C of the A.D. 04.11 provides clarified interpretations of each code's necessary criteria for placement and/or removal, and Section I (B) states, "UCC and central administrative staff shall strictly adhere to the definitions provided in this directive..." Defendants have willfully ignored this mandate and plaintiffs DeLeon, Prescilliano Martinez, and Gambill, among others, have/had erroneously placed SPD codes as a result of defendant's negligence.

34.    Plaintiff DeLeon was assaulted by an officer in January 2011. To cover the misconduct, plaintiff DeLeon was charged with staff assault. After investigators found that the charging officer was the aggressor, and was intoxicated on-duty during the assault, the officer was fired, and charges were dropped against plaintiff DeLeon. Plaintiff DeLeon was released in 2012, and upon return to TDCJ in 2016, he was placed in lock-up and told he had been given an SPD for the staff assault he was cleared of in 2011. He has remained in punitive confinement to the present day due to this erroneous/retaliatory code.

(6)

35.     Plaintiffs, upon becoming aware that SPD codes had been placed on them, in most cases months/years after the fact, contacted unit administration and classification staff. Plaintiffs who filed grievances disputing the placement of erroneous SPD codes were told that the grievable time period had expired and had their grievances dismissed unprocessed.

36.     Plaintiffs were advised by defendants Hastings, Stevens, Burson, Moore and other TDCJ officials that their SPD codes would be removed pursuant to section IV of the A.D. 04.11. This section provides criteria that upon the offender meeting, requires a particular result, namely that a hearing be afforded, and ultimately, that "SPD code shall be removed". Former TDCJ Executive Director Brad Livingston deemed the latter criteria "the ten year rule".

37.     Plaintiffs have repeatedly requested review hearings pursuant to section IV (A)(B)(C) of the A.D. 04.11 upon meeting necessary criteria, and defendants Burson, Hastings, Stevens, and Moore have denied their requests in violation of this policy. Plaintiffs are told they "must do ten years".

38.     Plaintiff Armenta's SPD incident is over 20 years old and pre-dates SPD policy. Plaintiff Armenta received his first SPD review hearing on 6-20-2020. He was approved by UCC to have his old code removed, then summarily denied by SPDRC. Plaintiff Armenta has had no major disciplinary in those 20 years.

39.     Plaintiffs Gambill, Holt, Reyna, Fowler, and Prescilliano Martinez served between 10 and 15 years of punitive confinement before receiving their first SPD review hearings. Plaintiffs DeLeon and Joseph Martinez have served 10 and 7 years respectively without any SPD review despite exceeding necessary criteria and submitting numerous requests to defendants Hastings and Stevens.

40.     Section VI(A) of the A.D. 04.11 clearly states that if an offender seeks to have an SPD removed, they can request a review by UCC once every 12 months. Defendants Burson, Moore, Hastings, and Stevens have deliberately failed to provide these hearings to plaintiffs. Defendants Hastings and Stevens have

also improperly recorded SPD hearing dates and/or line class promotion dates, which has deprived plaintiffs of their scheduled reviews by months/years, costing plaintiffs months/years of good time credits effecting their release dates.

41.    Defendants Hastings and Stevens issued erroneous dates that were off by ten years to Plaintiffs Gambill and Holt in 2019. Plaintiff Gambill submitted Step 1 and Step 2 grievances #2019069528 to correct the blantant error.

42.    When plaintiffs complete the extraordinary 10 year criteria and are finally provided a review hearing, the reviews are often cursory and meaningless. UCC members have shown bias and open hostility towards plaintiffs. In 2016, after a prompt denial by UCC members, plaintiff Reyna was told, "no matter how long you do, we'll never forget this." In 2017, plaintiff Reyna was told by then-Senior Warden of Wynne unit, Kelly Strong, "as long as I'm here, you will not get an SPD removal".

43.    Defendants Hastings and Stevens have failed to provide plaintiffs with UCC/SPDRC decisions and have failed to forward details and/or dates of those hearings to SCC pursuant to the A.D. 04.11. In May 2016, Warden B. Smith told plaintiff Gambill during his SPD review hearing that he had no authority to remove a SPD, and that Warden Strong "doesn't like them", therefore he would delay his decision until further notice. Plaintiff Gambill was kept in limbo for months. Plaintiff Gambill submitted grievances #2016169972 and #2016179514 requesting a formal decision. Neither grievance provided a formal UCC decision/response.

44.    Ultimately, a TDCJ Ombudsman investigation initiated by plaintiff Gambill's family revealed that defendant Stevens had failed to forward any UCC decision to SPDRC pursuant to policy. Plaintiff Gambill was ordered a new UCC hearing eight months later (TDCJ Ombudsman Office Inquiry No:02-9121-06).

45.    In January 2017, after securing the new hearing, defendant Stevens welcomed plaintiff Gambill to the UCC by stating, "This is the guy who went over our heads to Huntsville". Defendant Stevens immediately voted to deny plaintiff

plaintiff Gambill that they had been instructed by "higher-ups" to lock him up for "investigation".

49. Plaintiff Gambill spent 3 days in solitary confinement. He was never questioned or given a reason for his confinement. On the third day, then-Sgt. Schmidt came to suddenly release plaintiff Gambill, saying, "you must have pissed someone important off". Plaintiff Gambill asked his family to cease their outside efforts to redress the SPD issues for fear of further retaliation from defendants.

50. When plaintiffs have gained approval from favorable UCC committees to have old and/or erroneous SPD codes removed, those recommendations are sent to the SPDRC for final approval. The SPDRC committee in Region One include defendants Moore, Bryant, Burson, and Werner. Plaintiffs Gambill, Armenta, Holt, Reyna, Fowler, and Prescilliano Martinez have all been approved to have their SPD codes removed by various UCC committees. SPDRC defendants have arbitrarily overturned these unit recommendations repeatedly without any legitimate reason to do so.

51. In March 2021, after receiving a cursory denial, Plaintiff Fowler was told by Wynne unit Warden Coleman that Director Bryant told him that as long as he is Director his SPD will never come off, and that,"he will not sign off on those".

52. SPDRC and UCC committees have abused their discretion and have acted outside of their statutory authority. The A.D. 04.11 grants UCC/SPDRC defendants no authority to indefinitely restrict plaintiffs to punitive confinement using the guise of SPD codes. The SPDRC has provided plaintiffs no notice of their hearing, afforded plaintiff's no opportunity to be heard, and have given no explanation for their decisions to continue the punishment, or stated when it will end.

53. Plaintiffs have repeatedly brought these concerns to each of the defendants via I-60 request forms, personal letters, Ombudsman Inquiries, and grievances. Plaintiffs have relied on verbatim TDCJ policy to request compliance in order to have erroneous and/or out-dated SPD codes removed pursuant with the A.D. 04.11. Defendants have denied all plaintiffs' efforts and have failed to remedy the

(10)

wrongs. In response to inquiry or grievance, defendants have failed to justify their actions, providing only vague or ambiguous replies found nowhere in policy.

54.     Defendants have provided plaintiffs no adequate post-deprivation remedy. Unit Grievance Investigators delay and/or fail to investigate, or process plaintiffs legitimate concerns. Defendants have a direct conflict of interest in regard to their other duties. Defendant Moore is the final authority over all unit grievances and classification decisions. Defendant Bryant is the final authority over Step Two grievances and Region One classification decisions. Both defendants are central voting members of the SPDRC, and have the power and authority to effect the deprivations complained of here. Defendants Moore and Bryant have the authority to deny both steps of the grievances plaintiffs file challenging the very deprivations they are responsible for. Plaintiffs are left with no legitimate remedy to seek relief.

## "Atypical and Significant Hardships"

55.     Defendant's failure to provide due process protections and adhere to state law policy has caused plaintiffs irrepairable and grievous harm. The indefinite application of SPD codes by defendants represents a dramatic departure from the plaintiff's sentence and goes far beyond the original scope of policy-maker's intent. Defendant's actions show they have little intention of ever removing plaintiff's out-dated SPD codes or ending their punishment.

56.     TDCJ is required by state law to provide work, treatment opportunities, encouragement and training to those convicted and sentenced to prison. Their stated classification goals include providing offenders with opportunity for personal improvement, and incentive to make positive institutional adjustments. (See TDCJ Classification Plan)

57.     TDCJ is structured so that all offenders have a pathway to advance to minimum custody in order to take full advantage of education and job opportunities. Upon arrival to TDCJ, nearly every single offender is classified as

(11)

G1, G2, or G3. These are general population minimum custody classifications and make up approximately 85% of TDCJ's total offender housing. These offenders are afforded full access to all educational, vocational, rehabilitational, and religious programming, and are provided extensive job training and apprenticeship programs. These inmates have daily out-of-cell access of 18-19 hours per day.

58.     Plaintiffs, due entirely to their SPD codes, are restricted to punitive custody housing no lower than G-4 status. While plaintiffs Gambill and Fowler served 13½ and 10 years respectively in Ad-Seg due to their SPD codes, all named plaintiffs are currently housed on G-4 status at Wynne unit. Wynne unit has no administrative segregation housing. G-5 and G-4 status are its punitive custody housing blocks.

59.     Housing on G-4 represents a major change in the typical conditions of confinement compared to the ordinary incidents of prison life within TDCJ, and prior to the implementation of the SPD policy in 2003, was imposed only upon the finding that an offender had been guilty of recent major misconduct.

60.     Conditions on G-4 custody are significantly more restrictive than those experienced by the typical TDCJ offender. Plaintiffs on G-4 status are locked in cells 22-23 hours per day, and for the last year have received less than 60 minutes of recreation per week on average. G-4 plaintiffs are restricted from nearly all jobs, all educational, rehabilitational, vocational, and religious programming. G-4 is essentially a mini-segregation within a maximum security unit reserved for major rule violators.

61.     On the John M. Wynne unit, there are approximately 2,650 inmates. Approximately 85% of those inmates are housed on G1, G2, or G3 housing. Less than 1.8% of Wynne unit inmates are restricted to punitive housing due to SPD codes. Plaintiffs who have served over 10 years on SPD confinement represent an extraordinary 0.26% of the Wynne Unit population. No other individual or class of inmates is subjected to perpetual punishment or endlessly blocked from advancement

(12)

within the TDCJ like SPD plaintiffs have been by defendants.

62.    All other punitive custody inmates have been found guilty of major rule violations and afforded due process before their punitive placement. Plaintiffs were afforded no due process and in certain instances have never been charged of any misconduct. In most cases, plaintiff's SPD codes resulted from incidents occurring outside of TDCJ custody.

63.    Prior to SPD policy, no TDCJ inmate who displayed good conduct would stay on either G-5 or G-4 custody status for longer than 12 months. All TDCJ offenders no matter their custody are given promotional and class review hearings every 6 months, to include Ad-Seg inmates. Plaintiffs are forced by defendants to serve a conscience shocking 10 year minimum to receive a meaningful review hearing, which is 2,000% longer than every other TDCJ inmate. No other TDCJ inmates are subjected to similar indefinite terms of punitive confinement.

64.    TDCJ develops an Individualized Treatment Plan (ITP) for each offender upon arrival prioritizing program-based needs to comply with state law. Most of these programs are mandatory and offenders are required to participate to be considered for release on parole as defined by Texas Government Code § 508.152. Non-attendance can result in disciplinary action, loss of good time, or negative parole consideration (Page #10 of TDCJ Offender Orientation Handbook).

65.    The Texas Board of Pardons and Paroles relies heavily on a risk assessment matrix program that calculates "Total Risk Score". The higher an inmate's score, the more negatively it impacts an offender's chances for parole release. (Low Risk 0-5, Moderate 6-9, High 9-11, Highest 12+) The Parole Board's risk assessment tool penalizes inmates who have not completed educational or vocational programs, and factors in an inmate's current custody. The tool treats G4, G5, and Ad-Seg exactly the same, penalizing them with the highest score. Plaintiffs, by being restricted to punitive custody and denied access to needed programs, receive four extra points, which will move their scores up two full risk levels.

66.     Defendant's use of indefinite SPD punishment negatively impacts plaintiff's ability to complete essential ITP programs and virtually eliminates plaintiffs prospects for parole release. All plaintiffs have parole eligibility, but combined with defendants Hastings and Stevens failure to provide timely class and review hearings, which has resulted in lost good time and work time credits, plaintiffs have suffered irrepairable harm and have had the nature and length of their sentences substantially transformed and/or extended.

67.     The significant nature of plaintiff's circumstances are regularly noted in the credulity of veteran officer's comments, including defendants. Defendant Moore after arriving at Wynne unit told plaintiffs Joseph Martinez, Reyna, and Gambill that he had, "never saw guys so well-behaved treated so poorly".

### CRUEL and UNUSUAL PUNISHMENT

68.     Due solely to defendant's indefinite application of SPD codes, plaintiffs are forced to live on dangerous disciplinary housing wings among offenders known by defendants to have had recently displayed serious misconduct, which vastly increases plaintiffs risk of harm. Plaintiffs Prescilliano Martinez, Joseph Martinez, and Reyna have been assaulted and injured by inmates on G-4 status.

69.     Plaintiffs are double-celled, 22-23 hours per day, in cells measuring less than 55 square feet, under pandemic conditions, with often unstable and/or chronically ill offenders, placing plaintiffs in a heightened state of anxiety.

70.     In 2019, Plaintiff Joseph Martinez brought these concerns to defendant Moore on several occasions. Warden Moore acknowledged the elevated dangers SPD plaintiffs faced due to prolonged exposure to G-4 conditions, and took preventative action in January 2020 addressing these concerns. Warden Moore ordered all SPD classified inmates on G-4 separated and housed together pursuant to Texas Government Code § 501.112. This provided a measure of relief, but by year's end new officers and classification staff had undone this, placing plaintiffs back in riskier mixed housing with disciplinary status inmates.

71.    Defendants are aware of the increased number of violent assaults on
G-4 custody. Defendants know that lengthy placement on punitive housing wings
place plaintiff's lives in danger and exposes them to repeated lock-downs, chem-
ical agents, and/or other disciplinary measures. Defendant Moore has sanctioned
multiple punitive lock-downs upon G-4 due to elevated levels of misconduct. De-
fendant Moore has had to restore order himself on multiple occasions with his of-
ficers. Due to limited out-of-cell time and limited number of phones, there are
repeated fights over their use, including a November 2019 riot between differing
factions over control of G-4 phone use. Plaintiffs are forced to manuveur within
this dangerous environment year after year.

72.    Plaintiffs are continually harmed by the stigma associated with their
punitive housing status. Plaintiffs face heightened scrutiny by militarized staff
that subject them to confrontation, bogus write-ups, group punishments, targeted
harassment, and routine cell and strip searches. Severe understaffing and poor
training places plaintiffs at elevated risk of serious harm from staff and inmates.
Plaintiff Joseph Martinez has been assaulted twice and seriously injured in 2017
by inmates. Plaintiff DeLeon was attacked by a drunken, violent officer. Plain-
tiff Reyna was targeted and harassed with bogus searches and write-ups repeatedly.
Plaintiff Reyna's attorney wrote defendant Collier and Moore to address this.
Shortly after, one of the officers in question, Sgt. Schmidt, beat a handcuffed
offender to death during a use of force with other officers and was dismissed.

73.    After a ten day hunger strike on G-4, an investigation by Inspector
General agents in May 2018 revealed that Wynne unit officers were targeting G-4
inmates with lock-downs and "case-quotas", writing bogus infractions to lessen
the amount of inmates who could participate in already limited recreation. Plain-
tiffs were among those who received bogus write-ups and repeated lock-downs.

74.    Plaintiffs have been exposed to intolerable temperature extremes.
Windows on G-4 housing are broken out and ill-fitting, ventilation is poor, and

due to the stigma associated with punitive housing, maintenance officers ignore and/or are slow to fix the problems. Defendants Bryant and Moore issued an order restricting G-4 inmates from wearing their state-issued jackets beyond their housing areas. Plaintiffs suffered through record low temperatures and experienced physical pain and emotional distress due to defendants calculated indifference.

75.    Plaintiffs suffer repeated water outages, floods, broken pipes, clogged and/or overflowing toilets and sinks due to the century-old prison conditions and the historical indifference shown by defendants to repair the facilities. Plaintiffs routinely suffer full-cell flooding on G-4 housing exposing them to raw sewage and disease. These conditions pose real and imminent risk of serious harm to plaintiff's future health, and defendants are aware of the disrepair.

76.    Defendants Collier, Bryant, and Moore denied plaintiffs medical care. In April 2020, G-4 offenders were exposed to the covid virus by an officer. G-4 was locked down on April 2nd. Officers were issued full PPE. Offenders were provided nothing and instructed not to cover their faces. Officers were instructed not to speak to inmates about their exposure. Within one week, nearly all G-4 inmates, including plaintiffs Holt, Reyna, Gambill, Fowler, and Joseph Martinez were suffering from the virus. When plaintiffs told medical staff of their symptoms, they were told it was "allergies", knowing full well it was not. No sick call requests were answered and plaintiffs were provided no medication to ease their high fevers, or painful head and bone aches. Plaintiffs suffered through their sickness in double cells giving it to, or receiving the virus from their cellmates.

77.    On April 12, 2020, with most all G-4 inmates suffering from covid, offenders began shouting for medical assistance. Shift Sgt. S. Shinette came to the G-4 door and told the men to "shut that noise up". When sick inmates continued to request for help, Sgt. Shinette ordered the G-4 block's power to be cut off, and yelled, "I don't care if all of you (expletive) over here die". Plaintiffs were left in the dark for hours. Plaintiff Gambill wrote Warden Moore to notify him of

(16)

this, but received no reply. Plaintiff Gambill wrote Texas Inmate Families As-
sociation, who notified Texas State Representative James White of the incident.
Defendants Collier, Bryant, and Moore knew plaintiffs were severely ill and were
deliberately indifferent to their medical needs. Dozens of men died on Wynne unit
as a result of similar neglect, heightening the expectation of future harm.

78.    Plaintiffs have been subjected to these conditions 20-40 times longer
than all other inmates. Plaintiff Armenta and plaintiff Gambill have served over
19 years of punitive confinement solely due to out-dated SPD codes. Plaintiff
Holt has served over 18 years, with plaintiffs Reyna, Fowler, and Prescilliano
Martinez serving over 15 years of punitive confinement. Plaintiffs have received
no explanation as to what hidden criteria, or time limit they must meet.

79.    The totality of conditions combined with the indefinite punishment
that plaintiffs have been subjected to equates to administrative retaliation and
has detrimentally effected plaintiffs' physical, mental, and emotional healths.
Plaintiffs have been assaulted and injured by inmates and staff, have suffered
pain and trauma from extreme temperatures, and have lasting health damage due to
Covid sickness. Plaintiffs suffer lethargy, shortness of breath, joint pain, de-
pression, muscle atrophy, weight gain and/or loss, and a sense of hopelessness.
The absence of recreation, visitation, and other activities have added to plain-
tiffs physical and emotional deterioration. Plaintiffs have lost faith in TDCJ
officials to fulfill their duties or provide relief from current or future harm.

## DENIAL OF EQUAL PROTECTIONS

80.    Defendants, whom are Caucasian, have shown a pattern of discrimination
and bias that disproportionately effects minority plaintiffs by abusing the use of
SPD codes to indefinitely punish those they decide to single out or have animus
towards. Minority plaintiffs Armenta, DeLeon, Reyna, and P. Martinez have been
given SPD codes for incidents that many white inmates have done without SPD's being
given. Hispanic inmates make up about 30% of TDCJ, but approximately 70% of SPD in-

mates placed on punitive status and have been more likely to receive an SPD code
for marginal incidents than white inmates. Minority plaintiffs Armenta, Reyna,
DeLeon, and Prescilliano Martinez, despite exceeding all criteria necessary, are
disproportionately denied and given indefinite extensions by UCC/SPDRC defendants
without any rational basis for the dissimilar treatment.

81.     Minority plaintiff Mark Reyna in 2017, after having his UCC recom-
mendation for SPD removal overturned, asked, then-warden McClarin the reason for
SPDRC's actions, was told, "Because we've got enough of you Mexicans in general
population to deal with already."

82.     Plaintiffs are similarly situated to all other G-4 offenders in TDCJ.
Defendants afford all other G-4 inmates basic due process before assigning them to
punitive housing. Defendants have denied plaintiffs this and have singled out and
targeted plaintiffs arbitrarily for disparate treatment.

83.     In 2003, TDCJ retroactively placed SPD codes upon plaintiffs without
notice or hearing. In March 2020, Defendant Collier implemented a new class of
SPD codes. Front page notice was posted in TDCJ's prison newspaper "The Echo" of
the new SPD codes and the criteria necessary for their placement. TDCJ stated that
the new SPD codes would not be retroactively applied and that only after being
found guilty of the specific disciplinary would a new code be placed. Plaintiffs
received dissimilar treatment that resulted in decades of punishment. Many of-
fenders, including plaintiffs Gambill and Armenta would have never received an
SPD code had codes not been retroactively applied to them.

84.     Defendants Burson, Moore, Hastings, and Stevens provide all other G-4
inmates timely and meaningful review hearings every 3 to 6 months. G-4 inmates
have fixed terms of 6-12 months, with defendants routinely promoting these in-
mates in as little as 90 days of good behavior. All named defendants have denied
plaintiffs similar periodic reviews. Plaintiffs must serve ten years, and even
then, defendants routinely deny plaintiffs despite displaying exemplary long-term

conduct. There is no rational justification for the dissimilar treatment.

85.    When defendants approve all other G-4 inmates, their UCC approvals
are signed off on as a matter of course, and they are relocated to better hous-
ing within the same day. When plaintiffs are approved by UCC, they are left in
limbo for weeks/months, before learning their UCC approvals have been secretly
overturned without notice of any hearing date, or any explanation for the action
by SPDRC. Plaintiffs are the only inmates who receive secret hearings, to incl-
ude Ad-Seg offenders, who receive face-to-face SCC hearings.

86.    All other G-4 offenders serve fixed terms (betwenn 3-12 months of
good conduct) in punitive custody confinement, after which, they are promoted by
defendants. Plaintiffs are indefinitely confined to punitive housing due to the
extension of SPD codes, without which, all plaintiffs would be in general popu-
lation G3/G2 afforded all programs that typical offenders have access to due to
plaintiff's exemplary long-term conduct records. The Classification Plan directs
defendants to present a pathway to progress for all offenders. All other simi-
larly situated G-4 inmates can remove themselves from these harsh conditions by
complying with the rules. The plaintiffs are denied this same pathway to progress
by defendants indefinite application of these punitive codes, and have singled out
plaintiffs for unfair, disparate treatments without legitimate penological justi-
fication to do so.

87.    Plaintiff's SPD codes are the only SPD codes that place an offender
in indefinite punitive housing. Other SPD codes, such as Life without Parole
(LWOP), have special housing on G-3, which is a more secure level of minimum
custody general population for those with special security needs. They are af-
forded full access to jobs and unit programs. Defendants have no rational basis
for punishing SPD plaintiffs indefinitely when other SPD classified inmates are
not. Unless behavior warrants, no other SPD inmates are punitively confined.

88.    Defendants have denied plaintiffs Gambill, Holt, Fowler, and Armenta

from receiving religious beard approval due to their out-dated SPD codes, while granting religious beard approval to every other offender on the unit. Defendants have no penological justification for this discriminatory treatment.

89.    In other regions within TDCJ, as well as Region One, offenders with similar and/or worse incidents have had their SPD codes removed prior to, or at completion of ten years. Plaintiff Gambill's co-party received the same SPD code from the same 2002 event, and that co-party's SPD code was removed over eight years ago in another region within TDCJ. There is no penological justification for the dissimilar treatment.

90.    Defendants have been notified of these concerns for years and have deliberately failed to remedy the disparate treatment. Plaintiffs have been held to a different standard and have been intentionally targeted for harsh punitive treatment. This discrimination has no penological justification and the prolonged actions cause plaintiffs manifest harm.

VII.          CAUSE OF ACTION

91.    The actions of defendants Collier, Bryant, Burson, Werner, Moore, Has-tings, and Stevens in arbitrarily and impermissibly abusing their discretion by acting deliberately to impose atypical and significant hardships upon plaintiffs not in accordance with law or regulation, and unsupported by legitimate justifi-cation has denied plaintiffs their vested liberty interest right to be free from restraint and has denied plaintiffs due process of law in violation of the Fifth and Fourteenth Amendments of the United States Constitution.

92.    The actions of defendants Collier, Bryant, Burson, Werner, Moore, Has-tings, and Stevens to provide plaintiffs notice of SPD policy, notice of SPD placement upon them, notice of UCC/SPDRC hearings, and failure to provide timely and meaningful reviews with impartial, non-biased hearing officers, along with SPDRC defendants Bryant, Burson, Werner, and Moore's deliberate failure to pro-vide an opportunity to be heard, and/or present statements, failure to apply man-

(20)

dated criteria in determining SPD removal, and their failure to provide any jus-
tification for their actions have deliberately denied plaintiffs due process of
the law in violation of the Fourteenth Amendment of the United States Constitution.

93.     The actions of defendants Collier, Bryant, Burson, Werner, and Moore in
arbitrarily and capriciously instituting an unjust de facto policy of wanton pun-
ishment under the guise of indefinite SPD extension against plaintiffs violates
their rights to due process under the Fifth and Fourteenth Amendments of the
United States Constitution and constitutes cruel and unusual punishment in viola-
tion of the Eighth Amendment of the United States Constitution.

94.     The actions of defendants Collier, Bryant, and Moore in failing to
act on their knowledge of substantial risk of serious physical and psychologi-
cal harm to plaintiffs being indefinitely confined on violent punitive custody
housing status, watonly and unnecessarily inflicting pain and placing plaintiff's
lives in danger violates their right to be free from deliberate indifference to
their safety and constitutes cruel and unusual punishment in violation of the
Eighth Amendment of the United States Constitution.

95.     The failure of defendants Collier, Bryant, and Moore to provide plain-
tiffs safe housing, protection from temperature extremes, adequate medical treat-
ment, recreation, and functioning facilities constitutes deliberate indifference
to plaintiffs basic life necessities and is cruel and unusual punishment in vio-
lation of the Eighth Amendment of the United States Constitution.

96.     The willful failure of defendants Collier, Bryant, Burson, Werner,
Moore, Hastings, and Stevens to provide plaintiff's equal treatment by disparate-
ly denying plaintiffs simliar housing, timely and meaningful review, similar due
process safegaurds, promotional opportunities, access to needed ITP programs,
and other dissimilar treatment constitutes a pattern of discrimination against
plaintiffs and denies plaintiffs Equal Protections under the law in violation
of the Fourteenth Amendment of the United States Constitution.

(21)

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully pray that the court grant the following relief:

A.    Issue a declaratory judgment stating that:

1.    Defendants Collier, Bryant, Burson, Werner, Moore, Hastings, and Stevens' actions in arbitrarily denying plaintiffs' liberty interest to be free from restraint, and sustaining this infringement, violates, and continues to violate plaintiffs' rights under the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

2.    Defendants Collier, Bryant, Burson, Werner, Moore, Hastings, and Stevens' actions in failing to provide notice of hearings, notice of SPD placements, failure to provide timely, meaningful, and impartial hearings, failure to provide an opportunity to be heard, and failure to provide justification for denials, violates plaintiffs' rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution.

3.    Defendants Collier, Bryant, Burson, Werner, and Moore's actions in arbitrarily instituting, and sustaining a de facto policy of wanton punishment under the guise of indefinite SPD extensions violates plaintiffs rights under the Due Process Clause of the Fourteenth Amendment and the Eighth Amendment of the United States Constitution.

4.    Defendants Collier, Bryant, and Moore's actions in failing to act on their knowledge of substantial risk of serious physical and psychological abuse of plaintiffs violates, and continues to violate, plaintiffs' rights under the Eighth Amendment to the United States Constitution.

5.    Defendants Collier, Bryant, and Moore's actions in failing to provide safe, functioning housing conditions, in failing to provide protection from temperature extremes, and failing to provide adequate recreation and medical treatment violates plaintiffs' rights under the Eighth Amendment of the Uni-

(22)

ted States Constitution.

      6.   Defendants Collier, Bryant, Burson, Werner, Moore, Hastings, and Stevens' disparate actions in failing to provide plaintiffs similar treatment to what they have provided all other similarly situated individuals violates plaintiffs' rights under the Equal Protections Clause of the Fourteenth Amendment of the United States Constitution.

      7.   TDCJ's SPD policy, as currently practiced arbitrarily and capriciously throughout the institutional division, to be unconstitutional.

    B.   Issue injunctive relief ordering defendants Collier, Bryant, Burson, Werner, and Moore to:

      1.   Remove SPD codes from all plaintiffs who have:

         a)  SPD codes arising from incidents that pre-date SPD policy implementation.

         b)  erroneous and/or retaliatory SPD codes placed upon them.

         c)  completed 10 years from the date of incident.

         d)  been approved by UCC for SPD removal previously.

      2.   Immediately remove non-disciplinary status plaintiffs from mixed classification housing assignments with disciplinary status offenders.

      3.   Remove the 10 year punitive confinement provision from the A.D. 04.11 policy and afford plaintiffs a pathway to progress based on same conduct standards as all other TDCJ offenders. Provide I.T.P. mandated programs.

      4.   Provide plaintiffs immediate review hearings, and provide periodic review hearings every 6-12 months that are impartial and meaningful.

      5.   Disband the SPDRC committee.

    C.   Issue injunctive relief ordering defendants Collier, Bryant, and Moore to:

      1.   Provide religious beard approval to plaintiffs being so denied.

    D.   Issue injunctive relief ordering defendants Collier, Bryant, Burson,

Moore, Hastings, and Stevens to:

    1.   Immediately review and return any and all lost good time and/or work time credits to plaintiffs lost due to delayed and/or erroneous review dates.

    E.   Issue injunctive relief ordering defendants Collier, Bryant, and Moore to:

    1.   Take preventative measures to curb inmate and/or staff violence.

    2.   Repair broken and/or ill-fitting windows, ventilation systems, and repair pipes, toliets, sinks, drains, and electrical systems.

    3.   Provide access to adequate amounts of meaningful recreation.

    4.   Provide adequate medical treatment and/or prevention.

    5.   Rescind ban on wearing state-issued jackets.

    F.   Grant any other relief this Court may deem just and proper.

Trial by jury is hereby demanded on all claims alleged herein, and the parties are hereby given notice, pursuant to Fed. R. Civ. P. 38 (a)-(c).

Respectfully submitted this 18th day of _March_, 2021.

All plaintiffs currently reside:

John M. Wynne Unit

810 F.M. 2821

Huntsville, Tx. 77349

_Curtis Gambill_
Curtis Gambill # 805886

_Pete Armenta_
Pete Armenta, Jr. #2255553

_Jesse Holt_
Jesse Wade Holt #1362684

_M. R._
Mark Anthony Reyna #1213971

_Eddie Fowler_
Eddie Ray Fowler, Jr. #2231555

_Prescilliano Martinez_
Prescilliano Martinez #2323270

_Juan De Leon_
Juan Antonio De Leon #2060521

_Joseph M. Martinez_
Joseph Michael Martinez #1960242

VIII.        PLAINTIFFS' DECLARATION

Pursuant to 28 U.S.C. § 1746, I, Curtis Gambill, Pete Armenta, Jesse Holt, Mark Reyna, Eddie Fowler, Prescilliano Martinez, Juan De Leon, and Joesph Martinez, hereby declare under penalty of perjury under the laws of the United States of America, that I have read the foregoing and that all facts presented in this complaint and attachments thereto are true and correct to the best of my belief and knowledge.

Signed this __18th__ day of __March__, __2021__.

All plaintiffs currently reside:

John M. Wynne unit
810 F.M. 2821
Huntsville, Tx. 77349

Curtis Gambill # 805886

Pete Armenta, Jr. #2255553

Jesse Wade Holt #1362684

Mark Anthony Reyna #1213971

Eddie Ray Fowler, Jr. #2231555

Prescilliano Martinez #2323270

Juan Antonio De Leon #2060521

Joseph Michael Martinez #1960242

*Accept as Orgnl*



## Texas Department of Criminal Justice

# STEP 2    OFFENDER GRIEVANCE FORM

| OFFICE USE ONLY |
|---|
| Grievance #: 2020162989 |
| UGI Recd Date: SEP 23 2020 |
| HQ Recd Date: SEP 25 2020 |
| Date Due: 10-31 |
| Grievance Code: 209 |
| Investigator ID#: IJ725 |
| Extension Date: 12-10 |

FEB 11 2021

**Offender Name:** Curtis Gambill    **TDCJ #** 805886

**Unit:** Wynne    **Housing Assignment:** A1-04-03-T

**Unit where incident occurred:** Wynne Unit    A-1-1-04T

*You must attach the completed Step 1 Grievance that has been signed by the Warden for your Step 2 appeal to be accepted. You may not appeal to Step 2 with a Step 1 that has been returned unprocessed.*

**Give reason for appeal (Be Specific).** *I am dissatisfied with the response at Step 1 because...*

I am dissatisfied with Step 1's response because it failed to address the blatant violations of TDCJ policy, state statutory procedures, and the Due Process & Equal Protections Clauses of the U.S. Constitution. The response at Step 1 did not rely on any policy, **did not** provide any specific policy-based justification for the arbitrary and capricious extention of this out-dated SPD code. SPDRC committee did not give notice of their hearing. Did not provide any information as to their decision, gave no justification for their denial. All of which is a violation of current TDCJ policy and a direct enfringement of my Due Process rights. The Administrative Directive 04.11, which derives it's authority from the Texas Government Code § 494.002 (a) & 498.002, is the sole authority governing the application, maintenance, and removal procedures for Security Precaution Designator Codes. The A.D. 04.11 is very specific in it's application and states clearly "The UCC, and central administrative staff **shall strictly** adhere to the procedures set forth in this Directive". This Directive from front to back is chalked full of mandatory language. "It is basic canon of statutory construction that the word "shall" indicates mandatory intent and expresses author's intention that section should be strictly adhered to" U.S. v. Myers, 106 F.3d 936 (10th Cir. 1997) The definitions section of this Directive indicate the SPD codes over 10 years from date of incident "shall" be removed. In Section IV (E) (The Removal Procedures Section), states "If UCC votes to remove the SPD during annual review, the process described in Section IV.C 1-3 of this Directive shall be followed." This **did not** occur. In Section IV.C, it states "if it has been more than 10 years since incident.. SPD **shall** be removed.." Section IV.C (2) states how code over ten years should be down graded and coded. The Executive Director states in this Directive that this is the "ten year rule". I was approved by U.C.C. and unit warden for the removal of a nearly 19 year old SPD code, due to my long term good disciplinary conduct and the length of time since event. Arbitrary extension of this old code, after meeting and exceeding all criteria for policy rooted downgrade is a violation of state and federal liberty interests and a due process violation. Established rules cannot be arbitarily deviated from, or overlooked. The harm caused by the indefinite extension of this SPD causes manifest injustice and is totally without penological justification. Having the Unit overridden, which has become the norm for all SPD classified inmates in Region 1,

I-128 Front (Revised 11-2010)    **YOUR SIGNATURE IS REQUIRED ON BACK OF THIS FORM**    (OVER)

Appendix G

Curtis Gambill  805886
810 F.M. 2821
Huntsville, Tx.    77349



United States Courts
Southern District of Texas
F I L E D

MAR 3 0 2021

Nathan Ochsner, Clerk of Court