IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **CURTIS ALLEN GAMBILL, et al.,** | § | |
| | § | |
| | § | |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | |
| | § | **Civil Action No. 4:21-cv-01076** |
| **BRYAN COLLIER,** *et al.*, | § | |
| | § | |
| *Defendants.* | § | |

---

**DEFENDANTS MOTION TO DISMISS PLAINTIFFS' COMPLAINT PURSUANT TO
FEDERAL RULES OF CIVIL PROCEDURE 12(b)(1) & 12(b)(6)**

---

Defendants Bryan Collier, Stephen Bryant, Tara Burson, John Werner, Rodger Bowers,[1]

Ashley Hastings, and Virginia Stevens file this motion to dismiss pursuant to Rule 12(b)(1) & 12(b)(6)

of the Federal Rules of Civil Procedure in response to Plaintiffs' Complaint [ECF No. 1] and more

definite statements. ECF Nos. 47, 48, 49, 50, 51, 52, 53.

### I.        Statement of Facts

Plaintiffs Curtis Gambill, Jesse Holt, Mark Reyna, Eddie Fowler, Prescilliano Martinez, and

Juan DeLeon are inmates in the custody of the Texas Department of Criminal Justice (TDCJ) Wynne

Unit. Plaintiffs, proceeding pro se and in forma pauperis, sue several TDCJ officials in their official

capacity seeking declaratory and injunctive relief under 42 U.S.C. § 1983. *See* ECF Nos. 1, 47, 48, 49,

50, 51, 52, 53. Plaintiffs allege generally that the Defendants have violated their due process rights by

failing to afford them with a hearing before placing a "Security Precaution Designator" (SPD) code,

---

[1] Plaintiffs originally sued Rocky Moore, the former warden of the Wynne Unit. Defendants now automatically
substitute Rodger Bowers, the current warden of the Wynne Unit. See Fed. R. Civ. P. 25(d).

causing them to remain in restrictive housing. *Id.* Plaintiffs also allege that they were not afforded equal protection because other inmates with SPD codes were treated differently. *Id.*

   a. **SPD Placement, Review, and Removal**

The SPD Codes were implemented in 2003 and are governed by Administrative Directive 04.11 (AD 04.11). ECF No. 1 at 5. The policy dictates that an SPD shall be placed in the record of an inmate sentenced to life without parole or found to have engaged in escape, taking a hostage, staff assault resulting in serious injury, or defeating restraint devices. ECF No. 48 at 22. The SPD placement can be recommended by a sociologist, an intake interviewer, the Unit Classification Committee (UCC), or central administration staff. *Id.* The warden or designee has the authority to place an SPD in an inmate's record, housing area, or on the inmate's cell door at any time he determines a security risk exists. *Id.* If the warden authorizes the SPD, then the SPD shall be reviewed at the next UCC hearing. *Id.* at 23.

Removal of the SPD by the Security Precaution Designator Review Committee (SPDRC)[2] may occur if it meets the criteria outlined in AD 04.11. *See* ECF No. 48 at 24–25. The UCC makes the initial recommendation for SPD removal, which is then forwarded to the SPDRC for review. *Id.* at 25. If it has been more than 10 years since the incident that caused the placement of the SPD (ES, HS, and SA only) and the inmate is no longer considered an immediate security risk, the SPD shall be removed unless extraordinary circumstances exist. *Id.* The AD 04.11 policy provides that an inmate can request a review of the SPD by the Unit Classification Committee (UCC) once every 12 months. *Id.* If an inmate disagrees with the results of the UCC hearing, he may seek relief through grievance procedures. *Id.* at 27.

---

[2] Committee comprised of the Regional Director, Warden, and the Chairman of Classification and Records. ECF No. 48 at 21.

### b.  Factual Allegations

Plaintiffs allege that after they received the SPD code in 2003, they were placed in restrictive housing with no hearing or way to dispute the SPD placement on their classification file. ECF No. 1 at 6. Because of their SPD codes, Plaintiffs are all classified as "G-4" inmates. ECF No. 1 at 12. Conditions in G-4 custody are "significantly more restrictive than those experienced by the typical TDCJ offender." *Id.* Because of their G-4 status, Plaintiffs are locked in cells 22–23 hours per day and for the last year have received less than 60 minutes of recreation time per week on average. *Id.* Plaintiffs claim that they are restricted from "nearly all jobs, all educational, rehabilitational, vocational, and religious programming." *Id.*

Due to the custody classification and the inability for Plaintiffs to take classes, Plaintiffs contend that they are "penalized with the highest score" in the "risk assessment matrix program" used by the Texas Board of Pardons and Paroles to calculate "Total Risk Score." ECF No. 1 at 13. Specifically, by being restricted to "punitive custody and denied access to needed programs," Plaintiffs "receive four extra points," which move their scores up "two full risk levels," which results in "lost good time and work time credits." *Id.* at 13–14.

Additionally, Plaintiffs allege generally that being G-4 custody causes them to be exposed to an increased number of violent assaults, repeated lock-downs, and chemical agents. ECF No. 1 at 15. They complain globally about the conditions of confinement in restrictive housing, stating that G-4 offenders at one point were not allowed to wear their state-issued jackets beyond their housing areas, they receive inadequate medical treatment, and they were prevented from getting a religious beard approval. ECF No. 1 at 16, 17, 20.

### c.  Causes of Action

Plaintiffs sue Bryan Collier, the Executive Director of TDCJ, Stephen Bryant, the Regional Director of Region I, Tara Burson, the Chairperson of Central Classification and Records, Rodger

Bowers, the Senior Warden of the Wynne Unit, Ashley Hastings, the Chief of Unit Classification, and Virginia Stevens, the Classification Manager at the Wynne Unit. ECF No. 1 at 3–4. According to Plaintiffs, Defendants Hastings and Stevens serve on the UCC, and the SPDRC is made up on Defendants Bryant, Burson, Werner, and Bowers. *Id.* This motion presumes Defendants are sued solely in their official capacities because Defendants are sued for injunctive and declaratory relief for their actions in their official governmental roles.[3]

Plaintiffs claim that Defendants Collier, Bryant, Burson, Werner, Bowers, Hastings, and Stevens denied them due process for failing to provide Plaintiffs notice of the SPD policy and its placement on them, notice of the hearings, and meaningful reviews with the opportunity to be heard. ECF No. 1 at 20. Plaintiffs claim that Collier, Bryant, Burson, Werner, and Bowers instituted an unconstitutional policy because it results in a violation of their due process rights. *Id.* at 21. Plaintiffs bring a deliberate indifference claim against Collier, Bryant, and Bowers for their long-term placement in restrictive housing and the cruel and unusual conditions of their confinement. *Id.* Finally, Plaintiffs bring an equal protection claim against Collier, Bryant, Burson, Werner, Bowers, Hastings, and Stevens because the SPD codes disproportionally effect minority inmates and because other G-4 inmates receive meaningful review hearings every 3 to 6 months. *Id.* at 17–19.

### d. Requested Relief

Plaintiffs are only seeking declaratory and injunctive relief. ECF No. 1 at 1. Plaintiffs seek a declaratory judgment stating that Defendants violated their due process, equal protection, and Eighth Amendment rights and that the SPD policy is unconstitutional. ECF No. 1 at 22–23. Plaintiffs seek injunctive relief against Collier, Bryant, Burson, Werner, and Bowers to remove SPD codes, change

---

[3] The doctrine of *Ex parte Young* is an exception to the general prohibition of the Eleventh Amendment, which allows suits for prospective injunctive or declaratory relief against state officials in their official capacity. *See Verizon Md. Inc. v. PSC,* 535 U.S. 635, 645 (2002) (holding that the *Ex parte Young* exception applied to the Eleventh Amendment bar for claims for injunctive relief against defendants in their official capacities); *Ex parte Young,* 209 U.S. 123 (1908).

their housing classification, change the SPD policy, provide Plaintiffs with immediate review hearings, and disband the SPDRC Committee. *Id.* at 23. Plaintiffs also seek injunctive relief against Collier, Bryant, and Bowers to provide religious beard approval; against all Defendants to immediately review and return any lost good time credits; and against Collier, Bryant, and Bowers to take preventative measures to curb prison violence, repair broken windows and other broken items in the housing areas, provide access to recreation and adequate medical care, and rescind ban on wearing state issued jackets. *Id.* at 23–24.

## II.   Standard of Review

When evaluating a motion to dismiss under Rule 12(b)(6), the complaint must be liberally construed in favor of the plaintiff and all facts pleaded therein must be taken as true. *Leatherman v. Tarrant Cnty Narcotics Intel. & Coordination Unit*, 507 U.S. 163, 164 (1993); *Baker v. Putnal*, 75 F.3d 190, 196 (5th Cir. 1996). A complaint must nevertheless contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Bell Atlantic v. Twombly*, 550 U.S. 554, 570 (2007). This plausibility standard is not simply a "probability requirement," but imposes a standard higher than "a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). The standard is properly guided by "[t]wo working principles." *Id.* First, although "a court must accept as true all of the allegations contained in the complaint," that tenet "is inapplicable to legal conclusions" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements do not suffice." *Id.* at 667–78. Second, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. In considering a motion to dismiss, therefore, the court must initially identify pleadings that are no more than legal conclusions not entitled to the assumption of truth, then assume the veracity of well-pleaded factual allegations to determine

whether those allegations plausibly give rise to any right to relief. If not, "the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* (internal quotations omitted).

### III.    Arguments and Authority

**A.    Plaintiffs fail to state a claim for violation of due process**

In *Sandin v. Conner*, 515 U.S. 472, 481–83 (1995), the United States Supreme Court held that analysis of a prisoner's due process claim relating to his placement in lockdown or other denial of prison privileges begins with determining whether a constitutionally protected liberty interest exists. "Liberty interests protected by the Fourteenth Amendment may arise from two sources--the Due Process Clause itself and the laws of the States." *Hewitt v. Helms*, 459 U.S. 460, 466 (1983). In *Sandin*, the Supreme Court recognized that, although the States may create liberty interests, "these interests will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 484 (citations omitted). Thus, in *Sandin*, when a prisoner was placed in disciplinary segregation for 30 days and the placement did not inevitably affect the duration of his sentence, the Court held that due process does *not* require that a prisoner be afforded the procedural mechanisms previously prescribed in *Wolff v. McDonnell*, 418 U.S. 539 (1974), and *Hewitt*, 459 U.S. at 460.

"[T]he Due Process Clause does not protect every change in conditions of confinement which has a substantial adverse effect upon a prisoner." *Madison v. Parker*, 104 F.3d 765, 767 (5th Cir. 1997). "Prisoners held in lawful confinement have their liberty curtailed by definition, so the procedural protections to which they are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson v. Austin*, 545 U.S. 209, 225 (2005) (citations omitted). The Fifth Circuit in *Madison* held that a prisoner's 30-day commissary and cell restrictions imposed as punishment for disciplinary violations were "merely changes in the conditions of his confinement and do not implicate due process concerns." *Madison*, 104 F.3d at 768; *accord Hernandez*

*v. Velasquez*, 522 F.3d 556, 563 (5th Cir. 2008); *Dixon v. Hastings*, 117 Fed. Appx. 371, 2005 WL 17382, at *1 (5th Cir. 2005); *Malchi v. Thaler*, 211 F.3d 953, 957-58 (5th Cir. 2000). In *Hernandez* and *Madison*, the Fifth Circuit held that such restrictions do *not* represent the type of atypical, significant deprivation in which a state might create a liberty interest. *Hernandez*, 522 F.3d at 563; *Madison*, 104 F.3d at 768.

Examples of prison hardships that *would* qualify as so atypical and significant as to implicate due process considerations include unwanted administration of anti-psychotic drugs, involuntary commitment to a mental hospital and extension of the prisoner's sentence for his underlying criminal conviction. *Sandin*, 515 U.S. at 484. In addition, the Supreme Court recently held that solitary confinement in a "Supermax" facility imposes an atypical and significant hardship that creates a liberty interest in avoiding such a placement when all of the following factors <u>are taken together</u>: almost all human contact, including cell to cell conversation, is prohibited; the light is on for 24 hours per day; exercise is for 1 hour per day, but only in a small indoor room; the placement is indefinite and is reviewed just annually; *and* placement disqualifies an otherwise eligible inmate from parole consideration. *Wilkinson*, 545 U.S. at 223–24.

Here, Plaintiffs make a global allegation of the "general conditions" of the G-4 housing area as being "in a constant state of disrepair," where they have limited recreation and access to programs. ECF No. 48 at 10–11; *see generally*, ECF Nos. 1, 47, 48, 49, 50, 51, 52, 53. Of the Plaintiffs, only DeLeon, Fowler, and Reyna are eligible for parole consideration at this time.[4] As such, Gambill, Martinez, and Holt have not experienced any injury as to their parole eligibility. Plaintiffs' allegations regarding broken windows, cell flooding, loss of recreation, exposure to smoke from other inmates setting fires, etc., without any "atypical, significant deprivation" that might rise to the level of constitutionals concerns, such as loss of good time credits, is not enough to implicate a liberty interest

---

[4] TDCJ inmate information details are publicly available here: https://inmate.tdcj.texas.gov/InmateSearch/start.action.

under the Due Process Clause. *See Hernandez*, 522 F.3d at 563 (distinguishing the "extreme conditions" described in *Wilkinson* and holding that non-disciplinary "confinement to a shared cell for twelve months with permission to leave only for showers, medical appointments and family visits . . . is by no means an atypical prison experience"); *Dixon*, 117 Fed. Appx. 371, 2005 WL 17382, at *1 ("loss of commissary privileges, cell restriction, placement in administrative segregation, and extended work schedule were not atypical punishments requiring due process protections"); *Payne v. Dretke*, 80 Fed. Appx. 314, 2003 WL 22367564, at *1 (5th Cir. 2003) ("commissary and recreation restrictions [as disciplinary punishment] . . . do not implicate a liberty interest under the Due Process Clause").

Even if Plaintiffs could establish that restrictive housing deprives them of a liberty interest, they cannot show that the due process protections in place are constitutionally inadequate. "Because the requirements of due process are 'flexible and cal[l] for such procedural protections as the particular situation demands,'" the Supreme Court has "generally declined to establish rigid rules and instead [has] embraced a framework to evaluate the sufficiency of particular procedures." *Wilkinson*, 545 U.S. at 224 (quoting *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972)). This framework, first set forth in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), considers three factors when analyzing what process is due:

> First, the private interest that will be affected by the official action; second, the risk of erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Wilkinson*, 545 U.S. at 224-25 (quoting *Mathews*, 424 U.S. at 335).

**1. What Process is Due**

The first *Mathews* factor, the private interest affected by the official action, is to be evaluated "within the context of the prison system and its attendant curtailment of liberties" because "the

procedural protections to which [prisoners] are entitled are more limited than in cases where the right at stake is the right to be free from confinement at all." *Wilkinson*, 545 U.S. at 225. In this case, Plaintiffs make general allegations about how housing as a G-4 inmate requires them to be "double-celled", causes "increased danger of serious harm" because the inmates on that wing are "violent and disruptive," the cells flood and the inmates are exposed to high temperatures. This leads to the Plaintiffs "gaining weight, losing muscle, and feeling depressed." *See, e.g.*, ECF No. 52 at 7. Defendants contend that these types of conditions are typical of prison.[5] Nevertheless, assuming these descriptions are enough to show a "significant private interest in leaving the restrictive conditions," the second and third factors weigh in favor of the Defendants. *See Striz v. Collier*, 2020 U.S. Dist. LEXIS 246060, at 22 (citing *Incumaa v. Stirling*, 791 F.3d 517, 533-34 (4th Cir. 2015)).

### 2. Risk of Erroneous Deprivation and Value of Additional or Different Procedures

"The second factor addresses the risk of an erroneous placement under the procedures in place, and the probable value, if any, of additional or alternative procedural safeguards." *Wilkinson*, 545 U.S. at 225. In *Wilkinson*, the Supreme Court observed that notice of the factual basis for the government's decision and a "fair opportunity for rebuttal" are "among the most important procedural mechanisms for purposes of avoiding erroneous deprivations." *Id.* at 226.

---

[5] Plaintiff Reyna alleges that he "lost good time and work time credits, which alters the nature and potential length of [his] sentence substantially." ECF No. 47 at 6. Plaintiff Fowler alleges that he was "prevented from earning five extra days of good time credits per month…" which "changed his short way discharge date by about 20 months." ECF No. 50 at 2–3. To the extent that Plaintiffs allege their good time was actually revoked and are seeking the restoration of their good time, that is not a valid §1983 claim, and should be brought as a habeas corpus claim. *See Caldwell v. Line*, 679 F.2d 494, 496 (5th Cir. 1982) ("When a state prisoner attacks the fact or length of his confinement, the appropriate cause of action is a petition for habeas corpus, even though the facts of the complaint might otherwise be sufficient to state a claim under section 1983.") To the extent Plaintiffs are complaining about the ability or opportunity to earn good time, that is not a liberty interest. *See Hester v. Mamukuyomi*, 750 F. App'x 275, 277 (5th Cir. 2018) (unpublished) ("Likewise, the reduction in Hester's classification status and the potential impact on his good-time credit earning ability are not protected by the Due Process Clause.") (emphasis added); *Luken v. Scott*, 71 F.3d 192, 193 (5th Cir. 1995) ("Rather, Luken contends that the *mere opportunity* to earn good-time credits constitutes a constitutionally cognizable liberty interest sufficient to trigger the protection of the Due Process Clause. We disagree.").

The *Wilkinson* Court, after finding a protectable liberty interest, held that the procedures for placement of inmates at an Ohio supermax prison were constitutionally adequate. *See id.* at 224–30. Under the procedures at issue in that case, inmates received notice of the factual basis leading to consideration for placement in the maximum-security prison, had a fair opportunity for rebuttal, enjoyed multiple levels of review with overturn authority at each level, and received a placement review within thirty days of the initial assignment to the supermax facility. *See id.* at 225–29. Although the *Wilkinson* Court found that these procedures satisfied due process, it stressed that "[w]here[,] [as here,] the inquiry draws more on the experience of prison administrators, and where the State's interest implicates the safety of other inmates and prison personnel, the informal, non-adversary procedures set forth in *Greenholtz*, 442 U.S. 1 (1979), and *Hewitt v. Helms*, 459 U.S. 460 (1983), provide the appropriate model." *Id.* at 228–29. In both *Greenholtz* and *Hewitt*, due process was satisfied when an inmate received notice of the charges, an opportunity to be heard, and notice of any adverse decision. *See id.* at 229.

Although Plaintiffs assert that they have not received hearings, several of their own more definite statements contradict that assertion. Plaintiff Martinez received his UCC hearing in November 2020 (when he arrived back at TDCJ for another conviction), and again in November 2021. ECF No. 52 at 3–4. Martinez simply challenges the decision that was made in keeping his SPD code. *Id.* at 4.

Plaintiff Reyna was demoted to G-4 in December of 2019 due to his old SPD code being retained. ECF No. 47 at 3. Reyna attended the UCC hearing in March 2021. *Id.* at 4, 21–24. Reyna filed a grievance seeking for the SPD to be removed or downgraded and received responses from TDCJ officials explaining the process ("According to AD-04.11 and the Classification Plan the Special Designator Code Review Committee (SPDRC) has the authority to remove or retain a Special Designator (SPD) Code. If at such a time they cannot reach a unanimous decision the CID Deputy

Director will be the deciding factor.") and stating that Reyna's next hearing will be on March 17, 2022. *Id.*

Plaintiff Gambill received his UCC hearing in January 2012, 2013, 2014, 2015, 2016, 2017, 2018, 2019 (absentia), 2020, 2021 (absentia). ECF No. 48.

Plaintiff DeLeon received his UCC hearing in March 2021, at which he "was able to speak and explain what happened." ECF No. 51 at 4.

The record supports that the policies and procedures that TDCJ has in place provide due process for review of SPD codes by providing review hearings and several levels of review (from UCC to SPDRC to CID Deputy Director). *See* ECF No. 47 at 24; *see also Striz v. Collier*, No. 3:18-cv-202, 2020 U.S. Dist. LEXIS 246060 (S.D. Tex. Nov. 24, 2020) (finding that the policies and procedures regarding placement, retention, and removal of SPD codes at TDCJ are constitutionally adequate). The decisions of the review committees are explained in the codes themselves. ECF No. 48 at 19–31. At least for Plaintiffs Martinez, Reyna, Gambill, and DeLeon, who disagree with the retainment of their SPD codes but were afforded their hearings and given notice of the adverse decisions, their claims should be dismissed because they were given due process.

### 3. Government's Interest

The third *Mathews* factor also weighs against Plaintiffs. In the context of prison management, the government's interest in avoiding the burdens of additional procedural requirements is a "dominant consideration." *Wilkinson*, 545 U.S. at 225 (explaining that a state's "first obligation must be to ensure the safety of guards and prison personnel, the public, and the prisoners themselves") (citation omitted). The state has a significant interest in managing its prison facilities, maintaining order among its personnel and inmates, and preserving scarce resources. And a court "must give substantial deference to prison management decisions before mandating additional expenditures for elaborate procedural safeguards . . . ." *Id.* at 227-28.

The court in *Striz* found this factor especially relevant when considering the SPD codes because the reason behind the SPD codes is directly related to prison safety. *Striz*, 2020 U.S. Dist. LEXIS 246060, at 29–30. "It is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status.'" *Wilkerson v. Maggio*, 703 F.2d 909, 911 (5th Cir. 1983) (quoting *McGruder v. Phelps*, 608 F.2d 1023, 1026 (5th Cir. 1979)). "[C]ourts are ill equipped to deal with the increasingly urgent problems of prison administration and reform." *Procunier v. Martinez*, 416 U.S. 396, 405 (1974). Where a state penal system is involved, federal courts have "additional reason to accord deference to the appropriate prison authorities." *Turner v. Safley*, 482 U.S. 78, 85 (1987) (citing *Procunier*, 416 U.S. at 405).

A quick search of Plaintiffs' criminal records on the TDCJ website (available to the public) show the underlying cause for each Plaintiffs' SPD code. Plaintiff Fowler received a charge of escape from a city jail and was previously confirmed as a member of a security threat group. ECF No. 50 at 1–2. In addition to the conviction for escape, he was also convicted of possession of a firearm and implements for escape, along with several convictions for possession of controlled substances and an obstruction/retaliation charge (2018). Tex. Dept. Crim. Justice, *Inmate Information Details*, inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=05378735. Fowler's parole review information indicates that he was denied parole because his record indicates that he "has repeatedly committed criminal episodes that indicate a predisposition to commit criminal acts upon release" and for violating his parole. Tex. Dept. Crim. Justice, *Parole Review Information*, inmate.tdcj.texas.gov/InmateSearch/reviewDetail.action?sid=05378735&tdcj=02231555&fullName=FOWLER%2CEDDIE+RAY+JR.

Plaintiff Holt was charged with attempted escape from a county jail and convicted of aggravated assault on a police officer. ECF No. 49 at 2. Holt has a history of evading arrest and three total charges of assault on a public servant or public officer. Tex. Dept. Crim. Justice, *Inmate Information*

*Details*, https://inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=04171418. His last charge was possession of a controlled substance in 2017. *Id.* Holt is not eligible for parole until April 14, 2027. *Id.*

Plaintiff Reyna was charged with escape and aggravated assault on public servant in addition to his many robbery and burglary charges. ECF No. 47 at 1–2. Tex. Dept. Crim. Justice, *Inmate Information Details*, https://inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=05497852. Reyna is currently serving a life sentence and his parole was denied in 2017 for his repeated criminal history, the instant offense has elements of brutality, violence, and assaultive behavior, etc., such that he poses a continuing threat to public safety, and he has an unsatisfactory institutional adjustment. Tex. Dept. Crim. Justice, *Parole Review Information*, https://inmate.tdcj.texas.gov/InmateSearch/reviewDetail.action?sid=05497852&tdcj=01213971&fullName=REYNA%2CMARK+ANTHONY.

Plaintiff Martinez was charged with assault on a public servant while in county jail in 2005. ECF No. 52 at 2; Tex. Dept. Crim. Justice, *Inmate Information Details*, inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=05793668. Additionally, Martinez has 2 charges of burglary of habitation, 4 charges of possession of a controlled substance (one in 2019), and a charge of evading arrest with motor vehicle. *Id.* Martinez is not eligible for parole until October 6, 2022. *Id.*

Plaintiff Gambill is serving two life sentences for murder and conspiracy to commit capital murder. Tex. Dept. Crim. Justice, *Inmate Information Details*, inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=05746545. He is not eligible for parole until October 31, 2026. *Id.* Gambill has an "escape" code as a result of an "incident" that occurred while at county jail in 2002. ECF No. 48 at 2.

Plaintiff DeLeon has 4 charges of aggravated assault in addition to one burglary of a habitation and one deadly conduct charge. Tex. Dept. Crim. Justice, *Inmate Information Details*, https://inmate.tdcj.texas.gov/InmateSearch/viewDetail.action?sid=06978452. In 2011, he was involved in a staff assault, which he contends is not his fault. ECF No. 51 at 2. DeLeon was released from TDCJ in 2012. *Id.* He returned to TDCJ on an aggravated assault charge in 2016. *Id.* DeLeon was denied parole in 2021 due to his repeated criminal history and the nature of his offenses containing elements of brutality, violence, assaultive behavior, etc., such that he poses a continuing threat to public safety. Tex. Dept. Crim. Justice, *Parole Review Information*, https://inmate.tdcj.texas.gov/InmateSearch/reviewDetail.action?sid=06978452&tdcj=02060521&fullName=DELEON%2CJUAN+ANTONIO.

In assessing the *Mathews* factors, the process afforded the Plaintiffs regarding their SPD codes is constitutionally adequate. They are given review hearings where they can attend and present their own side, the decision to retain or remove the SPD goes through several different committees and officials, and the Plaintiffs know the basis for their SPDs as laid out in their complaints and the reasons given above. When analyzing these factors in the context of the SPD code and continuing restrictive housing, the court in *Striz* emphasized that "the government's interest in ensuring the safety of guards and prison personnel, the public, and the prisoners themselves is especially weighty here, and Striz has not shown that any private interest of his tips the balance." *Striz,* 2020 LEXIS 246060, at 30–31. The same is true here; the Plaintiffs have failed to establish that the Defendants violated their due process rights.

## B.    Plaintiffs fail to state a claim for equal protection

Plaintiffs assert that Defendants have violated their rights to equal protection. In their complaint, Plaintiffs DeLeon, Reyna, and Martinez make the global assertion that because they are "minorities," they are given SPD codes for incidents for which many white inmates were not given

SPD codes. ECF No. 1 at 17–18. However, in DeLeon's more definite statement, alleges that he is similarly situated to other G4 inmates who get "timely and meaningful review hearings," and states nothing about his race or names any other inmates outside his race who have committed the same crimes and did not get an SPD code. *See* ECF No. 51 at 8–9. In addition to alleging that other G4 inmates get timely and meaningful review hearings, Martinez asserts in his more definite statement that SPD codes disproportionately effect minorities because there are 11 inmates at the Wynne Unit G4 that have retained SPD codes beyond 10 years and 8 of them are minorities. ECF No. 52 at 8. Similarly, Reyna asserts that he is treated differently than other similarly situated G4 inmates because they are afforded due process. ECF No. 47 at 9. He also asserts that he was told by Assistant Warden McClarin (who is not a named Defendant and who originally approved the removal of his SPD code) that the reason the SPDRC overturned the UCC's decision in removing his SPD code was because "we've got enough of you Mexicans in population to deal with already, I guess." *Id.* Plaintiffs Holt, Gambill, and Fowler essentially allege that they have been treated differently than other inmates. ECF No. 48 at 12–14; 50 at 9–10; 49 at 8–9.

"The Equal Protection Clause of the Fourteenth Amendment is 'essentially a direction that all persons similarly situated should be treated alike.'" *Wood v. Collier*, 836 F.3d 534, 538 (5th Cir. 2016) (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)). Here, Plaintiffs' claims asserting they are treated differently than other G4 inmates does implicate that they are members of a protected class; rather, they claim that they were singled out. "An equal protection claim that is premised on differential treatment but not based on membership in a suspect class or the infringement of a fundamental right may be cognizable as a so-called 'class of one.'" *Id.* at 539 (citing *Village of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000)). To maintain a "class of one" equal-protection claim, a plaintiff must show that (1) he has been intentionally treated differently from others similarly situated, and (2) there is no rational basis for the difference in treatment. *Integrity Collison Ctr. v. City of Fulshear*,

837 F.3d 581, 586 (5th Cir. 2016) (citing *Olech*, 528 U.S. at 564). "Under rational basis review, differential treatment must be upheld against [an] equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification." *Wood*, 836 F.3d at 539 (quoting *Hines v. Alldredge*, 783 F.3d 197, 202-03 (5th Cir. 2015)).

However, Plaintiffs do not allege that the comparators share his criminal history, convictions for crimes with similar degrees of violence, their institutional record, their mental and physical condition, their age, or their perceived risk of escape or propensity for violence. Merely asserting that an inmate is similarly situated because he is also a G4 inmate that may have had a similar incident for which they received an SPD code, without more, does not meet a plaintiff's burden of showing that he is similarly situated to other inmates. *See Striz*, 2020 LEXIS 246060, at 33 (citing, *e.g., Stevenson v. La. Bd. of Parole*, 265 F.3d 1060, 2001 WL 872887, at *1 (5th Cir. 2001) (per curiam); *Farr v. Rodriguez*, 255 F. App'x 925, 926-27 (5th Cir. 2007) (per curiam)).

Moreover, any disparity in treatment between Plaintiffs and the other G4 inmates does not violate their right to equal protection so long as it rationally furthers a legitimate state interest. Safety and institutional security are legitimate penological interests. *See Washington v. Harper*, 494 U.S. 210, 225 (1990) ("There can be little doubt as to both the legitimacy and the importance of the governmental interest presented here. There are few cases in which the State's interest in combating the danger posed by a person to himself and others is greater than in a prison environment, which, 'by definition,' is made up of persons with 'a demonstrated proclivity for antisocial criminal, and often violent, conduct.'") (quoting *Hudson v. Palmer*, 468 U.S. 517, 526 (1984) (citations omitted)). Accordingly, courts must defer to prison administrators' adoption and implementation of policies needed to ensure order and security. *See Oliver v. Scott*, 276 F.3d 736, 745 (5th Cir. 2002) (explaining that prison administrators' judgments regarding institutional security are accorded "great deference"). Here, Plaintiffs have not sufficiently demonstrated that their classification lacks

the requisite rational relation to a legitimate governmental objective—that is, prison safety and security. *See Striz*, 2020 LEXIS 246060, at 33–34 (finding that plaintiff failed to state an equal protection claim when he alleged prison officials were treating him differently when other similarly situated inmates with violent felony convictions were allowed to complete the "GRAD" program or were released from restrictive housing).[6]

Plaintiffs DeLeon, Reyna, and Martinez's general allegations that Hispanic inmates retain SPD codes more than white inmates for the same incidents does not state a valid equal protection claim. To establish a denial of equal protection, Plaintiffs must prove that the prison officials "created two or more classifications of similarly situated prisoners that were treated differently, . . . and (2) that the classification had no rational relation to any legitimate governmental objective." *Stefanoff v. Hays County*, 154 F.3d 523, 527 (5th Cir. 1998). They must also establish a "discriminatory purpose." *Woods v. Edwards*, 51 F.3d 577, 580 (5th Cir. 1995). "Discriminatory purpose . . . implies that the decision maker selected a particular course of action at least in part because of, and not simply in spite of, the

---

[6] The court in *Striz* also noted that many other courts have found that class-of-one equal-protection claims are not viable when based on individualized assessments of inmates. *Id.* at 35–36 (citing *Howard v. Koeller*, 756 F. App'x 601, 604 (7th Cir. 2018) (holding that inmate's class-of-one equal-protection claim failed because it challenged discretionary decision making; *Dawson v. Norwood*, No. 1:06-cV914, 2010 U.S. Dist. LEXIS 54306, 2010 WL 2232355, at *2 (W.D. Mich. June 1, 2010) (citation omitted) (dismissing inmate's class-of-one equal-protection claim that he was treated differently than other prisoners in administrative segregation because "the class-of-one equal[-]protection theory has no place in the prison context where a prisoner challenges discretionary decisions regarding security classifications and prisoner placement); *Upthegrove v. Holm*, No. 09-CV-206, 2009 U.S. Dist. LEXIS 38961, 2009 WL 1296969, at *1 (W.D. Wis. May 7, 2009) (citations omitted) (finding that inmate's class-of-one equal-protection claim was properly dismissed "in light of current rulings suggesting that 'class-of-one' equal[-]protection claims are not cognizable in such an individualized and discretionary setting as the prison setting"); *cf. Rowe v. Cuyler*, 534 F. Supp. 297, 301 (E.D. Pa. 1982) ("[N]o two prisoners, being different human beings, will possess identical backgrounds and characters. Indeed, it is difficult to believe that any two prisoners could ever be considered 'similarly situated' for the purpose of judicial review on equal[-]protection grounds of broadly discretionary decisions because such decisions may legitimately be informed by a broad variety of an individual's characteristics."), *aff'd*, 696 F.2d 985 (3d Cir. 1982); *Faruq v. McCollum*, Civil Action No. 11-5987 (JBS), 2013 U.S. Dist. LEXIS 89429, 2013 WL 3283942, at *5 (D.N.J. June 25, 2013) ("[W]ith regard to security level and placement decisions that are based on individual factors and histories, it is hard to imagine that any inmate would be considered similarly situated [in an equal-protection claim]").

adverse impact it would have on an identifiable group." *United States v. Galloway*, 951 F.2d 64, 65 (5th Cir. 1992). "Disparate impact alone cannot suffice to state an Equal Protection violation; otherwise, any law could be challenged on Equal Protection grounds by whomever it has negatively impacted." *Johnson v. Rodriguez*, 110 F.3d 299, 306 (5th Cir. 1997). Here, Plaintiffs simply make the conclusory allegation that more white inmates get their SPD codes removed after 10 years than Hispanic inmates. However, in this same lawsuit there are three other non-Hispanic inmates with the same codes that have not had their codes removed. Plaintiffs have not shown that prison officials will not remove their SPD codes because of any purposeful discrimination or any impermissible motive, such as race. Therefore, Plaintiffs have stated no valid equal protection claim.

## C.    Plaintiffs are not entitled to injunctive relief

To obtain a preliminary injunction, the applicant must show (1) a substantial likelihood that he will prevail on the merits, (2) a substantial threat that he will suffer irreparable injury if the injunction is not granted, (3) that his threatened injury outweighs the threatened harm to the party whom he seeks to enjoin, and (4) that granting the preliminary injunction will not disserve the public interest. *See Planned Parenthood of Houston & Southeast Texas v. Sanchez*, 403 F.3d 324, 329 (5th Cir. 2005). For a permanent injunction to issue the plaintiff must prevail on the merits of his claim and establish that equitable relief is appropriate in all other respects. *See Dresser-Rand Co. v. Virtual Automation Inc.*, 361 F.3d 831, 847 (5th Cir. 2004) (citing *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 546 n. 12, 107 S. Ct. 1396, 94 L. Ed. 2d 542 (1987) (recognizing that the standard for a permanent injunction is essentially the same as for a preliminary injunction with the exception that the plaintiff must show actual success on the merits rather than a mere likelihood of success)). Injunctive relief in the form of "superintending federal injunctive decrees directing state officials" is an extraordinary remedy. *Morrow v. Harwell*, 768 F.2d 619, 627 (5th Cir. 1985). Emphasizing its extraordinary character, the Fifth Circuit has cautioned that an injunction "should not be granted unless the party seeking it

has 'clearly carried the burden of persuasion' on all four requirements." *PCI Transportation Inc. v. Fort Worth & Western Railroad Co.,* 418 F.3d 535, 545 (5th Cir. 2005) (citations omitted).

Because this case concerns prison conditions, the Prison Litigation Reform Act (the "PLRA") imposes additional restrictions on the authority to grant an injunction. The PLRA provides that "[p]rospective relief in any civil action with respect to prison conditions shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. § 3626(a)(1). In particular, the PLRA prohibits an order granting prospective relief or a preliminary injunction unless the court first finds that such relief is: (1) narrowly drawn; (2) extends no further than necessary to correct the harm; and (3) is the least intrusive means necessary to correct that harm. *See* 18 U.S.C. §§ 3626(a)(1)(A), 3626(a)(2). In considering a prisoner's request for prospective relief, the reviewing court "shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system" caused by the relief and shall respect the certain principles of comity where state or local law is concerned. *See* 18 U.S.C. §§ 3626(a)(1)(B), 3626(a)(2).

Injunctive relief is designed to prevent future violations, not to punish a defendant for alleged past behavior. *SEC v. Blatt*, 583 F.2d 1325, 1334 (5th Cir. 1978); *see also Armstrong v. Turner Indus., Inc.,* 141 F.3d 554, 563 (5th Cir. 1998) (noting that a plaintiff must allege likelihood of future violation of their rights by defendants to pursue an injunction, not simply future effects from past violations). For these reasons, "[s]peculative injury is not sufficient." *Holland Am. Ins. Co. v. Succession of Roy*, 777 F.2d 992, 997 (5th Cir. 1985) ("Speculative injury is not sufficient; there must be more than an unfounded fear"); *Janvey v. Alguire*, 647 F.3d 585, 601 (5th Cir. 2011).

Here, Plaintiffs are not able to satisfy the first factor because they are unlikely to prevail on the merits for the all the reasons stated above and their requested relief will certainly disserve the public interest. Essentially, Plaintiffs seek to have their SPD codes removed and their classification status changed. ECF No. 1 at 23. Not only would this be highly intrusive of the prison's classification

process,[7] as prohibited by the PLRA, but it would also disserve the public's interest in that it would threaten the safety of the security officials, the public, and the inmates.

Plaintiffs also seek to have AD-04.11 amended to lessen the standards needed to have the SPD removed, to provide them immediate review hearings and period reviews every 6 to 12 months, to "disband" the SPDRC committee, and for "religious beard approval." ECF No. 1 at 23. This relief is not narrowly tailored and extends far beyond that "necessary to correct the harm" as required by the PLRA. According to the Plaintiffs' complaint, it is already the policy and practice of TDCJ to give review hearings for the removal of the SPD codes. At least three of the Plaintiffs allege in their own more definite statements that they have had their review hearings but are not happy with the results. It is apparent that because Plaintiffs are displeased with the retainment of their SPD codes, they are requesting the SPDRC committee to be "disbanded." This committee is one of the pertinent steps in TDCJ's constitutionally adequate reviewal process. Changing the policy or disbanding the review committee would result in an overreach of the prison's classification's process and is not necessary to correct the alleged harm caused by Plaintiffs' alleged due process and equal protection violations.

Similarly, Plaintiffs' other requests for injunctive relief such as instituting "preventative measures to curb inmate and/or staff violence, unit repairs, "adequate amounts of meaningful recreation," and allowing them to wear state-issued jackets is not narrowly tailored to their claims of denial of due process or equal protection but rather goes to their complaints on the conditions of confinement. *See* ECF No. 1 at 24. Additionally, Plaintiffs' requests for restoration of good time are not properly before this court. *See Caldwell v. Line*, 679 F.2d 494, 496 (5th Cir. 1982) ("When a state prisoner attacks the fact or length of his confinement, the appropriate cause of action is a petition

---

[7] *See Wilkerson*, 703 F.2d at 911 ("It is well settled that '[p]rison officials must have broad discretion, free from judicial intervention, in classifying prisoners in terms of their custodial status.'")

for habeas corpus, even though the facts of the complaint might otherwise be sufficient to state a claim under section 1983.").

Finally, principles of federalism weigh heavily against interference by federal courts through the issuance of preliminary injunctions against state or local agencies; the Supreme Court has stated that correctional administrators are to be accorded wide-ranging deference in their adoption and execution of policies and practices that, in their judgment, are needed to preserve internal order and discipline and to maintain internal security. *See Block v. Rutherford*, 468 U.S. 576, 584–85 (1984). Consequently, federal district courts are not to allow themselves to become "enmeshed in the minutiae of prison operations." *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (citing *Bell v. Wolfish*, 441 U.S. 520, 562 (1979)). In other words, federal courts do not micromanage prison operations save exceptional circumstances. *Roberts v. Davis*, No. 6:19cv101, 2019 U.S. Dist. LEXIS 143711, at *23–24 (E.D. Tex. July 26, 2019).

## IV.    Conclusion

Plaintiffs fail to state a claim for violations of due process and equal protection, and their requests for injunctive relief are overbroad. As such, Plaintiffs claims for injunctive and declaratory relief should be denied and their case should be dismissed with prejudice.


Respectfully submitted.

**KEN PAXTON**
Attorney General of Texas

**BRENT WEBSTER**
First Assistant Attorney General

**GRANT DORFMAN**
Deputy First Assistant Attorney General

**SHAWN E. COWLES**
Deputy Attorney General for Civil Litigation

**SHANNA E. MOLINARE**
Division Chief
Law Enforcement Defense Division

*/s/ Briana M. Webb*
**BRIANA M. WEBB**
Assistant Attorney General
Texas State Bar No. 24077883
Briana.Webb@oag.texas.gov

Law Enforcement Defense Division
Office of the Attorney General
P. O. Box 12548, Capitol Station
Austin, Texas 78711
(512) 463-2080 / Fax No. (512) 370-9814

**Attorneys for Defendants**


**CERTIFICATE OF SERVICE**

    I, **BRIANA M. WEBB**, Assistant Attorney General of Texas, do hereby certify that a true

and correct copy of the above has been served via mail on July 14, 2022 at the following addresses:

**Curtis Allen Gambill**
805886
Wynne Unit
810 F.M. 2821
Huntsville, TX 77349
PRO SE

**Jesse Wade Holt**
1362684
Wynne Unit
810 F.M. 2821
Huntsville, TX 77349
PRO SE

**Mark Anthony Reyna**
1213971
Wynne Unit
810 F.M. 2821
Huntsville, TX 77349
PRO SE

**Eddie Ray Fowler**
2231555
Wynne Unit
810 F.M. 2821
Huntsville, TX 77349
PRO SE

**Prescilliano Martinez**
2323270
Wynne Unit
810 F.M. 2821
Huntsville, TX 77349
PRO SE

**Juan Antonio De Leon**
2060521
Wynne Unit
810 F.M. 2821
Huntsville, TX 77349
PRO SE

/s/ Briana M. Webb
**BRIANA M. WEBB**
Assistant Attorney General