UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CURTIS ALLEN GAMBILL, JESSE WADE HOLT, MARK ANTHONY REYNA, EDDIE RAY FOWLER, PRESCILLIANO MARTINEZ, JUAN ANTONIO DELEON, RAYMOND WINGFIELD, BRITNEY GULLEY, JERROD SPENCER, and RICKY SMITH, on behalf of themselves and all others similarly situated, | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | |
| Plaintiffs, | §<br>§ | Civil Case No. 4:21-CV-01076 |
| VS. | §<br>§ | **CLASS ACTION** |
| BRYAN COLLIER, DANIEL DICKERSON, CAROL MONROE, MARICIA JACKSON, ELBERT HOLMES, LONNIE TOWNSEND, JERRY SANCHEZ, BOBBY LUMPKIN, TIMOTHY FITZPATRICK, MELISSA BENNETT, and ERIC GUERRERO, | §<br>§<br>§<br>§ | |
| Defendants. | | |

---

**PLAINTIFFS' FIRST AMENDED CLASS ACTION COMPLAINT**

---

## I. INTRODUCTION

1.      Plaintiffs Curtis Allen Gambill, Jesse Wade Holt, Mark Anthony Reyna, Eddie Ray Fowler, Prescilliano Martinez, Juan Antonio DeLeon, Raymond Wingfield, Britney Gulley, Jerrod Spencer, and Ricky Smith (collectively, "Plaintiffs"), sue on their own behalf and as representatives of a class of incarcerated individuals who are or have been in the custody of the Texas Department of Criminal Justice ("TDCJ") and who have Security Precaution Designators ("SPDs" or "codes") placed upon them, consigning them to overly restrictive, punitive conditions

1

for more than 10 years without the meaningful procedural protections the Constitution requires.

2.      Under its SPD policy, Administrative Directive 04.11 ("A.D. 04.11" or "the Policy"), TDCJ assigns people in custody an SPD code based on their involvement in certain types of security incidents. People with these codes may not live in minimum custody housing (i.e., G1 through G3 housing). Instead, they must remain in high-security punitive housing—G4, G5, or administrative segregation ("ad seg," otherwise known as solitary confinement or restrictive housing). These restrictive wings are usually reserved for disciplinary purposes, meaning every other person housed there has at least had the benefit of a hearing before their placement in these harsh conditions—except Plaintiffs. The SPD policy has provided cover for TDCJ to subject hundreds, if not thousands, of individuals to prolonged punitive confinement *without* due process.

3.      Because of their SPD codes, Plaintiffs and Class Members have been subjected to punitive housing for at least a decade, some for twice that long. In punitive custody wings, Plaintiffs are restricted to their cells for 20-24 hours a day, and frequently for 22-24 hours each day. These wings are notorious for their unsanitary conditions: flooding, raw sewage, and pest infestations are common; cells lose power and water for hours at a time; and the barely functional ventilation and constantly damaged windows exacerbate the already dangerous temperature extremes at many units. These disciplinary wings are in a constant state of disrepair, yet TDCJ consistently fails to provide for their maintenance and cleaning needs. Their prolonged confinement in these isolating, dangerous, and unsanitary conditions has caused Plaintiffs' and Class Members' psychological and physical wellbeing to deteriorate.

4.      These indignities are difficult for anyone to endure. Under TDCJ's current policy, the one saving grace for anyone saddled with an SPD code is the assurance that the deprivations will not continue indefinitely: they will end after 10 years. Through its written policy and by the

2

assurances of numerous TDCJ employees, TDCJ has created a presumption that these codes will be removed 10 years after the underlying incident, and the person will be released back to general population. Plaintiffs and others pin their hopes on this deadline to get them through the otherwise intolerable conditions to which they are subjected for a decade.

5.      Yet in practice, the presumption that these codes will be removed after 10 years is far from a guarantee. Plaintiffs and hundreds of Class Members are kept in SPD purgatory for *years*. Class Members remain in punitive confinement past the ten-year mark, even after going years without any major disciplinary cases on their records. Without a penological justification or any semblance of due process, TDCJ uses SPD codes to confine Plaintiffs and Class Members indefinitely in punitive custody based on the whims of its officials.

6.      Defendants are TDCJ officials charged with enforcing and maintaining the arbitrary and deficient SPD policy. Plaintiffs sue TDCJ Executive Director Brian Collier, Director of the Correctional Institutions Division Bobby Lumpkin, the Regional Directors of each TDCJ region, and three officials within the Classification and Records Department: Timothy Fitzpatrick, Melissa Bennett, and Eric Guerrero (collectively "Defendants"). Each of these officials make life-altering decisions regarding Plaintiffs' and the putative class's classification and SPD status.

7.      Plaintiffs and the putative class seek a declaration that Defendants' ongoing practices violate their constitutional rights, and injunctive relief compelling Defendants to comply with the Due Process Clause of the Fourteenth Amendment.

## II. JURISDICTION AND VENUE

8.      This civil action seeks to redress the deprivation of rights secured by the United States Constitution and 42 U.S.C. § 1983. This civil action seeks declaratory and injunctive relief under 28 U.S.C. §§ 2201, 2202. Accordingly, this Court has jurisdiction pursuant to

28 U.S.C. §§ 1331 and 1343(a)(3).

9.      The United States District Court for the Southern District of Texas is the appropriate venue pursuant to 28 U.S.C. § 1391(b)(2) because this is where a substantial part of the events or omissions giving rise to the claims have occurred and continue to occur.

### III. PARTIES

### A. Plaintiffs

10.     Plaintiff **Curtis Allen Gambill**, TDCJ #805886, is incarcerated at the Polunsky Unit. At the time of the filing of this lawsuit, Mr. Gambill had an SPD code for Escape (ES). At present, his ES code has been in place for 22 years. He spent 14 years in ad seg, and is now in G4 housing, where he is a Life Skills Coach. In addition to Polunsky, he has spent time at the Wainwright and Wynne Units with his SPD.

11.     Plaintiff **Jesse Wade Holt**, TDCJ #1362684, is incarcerated at the Wynne Unit. In addition, he has spent time at the Ferguson and Coffield Units with his SPD. At the time of the filing of this lawsuit, Mr. Holt had an SPD code for Escape (ES), which had been on his record for 14 years. TDCJ downgraded Mr. Holt's ES code to an EZ code ("Escape Designator over 10 years") on February 5, 2024, after the filing of this lawsuit.

12.     Plaintiff **Mark Anthony Reyna**, TDCJ #1213971, is incarcerated at the Allred Unit. In addition to Allred, he has spent time at the Wynne, Stiles, Connally, Coffield, Robertson, Clements, and Telford Units with his SPD. At the time of the filing of this lawsuit, Mr. Reyna had an SPD code for Staff Assault (SA), which was placed in 2005. Mr. Reyna had an SPD code for 19 years; TDCJ only removed his code on March 27, 2024, after the filing of this lawsuit.

13.     Plaintiff **Eddie Ray Fowler, Jr.**, TDCJ #2231555, is incarcerated at the Memorial Unit. In addition, he has spent time at the Estelle, McConnell, Hughes, Ellis, Wynne, and Polunsky

Units with his SPD. At the time of the filing of this lawsuit, Mr. Fowler had an SPD code for

Escape (ES), placed after an incident in 2008. Mr. Fowler has had his SPD code for 17 years.

14.     Plaintiff **Prescilliano Martinez**, TDCJ #2323270 is incarcerated at the Goree Unit.

In addition, he has spent time at the Wallace, Byrd, Allred, Robinson, and Wynne Units with his

SPD. At the time of the filing of this lawsuit, Mr. Martinez had an SPD code for Staff Assault

(SA). The incident that resulted in the SPD occurred in 2005. In 2023, after the filing of this

lawsuit, TDCJ removed Mr. Martinez's SPD code 17 years after placing it.

15.     Plaintiff **Juan Antonio DeLeon**, formerly TDCJ #2060521, was incarcerated at the

Estelle Unit before being released in 2022. Though he is no longer incarcerated, Mr. DeLeon

remains at risk from TDCJ's SPD policy should he be re-incarcerated, as his old SPD code remains

on his record. At the time of the filing of this lawsuit, Mr. DeLeon had an SPD code for Staff

Assault (SA) placed in 2018 for an altercation that took place in 2011 with an officer who was

drunk on the job and later fired. Mr. DeLeon was incarcerated at the Wynne Unit, and previously

spent time with his SPD at the Ellis and Estelle Units.

16.     Plaintiff **Raymond Wingfield**, TDCJ #1164103, is incarcerated at the Ferguson

Unit and has also spent time at the Michael and Stiles Units. At the time of this filing, Mr.

Wingfield has SPD codes for Escape (ES), Staff Assault (SA), and Hostage (HS), though the

circumstances of the 2004 incident reveal that the placement of all these codes was questionable.

In the two decades that Mr. Wingfield has spent in ad seg because of his SPD codes, he has never

had a major disciplinary case. Despite his good behavior, Mr. Wingfield continues to be burdened

by his SPD codes and remains in ad seg to this day.

17.     Plaintiff **Gulley,** TDCJ #01601283, is incarcerated in ad seg at the Lane Murray

Unit, and has also spent time at the Skyview and Hobby Units.[1] At the time of this filing, Plaintiff

Gulley has an SPD code for Staff Assault (SA) arising out of a 2012 incident. In the 12 years since

he received his SPD, he has only had one major disciplinary case, which was subsequently

overturned at headquarters following a review of video footage. He has spent nearly 12 years in

G4 or higher custody, including more than seven years total in ad seg based on his SPD.

18.     Plaintiff **Jerrod Spencer,** TDCJ #02403863, is incarcerated at the Wynne Unit,

and has previously spent time at the Clemens, Allred, Smith, Montford, Middleton, and Michael

Units. At the time of this filing, Plaintiff Spencer has an SPD code for Staff Assault (SA). TDCJ

assigned his code based on incidents that occurred in 2012 and early 2013, when he was 15 years

old and incarcerated as a juvenile in the Texas Youth Commission ("TYC"), now the Texas

Juvenile Justice Department. Having paroled in 2019, he has received no major disciplinary

charges since he was reincarcerated in 2022.

19.     Plaintiff **Ricky Smith**, TDCJ #00543176, is incarcerated at the Polunsky Unit, and

has previously spent time at the Michael, Coffield, and Wynne Units. At the time of this filing,

Plaintiff Smith has an SPD code for Escape (ES). He received his code at the Policy's inception

arising out of three incidents in 1988 and 1993. When his code was placed, 10 years had already

passed since the incidents. Smith has had no major disciplinary cases since 2002 and has been in

ad seg for more than 35 years.

20.     Plaintiffs incorporate by reference the More Definite Statements previously filed

by Plaintiffs. *See* Dkts. 47–53.

---

[1] Plaintiff Gulley is transgender and uses he/him or they/them pronouns. He is currently, and has
always been, placed exclusively in women's prisons in TDCJ.

## B. Defendants

21.     Defendant **Bryan Collier** ("Director Collier") is the Executive Director of the TDCJ. Director Collier is TDCJ's highest authority and is responsible for all operations, oversight, and the creation, implementation, and review of all TDCJ policies and directives. Director Collier is "responsible for the administration and enforcement of all . . . rules implemented by [TDCJ]," Tex. Gov't Code § 493.006(b), including those related to classification, *id.* § 498.002. Director Collier is sued in his official capacity only.

22.     Plaintiffs bring suit against each regional director for Regions I through VI (collectively, the "Regional Director Defendants") in their official capacities. The Regional Directors Defendants are listed individually in the following paragraphs.

23.     Defendant **Daniel Dickerson** ("Director Dickerson") is TDCJ's Regional Director for Region I.[2] Director Dickerson oversees all daily operations within Region I. As regional director, Director Dickerson is a key voting member of the Security Precaution Designator Review Committee ("SPDRC") for prisons in his region, and is the final authority on classification decisions within Region I. Director Dickerson is also responsible for investigating and resolving Step Two grievances filed by incarcerated individuals. Director Dickerson is sued in his official capacity only.

24.     Defendant **Carol Monroe** ("Director Monroe") is TDCJ's Regional Director for Region II. Director Monroe oversees all daily operations within Region II. As regional director, Director Monroe is a key voting member of the SPDRC for prisons in his region, and is the final authority on classification decisions within Region II. Director Monroe is also responsible for

---

[2] Plaintiffs' Original Complaint named Former Director Stephen Bryant as TDCJ's Regional Director for Region I. Director Bryant has since been replaced by Director Dickerson.

investigating and resolving Step Two grievances filed by incarcerated individuals. Director Monroe is sued in his official capacity only.

25.     Defendant **Maricia Jackson** ("Director Jackson") is TDCJ's Regional Director for Region III. Director Jackson oversees all daily operations within Region III. As regional director, Director Jackson is a key voting member of the SPDRC for prisons in her region and is the final authority on classification decisions within Region III. Director Jackson is also responsible for investigating and resolving Step Two grievances filed by incarcerated individuals. Director Jackson is sued in her official capacity only.

26.     Defendant **Elbert Holmes** ("Director Holmes") is TDCJ's Regional Director for Region IV. Director Holmes oversees all daily operations within Region IV. As regional director, Director Holmes is a key voting member of the SPDRC for prisons in his region and is the final authority on classification decisions within Region IV. Director Holmes is also responsible for investigating and resolving Step Two grievances filed by incarcerated individuals. Director Holmes is sued in his official capacity only.

27.     Defendant **Lonnie Townsend** ("Director Townsend") is TDCJ's Regional Director for Region V. Director Townsend oversees all daily operations within Region V. As regional director, Director Townsend is a key voting member of the SPDRC for prisons in his region and is the final authority on classification decisions within Region V. Director Townsend is also responsible for investigating and resolving Step Two grievances filed by incarcerated individuals. Director Townsend is sued in his official capacity only.

28.     Defendant **Jerry Sanchez** ("Director Sanchez") is TDCJ's Regional Director for Region VI. Director Sanchez oversees all daily operations within Region VI. As regional director, Director Sanchez is a key voting member of the SPDRC for prisons in his region and is the final

authority on classification decisions within Region VI. Director Sanchez is also responsible for investigating and resolving Step Two grievances filed by incarcerated individuals. Director Sanchez is sued in his official capacity only.

29.     Plaintiffs also bring suit against select members of TDCJ's Classification and Records Department, as well as TDCJ administrators with decision-making authority relevant to A.D. 04.11. These are members of TDCJ's "central administration staff" as referred to in A.D. 04.11. The following paragraphs list those defendants.

30.     Defendant **Bobby Lumpkin** ("Director Lumpkin") is TDCJ's Director of the Correctional Institutions Division ("CID"). The CID is responsible for the confinement of all adults in TDCJ custody and oversees the Classification and Records division. *See* Tex. Gov't Code § 494.002; *id.* 498.002. Accordingly, Director Lumpkin is a key decisionmaker for all classification decisions. Director Lumpkin is sued in his official capacity only.

31.     Defendant **Timothy Fitzpatrick** ("Director Fitzpatrick") is TDCJ's Director of Classification and Records. Director Fitzpatrick oversees TDCJ's classification system, including the SPD system outlined in A.D. 04.11. Director Fitzpatrick reports directly to Director Lumpkin. Director Fitzpatrick is sued in his official capacity only.

32.     Defendant **Melissa Bennett** ("Chairperson Bennett") is the Chairperson of the State Classification Committee.[3] Chairperson Bennett's duties are outlined in the TDCJ Classification

---

[3] Plaintiffs' Original Complaint named Tara Burson as TDCJ's Chairperson of Classification and Records. Chairperson Burson has since been replaced in her role by Chairperson Bennett. Upon information and belief, TDCJ eliminated the Chairperson of Classification and Records position in 2021, and that person's role on the SPDRC is now filled by the Chairperson of the State Classification Committee ("SCC"), formerly Chairperson Burson and currently Defendant Bennett. TDCJ last updated its SPD policy before that change in titles was made. In some instances, the SCC chair has participated in SPDRC decisions. However, the Director of Classification and Records, Defendant Fitzpatrick, has also participated as a voting member of the

Plan. Chairperson Bennett is a member of the SPDRC in accordance with A.D. 04.11. Chairperson Bennett is sued in her official capacity only.

33.     Defendant **Eric Guerrero** ("Director Guerrero") is the Deputy Director of Support Operations.[4] Director Guerrero's duties include oversight of Classification and Records. Director Guerrero is part of the SPDRC and is tasked with making the final determination on SPD review decisions if a unanimous decision is not made by other SPDRC members in accordance with A.D. 04.11 and TDCJ's Classification plan. Director Guerrero is sued in his official capacity only.

34.     All named Defendants, and their predecessors in office, have acted under color of state law at all times relevant to this Complaint. The Defendants are all hereby sued in their official capacity for those acts and omissions described herein. All of the Defendants herein are state officials and thus may be served by serving the Office of the Attorney General. *See* Tex. Const. art IV, § 22.

## IV. EXHAUSTION OF REMEDIES AND PREVIOUS LAWSUITS

35.     All Plaintiffs who originally filed this lawsuit, Dkt. 1, have timely exhausted all available administrative remedies prior to filing this Complaint.

36.     Plaintiffs have never filed a prior lawsuit, nor has there been previous litigation, regarding the violations at issue in this Complaint.[5]

## V. FACTUAL ALLEGATIONS

37.     This case centers around the implementation and impact of Security Precaution

---

SPDRC in lieu of Chairperson Bennett. Therefore, both Defendant Bennett and Defendant Fitzpatrick are sued for their participation in SPDRC decisions.
[4] Plaintiffs' Original Complaint named Former-Director John Werner as TDCJ's Deputy Director of Support Operations. Director Werner has since been replaced by Director Guerrero.
[5] Plaintiff Gulley has previously filed two habeas petitions prior to reaching the 10-year mark for his SPD code. The claims were different than those presented here and did not raise any claims related to his SPD.

Designator codes. While the specifics of this Policy are set out in detail below, the issue is simple. After TDCJ places an SPD code, the code remains on a person's record for decades with no meaningful review, resulting in prolonged and indefinite confinement in utterly inhumane conditions. For this reason, Plaintiffs and Class Members seek an injunction against Defendants and a declaration that Plaintiffs and Class Members' Due Process rights have been, and continue to be, violated.

### A. The Security Precaution Designator System

38.     In 2003, TDCJ instituted a new administrative directive that authorized the use of SPD codes. The procedures, definitions, and criteria necessary for placement and removal of the various SPD codes are governed solely by TDCJ's A.D. 04.11. *See* **Ex. 1 (Administrative Directive 04.11, Jan. 6, 2015)**.

39.     The Executive Director of TDCJ, Defendant Collier, is authorized to organize, manage, and supervise TDCJ's daily operations, including implementing the Policy. *See* Board Policy 01.03. As Executive Director, Defendant Collier signs and authorizes all Administrative Directives. *See* Executive Directive 01.21. Defendant Lumpkin, as Director of the CID, also signs, reviews, and approves all Administrative Directives. *Id.* Together, Defendants Collier and Lumpkin compel and control the contents and implementation of A.D. 04.11.

40.     Pursuant to A.D. 04.11, an SPD code "documented in an offender's record . . . identifies the offender as a special management risk." Ex. 1 at 3 (defining SPD). While AD 04.11 lists several classification codes, only three are relevant to this lawsuit: **ES**, **HS**, and **SA**. Any person with ES, HS, and SA codes must be held on a custody level no less restrictive than G4/J4, a punitive and restrictive security level known for deplorable conditions and severe restrictions on a person's activities. *See infra* §§ V.B & V.D. Because of the severe consequences of having one

11

of these codes, Defendants and their agents must "strictly adhere" to the narrow definitions prescribed by the Policy. *Id.* at 5.

41.     The "Escape Precaution Designator" or "**ES**" code is "documented on the record of an offender who has a history of escape from secure adult correctional facilities" where escape means "the intentional commission of an overt act that results in the unauthorized departure from any part of a secure adult correctional facility, work assignment, or extended limits of the facility." Ex. 1 at 1. The "Hostage Precaution Designator" or "**HS**" code is "documented on the record of an offender who has a history of taking an individual hostage. *Id.* at 2. The "Staff Assault Precaution Designator" or "**SA**" code is "documented in the record of an offender who has a history of serious staff assault." *Id.* at 4. The Policy defines "serious staff assault" as when "an offender intentionally strikes a staff member resulting in serious injury . . . . Serious injury requires treatment beyond first aid, such as sutures, a fracture, or hospitalization." *Id.* at 3–4.

42.     According to the codes' definitions and TDCJ policy, ES, HS, and SA codes may only apply based on incidents that occurred within the previous 10 years. *Id.* at 2–4. After 10 years elapses from the date of the incident, ES, HS, and SA codes should be ordinarily downgraded to "EZ," "HZ," and "SZ" codes, respectively. These downgraded codes signify more than 10 years have passed since the incident prompting the placement of the SPD code. Crucially for Plaintiffs and Class Members, the downgraded codes have no minimum custody placement requirements, allowing people with them to live in G1, G2, or G3 level custody.

43.     Prior to the 10-year mark, Defendants provide virtually no avenue to contest an SPD placement or demonstrate changed circumstances to have the restrictions removed. Instead, prior to the 10-year mark, a person's SPD code may only be removed in the narrow circumstances where (1) the person has a release date within 18 months with certain specific criteria for good

behavior; (2) the person with a five-year-old SPD code has a non-aggravated sentence and no major disciplinary convictions in the past three years; or (3) the person has "an extraordinary set of circumstances for which the UCC deems the request for removal of the SPD appropriate." Ex. 1 § IV.A

44.     After 10 years, the policy indicates that ES, HS, and SA codes should rarely remain in a person's record. "If it has been more than 10 years since the incident that caused the placement of the SPD, ES, HS, or SA only, and the offender is no longer considered an immediate security risk, the SPD **shall** be removed **unless extraordinary circumstances exist**." *Id.* § IV.C (emphasis added). The Policy vests the SPDRC and its members, including Defendants Fitzpatrick, Bennett, Guerrero, and the Regional Director Defendants, with the "authority for retaining the SPD past the designated period." Ex. 1 at 3.

45.     In practice, Defendants allow these codes to remain on individuals' records long past 10 years, frequently refusing to provide any notice of the mandated reviews or opportunities to be heard.

46.     At the time of this writing, **486** of the 1484 individuals with ES, HS, or SA codes in TDCJ custody have had those codes **for more than 10 years**. This flies in the face of TDCJ's own Policy, which mandates strict adherence and limits official discretion in the application of the Policy. Ex. 1 § 1.B. AD 04.11 provides Plaintiffs with a legitimate expectation of a specific result once certain criteria are met. Especially relevant is the mandatory language regarding the downgrade and removal of SPD codes after 10 years, establishing a presumption that these codes will be downgraded and removed upon meeting necessary criteria.

47.     The Defendants and their predecessors have violated, and will continue to violate, the due process rights of numerous individuals with SPDs through their implementation and

enforcement of the Policy. Defendants Collier and Lumpkin sanction and control the Policy's operation in this lawless manner. Defendants Fitzpatrick, Bennett, Guerrero, and the Regional Director Defendants likewise engage in, approve, and control reviews that fall far short of the Policy's requirements, amounting to a denial of any process to Plaintiffs.

48.     From its inception, the Policy has been arbitrarily carried out within TDCJ. Defendants' disregard for Plaintiffs' due process rights has created a de facto policy of indefinite punishment unique to this class of individuals and has cultivated an environment in which Plaintiffs and Class Members must live in deplorable conditions for years on end.

## B.  Named Plaintiffs Have All Languished in Punitive Housing for More Than a Decade Due to Defendants' Unlawful Application of the Policy

49.     Defendants have unlawfully maintained punitive SPD codes placed on every Named Plaintiff. Their impermissible actions against these 10 individuals are indicative of the harms that Defendants inflict on each member of the putative class.

50.     At the time of the filing of this lawsuit, Mr. Gambill had an SPD code for Escape (ES). Mr. Gambill escaped from a county jail in 2002. Sometime after that, TDCJ implemented AD 04.11, initiating the SPD policy. TDCJ retroactively placed an SPD code on Mr. Gambill without providing him any notice. Mr. Gambill was placed in ad seg. Thereafter, Mr. Gambill was confirmed as a gang member, keeping him in ad seg indefinitely. Although he wanted to renounce his gang affiliation, Mr. Gambill was unable to because of his SPD code. TDCJ requires individuals to undergo a program called the Gang Renouncement and Disassociation Process ("GRAD") to have their gang status removed, but TDCJ prevents anyone with an SPD from enrolling. Unable to participate in GRAD, Mr. Gambill spent 14 years in ad seg because of the catch-22 his SPD code created. TDCJ refused to review Mr. Gambill's ES SPD code for 10 years. Even after he spent 10 years with his SPD, the grievances he filed were ignored. Ultimately, Mr.

Gambill had to resort to a hunger strike to obtain the annual Unit Classification Committee ("UCC") SPD review hearings he is entitled to as a matter of TDCJ policy. Today, Mr. Gambill is confined in G4 housing. Despite not having any major disciplinary cases in nearly 21 years, Mr. Gambill continues to have an SPD code. Ironically, while his own access to programming is extremely limited due to his SPD code, Mr. Gambill teaches Cognitive Life Skills to other incarcerated individuals. In fact, Mr. Gambill is the only Life Coach with a G4 custody designation in the entire TDCJ system.

51.    Plaintiff Holt had an ES code at the time this suit was filed, which had been on his record for 14 years. The circumstances of the incident indicate that the code was erroneously placed. While in a county jail, Mr. Holt, who was intoxicated at the time, walked out of an unlocked drunk tank, but never left the premises of the jail. Without allowing Mr. Holt an opportunity to challenge the allegation, TDCJ placed an escape code on him. The ES code was premised on his fighting with the picket officer to open a door, conduct which, according to A.D. 04.11, is insufficient to form the basis of an ES code. TDCJ could have placed a code for Attempted Escape (EA), which would not have required Mr. Holt to spend a day in punitive housing, let alone more than a decade. Mr. Holt received two hearings during the entirety of the 14-year duration of his SPD. Each "hearing" lasted less than 30-seconds, and the UCC panel denied him immediately as he walked up to their hearing table. After the filing of this lawsuit, TDCJ downgraded Mr. Holt's ES code to an EZ code ("Escape Designator over 10 years") on February 5, 2024, allowing him to be placed in G2. Since having the code removed, Mr. Holt was able to secure a job that was previously unavailable to him because of his SPD code.

52.    Plaintiff Reyna had an SA code at the time this suit was filed. TDCJ placed the code in 2005 for an incident involving an officer when Reyna was in ad seg. Mr. Reyna did not receive

a UCC SPD hearing for 10 years. In 2016, after UCC members summarily denied his code removal, Mr. Reyna was told, "No matter how long you do, we'll never forget this." In 2017, then-Senior Warden of Wynne Unit, Kelly Strong, told Mr. Reyna, "As long as I'm here, you will not get an SPD removal." Despite wanting to engage in programming to better himself and prepare for parole, Mr. Reyna had no access to the necessary programs because of his SPD. Unlike individuals in general population, people housed at G4 or higher can access few to none of the programs the Board of Pardons and Paroles requires. Mr. Reyna had an SPD code for 19 years. TDCJ only removed his code after the filing of this lawsuit, in March 2024. Since having the code removed, Mr. Reyna has already joined the waitlist for education and trade programming. Mr. Reyna is currently attending classes to get his GED.

53.     Plaintiff Fowler has an ES code, placed after an incident in 2008. Mr. Fowler spent the next nine years in ad seg, and like Mr. Gambill, was unable to renounce his gang affiliation status due to his SPD code. He was paroled in 2017. Upon his return to TDCJ custody in 2018, Mr. Fowler's old SPD code remained on his record. As a result, TDCJ placed him back in ad seg. Due to his SPD-based housing classification, Mr. Fowler has struggled to access the programs needed to complete his Individual Treatment Plan for parole and was denied parole in 2022 and 2023. Mr. Fowler has had his SPD code for 17 years.

54.     Plaintiff Martinez had an SA code at the time this suit was filed. The incident that resulted in the SPD occurred in 2005. Mr. Martinez began receiving UCC SPD hearings only after spending 10 years with his code. On multiple occasions, the UCC *voted to remove* Mr. Martinez's code. Despite the unit-level approvals, Mr. Martinez would learn months after his hearings that "someone in Huntsville" overturned that decision. Mr. Martinez was released from TDCJ custody in 2015. Upon his return to TDCJ custody on an unrelated charge, TDCJ relied on his old SPD

code to place him back in G4 housing. In 2023, after the filing of this lawsuit, Mr. Martinez was taken to a UCC SPD hearing where his SPD code was removed after 17 years. However, he remained in G4 for six months even after his code was removed.

55.     Plaintiff DeLeon had an SA code at the time this suit was filed. Mr. DeLeon was assaulted by an officer in January 2011. To cover the misconduct, Mr. DeLeon was charged with a staff assault. After an investigation found that the officer involved was indeed the aggressor—in fact, was drunk on the job—the officer was fired, and charges were dropped against Mr. DeLeon. Mr. DeLeon was released from TDCJ custody in 2012, and upon return to TDCJ in 2015, was told he had been given an SPD for the "staff assault" he was cleared of in 2011. Mr. DeLeon remained in punitive confinement due to this erroneous code. Though Mr. DeLeon has been in and out of TDCJ custody, each time he would return, his old SPD code remained on his record, and he would be sent to G4 housing immediately. It has been more than 10 years since the initial date of the incident, but Mr. DeLeon remains at risk of being placed back in G4 housing, with all its attendant deprivations, due to his outdated and erroneous SPD code if he ever returns to TDCJ custody.

56.     Plaintiff Wingfield has ES, SA, and HS codes, though the circumstances of the underlying incident reveal that the placement of the codes is questionable. In 2004, Mr. Wingfield was at his TDCJ-assigned kitchen work area when another incarcerated individual assaulted a correctional officer. At the direction of the person carrying out the assault, Mr. Wingfield tied up a correctional officer in the kitchen commissary, a storage room behind the main kitchen. He then exited the kitchen commissary room and went to the main kitchen area to sit with the other incarcerated individuals that staff had assembled in response to the incident, never leaving his assigned work area, much less any prison building. Though Mr. Wingfield's conduct was not sufficient to support the SA or ES codes, he received them in any event. The incident resulted in

his placement in ad seg, where he has remained for 20 years. Mr. Wingfield has faced repeated periods of harassment by staff, including extensive cell searches and cell moves multiple times a week. TDCJ staff have told Mr. Wingfield that he will not be released from ad seg so long as his SPD codes remain. Mr. Wingfield has had his SPD reviewed from time to time but has only attended a review two or three times in a decade. He has gone years without ever attending a UCC hearing. In the two decades that Mr. Wingfield's SPD codes have been in place, he has had only a single verbal reprimand in 2011, and has never had a major disciplinary case. Despite his good behavior, Mr. Wingfield continues to be burdened by his SPD codes to this day.

57.     Plaintiff Gulley has an SA code as of this filing. He received his code in 2012 based on a staff assault involving an officer with a history of homophobic and transphobic conduct. He learned about his code's placement from an officer outside of a UCC hearing. Despite his code, he spent several months at the Skyview Unit for mental health treatment, where he was allowed to move around freely, had a job, and caused no incidents. In 2017, he was transferred to the Hobby Unit, which does not have ad seg. There, he lived in medium custody and caused no incidents. He arrived at Lane Murray in 2019 and spent several months in medium custody. He was sent back to ad seg after a change in wardens, and has remained in ad seg since 2020. Plaintiff Gulley's experience shows that the Policy is carried out erratically even at the women's facilities within TDCJ. Plaintiff Gulley has only had one SPD hearing in or around May 2023. He was only given a hearing after he filed a grievance. The hearing took place over the phone and the warden did not allow him to speak. The warden simply told him that he "wasn't deemed worthy of being removed from restrictive housing." The warden misgendered him throughout the hearing. Plaintiff Gulley has a UCC hearing every six months to evaluate his safety as a transgender person, but is not permitted to discuss his SPD at that time. Plaintiff Gulley has had only one major disciplinary case

since receiving his code, when in 2021 an officer claimed he threatened and hit her. Plaintiff Gulley filed a grievance to challenge the false allegations. When headquarters staff reviewed the video footage, they confirmed Plaintiff Gulley's story and overturned the grievance. He has had no other major disciplinary cases, yet remains in ad seg because of his 12-year-old SPD.

58.     Plaintiff Spencer received an SA code based on three staff assaults in 2012 and early 2013, when he was incarcerated as a juvenile at TYC. At the age of 17, he was transferred to TDCJ and placed in the Youthful Offender Program ("YOP") at the Clemens Unit. While there, he received a case for threatening an officer. When he turned 18, he was discharged from the YOP and placed on G5 restrictive housing. He received another case for allegedly touching an officer through his tray slot, and was placed in ad seg at the Allred Unit. He paroled from ad seg in 2019. In 2022, he was reincarcerated on possession charges. While in G4 at the Michael Unit, he was stabbed by another incarcerated individual and had to receive emergency medical treatment. After he was stabbed, he was sent to the Wynne Unit, where he remains. At his initial classification hearing at the Middleton Unit, a staff member remarked that Plaintiff Spencer's SPD should be lifted, but the warden stated that he needed to do a few more months with his code. Plaintiff Spencer has never had a UCC hearing to review his SPD. Whenever he arrives at a new unit, Spencer asks about his code, and has been repeatedly told that he just has to wait a few more months. His requests to have his code reviewed have gone unanswered. He has had no major disciplinary cases since returning to TDCJ. Because of his SPD, he is unable to receive the educational and vocational training he hopes to engage in that are crucial to his rehabilitation and parole. He is also unable to engage in substance abuse programming, including the inpatient treatment required for his parole.

59.     Plaintiff Smith received an ES code based on three escapes in 1988 and 1993 and

has spent three decades in ad seg. For more than **30 years**, Smith has been confined to his cell for 20-24 hours a day. When TDCJ introduced the SPD policy in 2003, Plaintiff Smith's code was applied retroactively—even though it had already been 10 years since the latest escape. He has an attempted escape on his record from 1997 which did not meet the definition for an ES code. Plaintiff Smith was given no hearing before the SPD was placed, and only found out about his code from his paperwork. He has had no major disciplinary cases since 2002. In all that time, he has never had an SPD review hearing. Although he attends State Classification Committee hearings because of his ad seg placement, in the handful of times the members have acknowledged his SPD can be reviewed, they have refused to remove it from his record. He has only learned about these denials after the fact through the mail.

60.     Plaintiffs have all spent well over a decade—some more than twice that long—in punitive confinement because of their codes. They have been denied a meaningful opportunity to challenge codes that are in some instances erroneously placed or retained, or to demonstrate that their years-long records of good behavior warrant removal of their SPDs. Because of Defendants' inappropriate application of A.D. 04.11, Plaintiffs, and hundreds like them, have been deprived of their protected liberty interest in release from punitive housing conditions without due process.

## C.  TDCJ's SPD Classification Process Lacks Constitutionally Required Protections at All Stages

### (i)     TDCJ places SPD codes without affording any procedural protections.

61.     TDCJ assigns SPD codes through a rote, automatic process, as set out in A.D. 04.11, and maintained by Defendants Collier and Lumpkin. Placement can occur during intake by a sociologist, during classification reviews conducted by the Unit Classification Committee ("UCC"), or at any time by central administration staff. If any of these administrators believes that an incarcerated person's record meets the specific definitions set out in the Policy, the incarcerated

person's unit is notified to update classification records. No more is necessary to place an SPD code that can have irreversible effects on a person's life.

62.     Never in this brief process is TDCJ required to notify a person that they are being reviewed for the placement of an SPD code or that an SPD code has been placed on their record. In fact, A.D. 04.11 is devoid of any procedural protections whatsoever attached to the SPD placement decision. The incarcerated person in question receives no notice, is not offered a hearing or any other opportunity to be heard or present evidence, and is not entitled to any reasoning for the decision.

63.     There is no process by which an incarcerated person can challenge an erroneous classification decision. Instead, they must resort to the ordinary grievance process, which offers only 15 days to raise an issue, and is often presided over by the very same individuals involved in the SPD placement decision. For example, at the Wynne Unit, Warden Moore has been the final authority presiding over both Step 1 grievance decisions and classification decisions, and Director Bryant (formerly the Region I Director) has been the final authority presiding over both Step 2 grievances and Region 1 classification decisions. Both of these individuals sat on the SPDRC for the Wynne Unit. This means an incarcerated person's grievance request related to an erroneous SPD code is reviewed, and usually denied, by the same individuals responsible for placing or retaining the code in the first place.

64.     Indeed, none of the Plaintiffs were notified that SPD codes were placed on their records, nor were they able to challenge the decision. For example, Plaintiff Reyna did not know when his code was placed, and only learned of it when he did not receive a regular six-month UCC hearing like people usually would who were placed in disciplinary housing. Plaintiff Gambill likewise received no notice, and only learned of the 2003 SPD placement, for a pre-2003 incident,

when he tried to enroll in the GRAD program years later and was told his code made him ineligible. He wrote to unit classification and only then learned that he had an ES code based on a 2002 incident at a county jail that resulted in no disciplinary action or conviction. Plaintiff Fowler learned of his ES code, arising from a 2008 incident in Joshua City Jail, months after arriving in TDCJ custody.

65.     The fact that TDCJ has erroneously placed many SPD codes makes the lack of any specified mechanism to challenge an SPD placement even more dire. Despite the requirement of A.D. 04.11 that "staff shall strictly adhere to the definitions provided in this directive," Ex. 1 § I.B., TDCJ has placed SPDs for acts that fall short of its own definitions.

66.     For example, staff placed an ES code on Plaintiff Holt based on an attempt in which he never exited the premises of the jail where he was being held. Indeed, he was criminally charged only with an attempted escape, and should have received only an Escape Attempt (EA) SPD code. When he wrote to unit classification to notify them of the error, he was told he would have to wait 10 years to have his code removed regardless of their mistake.

67.     Similarly, Plaintiff Martinez received an SA code in 2005 for an incident that did not meet TDCJ's definition of Staff Assault. After arriving at Victoria County Jail intoxicated and handcuffed, several officers restrained him to keep him from hitting his head against the wall. He tripped in the scuffle, causing officers to land on top of him. One officer had Mr. Martinez in a headlock—when Mr. Martinez fell, his mouth was pushed into the officer's arm by the weight of the fall. No officers received medical attention beyond first aid as a result of the incident, although Mr. Martinez was charged with assaulting staff, entered a guilty plea, and was sentenced to two years. None of this should have resulted in an SA code, as A.D. 04.11 specifically states that an SA code applies when "an offender intentionally strikes a staff member resulting in serious injury"

which "requires treatment beyond first aid." Further, "[t]he intent or threat to injure is not enough, staff must sustain a serious injury. The fact that an offender is charged with or convicted of assaulting a correctional officer does not mean an SA code shall be placed." Ex. 1 at 4. In spite of this detailed definition, Plaintiff Martinez received an SA code for an incident that was not intentional and for which no one required medical attention beyond first aid.

68.     Plaintiff DeLeon received an SA code based on an incident in which an officer at the Roach Unit was intoxicated on the job and began to punch and physically assault him. Plaintiff DeLeon attempted to protect himself, and other officers intervened to stop the officer. DeLeon initially received a major disciplinary case for alleged staff assault, but an officer wrote a witness statement confirming the assailant officer was drunk and at fault. The assailant was fired, the disciplinary charges were dropped, and Plaintiff DeLeon was subsequently released from TDCJ in 2012. Yet when he was reincarcerated several years later in 2014, and was put in TDCJ custody in 2016, DeLeon was immediately placed in ad seg. He was told to complete the Administrative Segregation Diversion Program to obtain a G2 housing placement. Though DeLeon complied and completed the program, he was later told that he in fact could *not* get out of restrictive housing due to his old, erroneous SPD code, even though he informed UCC members that the code should not exist on his record. DeLeon spent the remainder of that sentence in G4 housing before being released from TDCJ custody in 2022.

69.     What TDCJ regards as a routine classification decision is, in reality, a form of punishment with significant and far-reaching consequences. The cursory and bare-bones placement procedure created and maintained by Defendants Collier and Lumpkin disguises the fact that the decision can entomb a person in punitive, disciplinary confinement for decades.

*(ii)*     *Interim SPD review hearings are irregular and cursory—if they occur at all.*

70.     Despite the major deprivation that an SPD code imposes on an individual, TDCJ routinely denies any hearing or other process to review whether the SPD code should be removed for the first 10 years following a code placement. Thus, a person automatically spends 10 years in punitive confinement once TDCJ has placed an SPD code.

71.     Even when the Policy itself suggests a limited possibility for review by Defendants Fitzpatrick, Bennet, Guerrero, and the Regional Director Defendants as members of the SPDRC, in practice, that avenue is entirely foreclosed by Defendants. For example, in 2011, Plaintiff Reyna requested a review hearing based on Section IV.A.2 of the Policy stating that an SPD can be removed after five years if a person with a non-aggravated sentence is discipline-free for three years. The hearing was denied and he was told the code would be removed after 10 years. He did not receive a "hearing" until 10-and-a-half years after the underlying incident.

72.     Plaintiff DeLeon wrote to his then-unit staff Hastings and Stevens, and to Tara Burson[6], Former Chairperson of Classification and Records and of the State Classification Committee, every year to request an SPD hearing for his erroneously-placed SA code. When he received a response, it stated that he would have to do 10 years with an SPD before it would be removed.

73.     Finally, Plaintiffs Gambill, Holt, Gulley, Smith, Wingfield, and Spencer never received a UCC SPD review hearing until 10 years or more after their underlying incidents.

74.     Nor are these experiences unique to these plaintiffs. An SPD placement means automatic purgatory for 10 years, with no consideration of the person's good behavior, rehabilitation, or application of the Policy's provision allowing for removal of the SPD code after five years.

---

[6] Defendant Bennett has since succeeded Burson in this role.

***(iii)***     ***TDCJ falls short of its obligation to provide procedural protections to those with codes older than 10 years.***

75.     Even after the 10-year mark, TDCJ fails to provide annual hearings, despite a clear directive that the placement decision "**shall** be reviewed annually for possible removal of the SPD." Ex. 1 §§ IV.B.6, IV.C.1 (emphasis added).

76.     The Policy, as approved and implemented at the direction of Defendants Collier and Lumpkin, provides that "unit classification staff shall determine whether a recommendation for removal is necessary" and "[t]he warden shall be notified of the UCC recommendation of removal for concurrence." *Id.* § IV.C.1 (emphasis added). No other administrator is given any authority to weigh in on the decision to remove the SPD code.

77.     Although A.D 04.11 purports to allow for annual SPD review hearings after 10 years, in reality, such hearings are sporadic and cursory, if they occur at all. Unless a person specifically requests hearings through the grievance process, they often go years without a UCC SPD hearing. Sometimes, Plaintiffs are only notified of a UCC decision following a hearing conducted in absentia. For example, Plaintiff Reyna only received two hearings in a five-and-a-half-year period; in other years he was denied in absentia and not informed prior to the review.

78.     Plaintiff Fowler went nearly 14 years without being made aware of any review hearing; when he requested a hearing, he received no response. In or around January 2020 he made a request to Warden Moore to remove his code and was told the decision was up to the SPDRC. Moore saw no reason *not* to remove the code based on Plaintiff Fowler's file, and said he had seen SPDs removed for more serious underlying incidents. He told Plaintiff Fowler just to stay out of trouble until his next hearing. Yet in or around March 2020, when Plaintiff Fowler was supposedly scheduled for his first SPD review hearing, he was never called out, had no hearing, and merely received a denial in the mail with no justification.

79.     Plaintiff Gulley has only had one UCC hearing to review his SPD, which was conducted over the phone. He received a hearing after 11 years with an SPD, and only after filing a grievance requesting release from ad seg. He was not allowed to speak at the telephonic hearing, and the warden conducting the hearing consistently misgendered him.

80.     Plaintiff DeLeon requested SPD reviews annually but only received hearings in 2020 and 2021 and went from 2017 to 2020 without any hearings. Plaintiff Holt similarly went three years without a review starting in 2020, despite writing to staff and filing grievances. Plaintiff Spencer has sent numerous requests for his SPD to be reviewed, yet has never had a UCC SPD hearing despite his code being more than 11 years old. He has been told on multiple occasions that he only has to do "a few more months" with an SPD, but TDCJ still refuses to remove his code. In his three decades in ad seg, Plaintiff Smith has **never** attended a UCC SPD review hearing, and has only had his SPD reviewed a handful of times, which he learned about after the fact and through the mail.

81.     The sporadic nature of the "annual" SPD review hearings is characteristic of TDCJ's approach to the entire Policy, as carried out under the approval of Defendants Collier and Lumpkin. Hearings rarely occur, and when they do, they are more often than not a mere formality far from meaningful review. When TDCJ fails to provide hearings, as it often does, it violates its own policy and deprives individuals of the benefit of the process it has created. Defendants fail to consider each incarcerated person's entire record and rehabilitation status, summarily depriving them of even the chance to leave their overly restrictive housing conditions.

*(iv)*     ***For incidents older than 10 years, the Policy gives no authority to the SPDRC to weigh in on the first instance, yet the SPDRC continues to act without authority.***

82.     For SPD codes that are less than 10 years old, "[r]emoval of the SPD by the SPDRC may occur if an offender has an SPD of ES, HS, or SA and fits into one of the following

categories:" (1) if the offender has a release date within 18 months with certain specific criteria for good behavior; (2) if the offender with a 5-year old SPD code has a non-aggravated sentence and no major disciplinary convictions in the past three years; and (3) if an offender has "an extraordinary set of circumstances for which the UCC deems the request for removal of the SPD appropriate." Ex. 1 § IV.A.

83.     For one of these three general categories, the Unit Classification Committee ("UCC") "shall make the initial recommendation for SPD removal." *Id.* § IV.B. If the UCC decides to recommend removal of an SPD code based on one of the three categories, the recommendation is forwarded to the SPDRC for review. *Id.*

84.     The SPDRC is made up of three people: the warden, the Chair of Classification and Records,[7] and the Regional Director. If the SPDRC's decision is not unanimous, a deputy director for the Correctional Institutions Division acts as a tie-breaker. *See id.* § IV.B, D. Currently, the SPDRC consists of Defendant Bennett, the appropriate Regional Director Defendant based on the unit location, and the warden of the facility where the person is confined. Defendant Guerrero, as Deputy Director of Support Operations, is the deciding vote in the case of a non-unanimous vote. Defendant Fitzpatrick, as Director of Classification and Records, has also participated in SPDRC decisions in lieu of the Defendant Bennett.

85.     For SPD codes that are older than 10 years, the Policy lays out a completely separate protocol: "If it has been more than 10 years since the incident that caused the placement of the SPD, ES, HS, or SA only, **and** the offender is no longer considered an **immediate security risk**, the SPD **shall** be removed **unless extraordinary circumstances exist**." *Id.* § IV.C (emphasis

---

[7] As noted above, *supra* section III.B., the composition of the SPDRC is not entirely clear from Defendants' policies and practices. These allegations are based on Defendants' policies as available to Plaintiffs at the time of this filing.

added).

86.     The procedure states that "unit classification staff shall determine whether a recommendation for removal is necessary." *Id.* § IV.C.1. "The warden shall be notified of the UCC recommendation of removal for concurrence." *Id.* No other administrator is given any authority to weigh in on the decision to remove or retain an SPD code older than 10 years.

87.     Despite the clear directive for only unit-level staff to make removal decisions for SPD codes older than 10 years in the first instance, Plaintiffs and Class Members are regularly told that while their removal was approved at the unit level, "someone in Huntsville" denied the removal. In these cases, Defendants Bennett, Fitzpatrick, and the Regional Director Defendants voted to overturn the UCC recommendations as members of the SPDRC. In cases where their votes to retain codes were not unanimous, Defendant Guerrero exercised his authority under the Policy to break the tie and retain the SPD code.

88.     The SPDRC, including Defendants Bennett, Guerrero, Fitzpatrick, and the Regional Director Defendants, acts without authority when it denies the removal of an SPD older than 10 years the first year for which the UCC finds that there is (1) no immediate security risk, and (2) no extraordinary circumstances.

*(v)     Unabridged discretion under the Policy allows Defendants to retain SPD codes beyond the presumptive 10-year expiration date, in contravention of the Policy.*

89.     A.D. 04.11, as authorized and implemented by Defendants Collier and Lumpkin, creates a presumption that ES, SA, and HS codes will be removed 10 years after the underlying incident, if not before. This presumption is based on two sections of the Policy. First, Section IV, "Review for Removal of Security Precaution Designators," contains an entire subsection premised on the 10-year presumptive expiration date, again stating, "If it has been more than 10 years since the incident that cause the placement of the SPD . . . and the offender is no longer considered an

28

immediate security risk, the SPD shall be removed unless extraordinary circumstances exist." Ex. 1 § IV.C. Second, TDCJ uses a separate set of codes for individuals whose underlying incidents occurred more than 10 years ago. These codes—EZ, SZ, and HZ—denote the prior incident but do not serve as a basis for classification at a heightened security level. In other words, after 10 years, the code must be changed and the individual is no longer required to remain in G4 or higher punitive housing. Together, these elements confirm that A.D. 04.11 was written under the presumption that codes would be removed after 10 years.

90.     In addition to TDCJ's written policy, Plaintiffs were also informed of the "10-year rule" by a number of different TDCJ employees. For example, upon discovering his SPD, Plaintiff Reyna asked how long his SA code would last, and was told it would last 10 years. Plaintiff Gambill was similarly told by the warden of the Wainwright Unit that his code would remain for 10 years. Thus, Defendants understand the Policy to require removal of SPD codes after 10 years.

91.     Nevertheless, the Policy permits UCC staff and the SPDRC to retain a 10-plus-year-old SPD code if the person is considered an "immediate security risk" or "extraordinary circumstances" exist. But the Policy's lack of clarity with regard to these terms allows UCC staff and the SPDRC, to apply them indiscriminately and without explanation.

92.     Instead of defining "extraordinary circumstances" the Policy merely provides examples of situations sufficient to warrant that designation, such as when "a staff assault resulted in death, the offender was involved in multiple escapes, or the offender injured hostages."

93.     The Policy also does not specify criteria to govern the review of codes more than 10 years old, other than that "[d]uring routine classification committee meetings and annual reviews, unit classification staff shall determine whether a recommendation for removal is necessary." Ex. 1 § IV.C.1. Individuals with SPDs more than 10 years old are therefore left without

any basis to challenge a determination of "extraordinary circumstances" or "immediate security risk."

94.     Thus, no matter how clean a person's disciplinary record is after receiving an SPD code, Defendants who participate in the SPDRC can still hide its undefined language to maintain codes long past the 10-year mark. The lack of clarity as to what constitutes "extraordinary circumstances" or "immediate security risk" leaves individuals without any guidance on what they must do to return to minimum security, and provides officials with unlimited discretion to perpetuate this oppressive policy. Indeed, many Plaintiffs have exhibited exemplary behavior for years. Plaintiffs Gambill, Smith, and Wingfield have been free of major disciplinary infractions for 20 years. Plaintiff Martinez has gone more than four years without a major disciplinary case. It has similarly been years since Plaintiff Holt has received any disciplinary case, major or minor.

95.     The Policy's lack of guidance as to what constitutes "extraordinary circumstances" or "immediate security risk" has allowed Defendants Bennett, Guerrero, Fitzpatrick, and the Regional Director Defendants to **rely only on the underlying incident** that may be decades old to justify retaining an SPD code. For example, Plaintiffs Gambill and Holt received ES codes based on single escapes from jail prior to arriving in TDCJ. Plaintiff Martinez received an SA code also based on an isolated incident in a county jail where the only injuries were not "serious" as defined by the Policy. Plaintiff Spencer received an SA code based on incidents that occurred when he was only 15 years old and in a juvenile prison. The incident underlying Plaintiff DeLeon's SA code, in which a drunk TDCJ officer was the aggressor, involved similarly minor injuries. None of these incidents come close to the minimal guidance TDCJ has provided in defining "extraordinary circumstances" sufficient to extend an SPD beyond the presumptive 10-year period, and they are a far cry from what any reasonable person would understand the term to mean. Defendants

disregard years, sometimes decades, of exemplary behavior when they rely improperly on a sole incident far in the past. In spite of these clear violations of the Policy, Defendants Collier and Lumpkin continue to give UCC staff and the SPDRC unrestrained authority to punish Plaintiffs for old incidents that do not meet the Policy's definitions.

96.     The arbitrary application of the Policy is illustrated with Plaintiff Martinez. He received an SA code in 2005. He cycled in and out of TDCJ several times, living in general population on multiple occasions. For more than 10 years, he remained unaware of his SPD and was never given notice of the code. Around 2010, he was placed in G4 housing for no discernable reason. Yet later, he was sent back to general population and even served as his unit kitchen's head chef in 2018. It was not until he returned to TDCJ and arrived at the Wynne Unit in November 2020 that he got his first SPD review hearing—15 years after the underlying incident and with no indication of what the "extraordinary circumstances" were.

97.     Most shocking is the application of the Policy to Plaintiff Gambill who is still dubiously an "immediate security risk" while simultaneously having been made a Life Coach by TDCJ.

*(vi)     TDCJ retains codes longer than 10 years without proper justification or documentation.*

98.     By setting out a clear presumption that codes will be removed 10 years after the underlying incident, TDCJ has created an interest in having one's code removed at that time. Yet TDCJ has failed to institute the procedural protections necessary to safeguard the interest it has created. When the UCC requests to retain an SPD longer than 10 years, the "circumstances must be fully documented and approved by the SPDRC." In the face of this directive, the SPDRC, including participants Defendants Fitzpatrick, Bennett, Guerrero, and the Regional Director Defendants, provides only vague and brief statements that fall far short of "full" documentation,

and they are not even provided to the individuals whose codes are retained. Even if they were provided, these cursory statements would neither properly inform individuals of the reasons for the retention of their codes nor instruct them on what they must do to ensure their codes are removed in the future.

99.     Moreover, individual TDCJ employees have made comments to multiple Plaintiffs on multiple occasions that indicate their personal contempt towards individuals with SPD codes is the only real factor when presented with the question of whether an SPD should be removed.

100.    For example, some UCC and SPDRC members made comments to Plaintiffs to the effect that they would never lift an SPD code. At Plaintiff Reyna's first UCC hearing, 10-and-a-half years after the underlying incident, the Chair at the Telford Unit told him, "I don't care how long you do, we'll never forget an assault on one of our own."

101.    In or around March 2021, Plaintiff Fowler was allowed to attend his first SPD review in 15 years. UCC chair Assistant Warden Coleman told him he had no problem removing the SPD, but he had to make a call first. The next day, Coleman told Plaintiff Fowler that removal was denied because Former Director Bryant had stated, "As long as I'm the Director, no SPD codes are gonna be removed." Coleman said he would not go against the regional director to recommend removal.

102.    Similarly, Plaintiff DeLeon received a UCC review in March 2021, 10 years after his underlying incident. The UCC, chaired by Assistant Warden Coleman, unanimously approved removing the code. After several weeks with no update, Warden Coleman finally told him that Bryant denied the removal, stating, "As long as he was in Huntsville, he wasn't removing any SPD codes."

103.    In November 2021, Plaintiff Martinez was called for a UCC review after 16 years

with his code. The UCC chair said he had no problem removing the code but had to call Warden Moore to approve the action. Moore responded, "No. Hell no."

104.   When a warden reviewed Plaintiff Gulley's SPD in 2023, she told him he "wasn't deemed worthy of being removed from restrictive housing."

105.   In other instances, even when a UCC recommends removing an SPD, the SPDRC exercises control over SPDs and overturns the decision for inappropriate reasons—or no discernable reason at all—without clear authority to do so. When the SPDRC does provide a reason for overturning a UCC SPD removal, it frequently recites cursory justifications that are divorced from the Policy and provide no guidance as to how the individual can secure removal in the future. For Plaintiffs, the reasons provided were almost always some form of the overly general "nature of the incident," "seriousness of the incident and poor institutional adjustment," "seriousness of the offense," or "seriousness and severity of the incident as well as totality of the subject's history."

106.   Plaintiffs repeatedly experienced arbitrary decisions at the hands of the SPDRC, with its final authority over SPD retention decisions, and other TDCJ officials. In 2017, Plaintiff Reyna went to a UCC hearing at the Wynne Unit. Assistant Warden McClarin noted Plaintiff Reyna's history of good conduct, and decided to remove his code and move him to minimum custody. When the move did not happen, Plaintiff Reyna filed a Step 1 grievance and was scheduled for a new UCC hearing in front of Warden Kelly Strong and Classification Manager Stevens. He was told the promotion was a mistake, and as long as Strong was Senior Warden, she would never remove an SPD. When he asked Strong about the 10-year rule, she responded, "I am the policy." Plaintiff Reyna had another hearing in July 2020 and was approved for SPD removal, which the SPDRC overturned with no notice of the hearing, opportunity to present a statement, notification of the decision, or reasoning. He only found out about the hearing when his family

called the unit to inquire.

107.    Similarly, in 2020, Plaintiff Martinez had his first SPD review hearing ever, at which Major Boyd recommended removing his 15-year-old code. After writing letters and grievances, he eventually learned that the removal was denied by the SPDRC.

108.    Finally, Plaintiff Holt was approved for SPD removal after several years without a review. He was never moved from G4, however, and received no notification or explanation from the UCC and SPDRC. He only later learned that the removal was overturned by the SPDRC.

109.    These experiences are not unique to Plaintiffs. Rather, they illustrate the widespread practice across TDCJ of relying on the vagaries of A.D. 04.11 for cover to arbitrarily force certain individuals to remain in punitive conditions far longer than the Policy allows.

*(vii)    Plaintiff Gambill's history of SPD review hearings demonstrates the many failings of TDCJ's Policy.*

110.    Plaintiff Gambill's experience with SPD reviews illustrates all of these obstacles confronting an individual attempting to remove a decades-old SPD code. Plaintiff Gambill had his first UCC hearing, arising out of a 2002 incident, in January 2012 and was unanimously approved for code removal by the UCC. He found out months later that the SPDRC overturned the decision with no notice of the hearing or its outcome, no opportunity to present a statement, and no justification. Under the Policy, the SPDRC did not have any authority to override the UCC's recommendation of removal. Ex. 1 § IV.C. The following year, in 2013, his hearing was several months late. He filed a grievance to request a hearing and was told that then-Senior Warden Bell would oversee the UCC. Bell told Gambill he had been a model prisoner, but that Huntsville had told all wardens that if they removed any SPDs and the individuals were involved in subsequent incidents, the wardens would be held responsible. Bell told Plaintiff Gambill regretfully that he had to look out for his family and career, and Plaintiff Gambill would probably have to wait 15 or

20 years for someone to sign off on removing his SPD.

111.    The same pattern repeated itself, year after year. In 2014, Plaintiff Gambill was approved for SPD removal because his disciplinary history had been clear for years and because so much time had passed since the underlying incident. The SPDRC overturned the decision. Then in May 2015, Warden Bell denied removal of the code because he said Huntsville would just override the removal. In May 2016, Warden Smith told Plaintiff Gambill that he had no authority to remove the SPD, and that his boss, Warden Strong, would not remove his code. Smith delayed making the decision until talking to Warden Strong. Plaintiff Gambill waited for months, filed grievances, and never got an answer. An investigation by the Ombudsman revealed that Classification Manager Stevens failed to provide a UCC decision or inform the SPDRC. Plaintiff Gambill received a new hearing in January 2017. Stevens welcomed him by saying, "This is the guy who went over our heads to Huntsville" and immediately denied the code removal. Plaintiff Gambill has received a denial at every hearing since then.

112.    At Plaintiff Gambill's January 2018 hearing, Stevens entered the UCC waiting room and said, "If y'all are here for SPD reviews, you are wasting your time, because I can tell you right now, we aren't approving them." Plaintiff Gambill still went ahead with his hearing, and Stevens voted to deny him even before he had entered the room. When he asked for the criteria the UCC was applying, Stevens and then-Captain Webb told him, "We most likely will never vote to remove an SPD code." The next year, Stevens and Hastings told him he had to wait until 2022 for his 10 years to be over with—an incorrect calculation that added 10 extra years to his time with an SPD.

113.    Plaintiff Gambill was denied removal in absentia in May 2019. When his family filed a Texas Public Information Act Request, he was placed in ad seg for three days. A sergeant

told him, "You must have pissed someone important off." At that point, he asked his family to stop advocating for him out of fear of retaliation. In 2020, 14 months after his last review, Plaintiff Gambill went to a UCC hearing chaired by recently-promoted Warden Boyd. Boyd said he had never seen someone with such an old SPD and was stunned that someone with such a track record of good conduct was in G4 housing. Yet the SPDRC, made up at that time of Bryant, Burson, Werner, and Moore, overturned the UCC's decision to remove the code. When Plaintiff Gambill asked Assistant Warden Coleman for a reason, he learned that Bryant had said, "as long as he is Director of Region I, he isn't approving any SPD codes" for removal.

114.   In July 2021, Plaintiff Gambill wrote to Hastings to schedule his annual SPD review and received no response. When his family inquired, he learned he had been reviewed and denied in absentia three weeks earlier.

115.   Plaintiff Gambill's experience is by no means unique. The entire putative class is subject to TDCJ's decisions in deficient, or nonexistent, reviews. Defendants continues to maintain and enforce TDCJ's SPD program arbitrarily with unchecked authority.

### D. Plaintiffs and the Class Have Spent More than 10 years in Inhumane Conditions

116.   As a result of their ES, HS, or SA SPD codes, Plaintiffs and Class Members are all incarcerated in G4, G5, or ad seg indefinitely even after 10 years have passed from the incident underlying their SPD codes. *Supra* § V.A–B. The retention of the SPD codes by Defendants Fitzpatrick, Bennett, Guerrero, the Regional Director Defendants, and other TDCJ officials, and the accompanying restriction to disciplinary confinement inflicts atypical and significant hardships over and above those of normal prison life.

117.   The mandatory confinement in G4 or higher housing authorized by Defendants Collier and Fitzpatrick carries with it poor physical, sanitary, and other conditions, and an environment so poor that all other residents cannot be subjected to it absent a disciplinary

conviction. Plaintiffs and Class Members are regularly stuck in their cells for 20-24 hours each day, if not longer. In the limited time they spend outside their cells, they face a constant threat of violence in these notoriously rough wings. Plaintiffs have also been subjected to intolerable temperatures, flooding, raw sewage, and pest infestations.

118.    Moreover, because of their SPD status, Plaintiffs and Class Members cannot access rehabilitative, educational, or vocational programming, and their codes have a significant negative impact on the possibility of their parole.

119.    Plaintiffs and Class Members have languished in these severe conditions for 20 to 40 times longer than the vast majority of individuals incarcerated in these wings for disciplinary reasons. For example, people housed in disciplinary housing for possessing contraband may remain in G4 for up to six months, a fraction of the time Plaintiffs and Class Members spend there. This prolonged and indefinite incarceration in severely restrictive, dangerous, and inhumane conditions has taken, and will continue to take, a substantial toll on the psychological and physical wellbeing of Plaintiffs and Class Members.

*(i)*     *Plaintiffs and Class Members are Incarcerated in Severely Restrictive Conditions that Limit Human Contact, Interaction, and Recreation.*

120.    As a result of their SPD codes, Plaintiffs and Class Members are incarcerated in cells measuring less than 55 square feet, often for 20-24 hours a day, for years, or decades, on end. For those in ad seg, they are lucky to leave their cells for two hours a day.

121.    Due to frequent lockdowns, Plaintiffs and Class Members in G4, G5, and ad seg housing spend much of their time restricted to their cells 24 hours a day. Disciplinary lockdowns can last for weeks or even months. Even when there is no disciplinary or penological reason, staffing shortages mean even more lockdowns. Plaintiffs regularly go months without being allowed outdoors. Plaintiffs and Class Members in G4 and G5 lose out on recreation time, exercise,

and even access to phones because there are not enough staff to supervise them outside of their cells. Plaintiffs have experienced weight gain and muscle atrophy due to their prolonged restriction to their cells.

122.    Plaintiffs and Class Members are ineligible for contact visits due to their security classification level, and are limited in the amount of non-contact visits they can receive. Plaintiffs and Class Members confined in G5 or ad seg have even fewer opportunities for human contact since their custody designations render them ineligible to make private phone calls. While individuals in G1, G2, and G3 custody can receive commissary items purchased by their friends or family through ECommDirect, Plaintiffs and Class Members are restricted from receiving support through this service due to their custody designations.

123.    The vast majority of incarcerated individuals in G4 and G5 have recently committed major disciplinary violations, and are placed in these wings as part of their punishment. These individuals receive notice and an opportunity to contest the disciplinary charges before being found in violation and placed in G4 or G5. Unlike Plaintiffs and Class Members, they receive at least some process and an end date for their punishment before being placed in such conditions.

124.    In contrast to Plaintiffs and the Class Members' experience, individuals placed in G4 or G5 due to other disciplinary violations are generally promoted to less restrictive housing within 6 to 12 months if they maintain good conduct. However, Plaintiffs and Class Members are punitively confined in G4 for years, or even decades, regardless of the good behavior time accrued, due to the SPD Policy. Plaintiffs have been subjected to disciplinary confinement 20 to 40 times longer than individuals who are placed in G4 and G5 for reasons other than SPD codes.

125.    Together, these restrictions on out-of-cell time, visitation, and contact with family and friends severely limit Plaintiffs' and Class Members' human interaction and recreation, which

is only exacerbated for those in ad seg. Experts universally recognize that such prolonged isolating conditions and lack of contact causes severe mental and physical health problems including anxiety, depression, visual and auditory hallucinations, paranoia, compulsivity, and suicidal ideation.[8] As the president of the union representing Texas correctional employees wrote in 2014, "depriving inmates of human contact for long periods of time may exacerbate mental crisis, assaultive behavior, antisocial behaviors, and acute health disorders."[9]

(ii)   *Plaintiffs and Class Members Are Exposed to Constant Danger in G4 Custody for Significantly Longer Periods of Time than the Average Individual Incarcerated in G4.*

126.   The vast majority of individuals in G4 custody were placed there as punishment for recent major disciplinary violations, often for assaults or similar misconduct. However, unlike individuals with SPDs, when these non-SPD individuals maintain good behavior for 6 to 12 months, they are promoted back to minimum custody. People with SPDs, who have the same or *better* disciplinary records, nonetheless must endure these conditions for more than a decade.

127.   G4 is widely known as the most violent wing in each TDCJ unit because many of the people who populate it are being punished for recent assaults or other violent behavior. As transient inhabitants of these wings, they have little incentive to maintain order or keep the wings safe. Plaintiff Holt describes life in G4 as "like you're living in a war zone" due to the constant fights, fires, and lockdowns.

128.   Disciplinary lockdowns are common in G4 and can last for weeks or even months.

---

[8] *See, e.g.*, Terry A. Kupers, *Supermax Prison Isolation in Pre-Crime Society*, in THE PRE-CRIME SOCIETY 293-94 (Bruce Arrigo & Brian Sellers eds., 2021); Lauren Brinkley-Rubinstein, Josie Sivaraman, David L. Rosen, *Association of Restrictive Housing During Incarceration With Mortality After Release*, 2 JAMA OPEN NETWORK 19 (Oct. 4, 2019).
[9] Statement of Lance L. Lowry, AFSCME Texas Correctional Employees Local 3807 (Feb. 25, 2014), https://solitarywatch.org/wp-content/uploads/2014/02/Lance-Lowry-Senate-Hearing-Submission.pdf.

During these lockdowns, Plaintiffs and Class Members are denied recreation, access to showers, and clean clothing and bedding for weeks at a time. They are even denied opportunities to attend **their own review hearings** during lockdowns.

129.    Plaintiffs and Class Members in G4 and G5 are frequently subjected to chemical agents when guards spray them at others in response to fights and disturbances. Frequent exposure to chemicals has damaged their lungs and exacerbated their allergies.

130.    In these wings, people frequently start fires for any number of reasons, from mental health crises to a desire to get staff to pay attention to them. Cells are often filled with smoke from fires started by others, made worse by fumes from people smoking drugs. This noxious combination has resulted in painful breathing, irritation to the eyes, headaches and allergies for Plaintiffs and Class Members. For instance, Plaintiff Reyna experienced blackouts and seizures due to pre-existing conditions after inhaling the toxic fumes in G4 at Wynne.

131.    Plaintiffs and Class Members are forced to maneuver this constant danger and threat of violence for years due to their SPD codes while other non-SPD individuals are promoted from G4 and returned to minimum custody based on their good conduct within months. Plaintiffs have been attacked by other individuals incarcerated in G4 during their limited out-of-cell time. For instance, Plaintiff Spencer was stabbed by another individual in G4 at the Michael Unit, and he had to receive emergency medical treatment. Plaintiffs are also frequently incarcerated with cellmates who are violent and unpredictable, and they have been attacked by their cellmates as well.

132.    Recognizing the uniquely dangerous circumstances of Plaintiffs' prolonged incarceration in G4, Former Wynne Warden Moore told Plaintiffs Reyna, Gambill, and Former Plaintiff Joseph Martinez that he had "never saw men so well-behaved treated so poorly."

**(iii)**     ***Plaintiffs and Class Members Incarcerated in G4, G5, and Ad Seg Are Subjected to Intolerable Temperatures, Flooding, Raw Sewage, Pest Infestations, and Other Inhumane Conditions that Go Unaddressed by TDCJ.***

133.    The G4, G5, and ad seg wings of TDCJ prisons are in a constant state of disrepair. There are broken windows, missing screens, clogged pipes, roof leaks, poor ventilation, broken electrical systems, and frequent water and power outages. Plaintiffs and others frequently complain of these conditions, but due to the lack of regard for individuals in these disciplinary confinement wings, Defendants have allowed maintenance workers to ignore requests for repairs. Understaffing makes it even less likely that these conditions will be rectified.

134.    As a result of the broken windows, poor ventilation, and power outages, Plaintiffs and Class Members have been subjected to intolerable temperatures as high as 119 degrees during the summer and as low as -11 degrees during the winter.

135.    Plaintiffs and Class Members in G4, G5, and ad seg frequently have their cells flooded with raw sewage, feces, and water due to clogged pipes, dilapidated plumbing systems, and the actions of other people incarcerated on these wings.

136.    At the Wynne Unit, for example, Plaintiff DeLeon's cell floor would flood multiple times a week when he lived on the top row of cells. Every time it rained, the roof would leak and run down an entire wall of his cell. At times, he would have two inches of standing water in his cell, not to mention the mold on the ceiling as a result of this constant flooding. He experienced similar flooding at the Estelle Unit: his cell flooded approximately six times in the four months he spent there. Plaintiff Spencer lives in a cell with a toilet that floods continuously from the bottom. Plaintiff Gulley has been in multiple cells that are incessantly flooded with sewage from the toilet, or with ceiling lights that flood every time the toilet is flushed in the cell above.

137.    TDCJ officials do not clean cells in G4, G5, and ad seg after sewage leaks, and they

refuse Plaintiffs' and Class Members' requests for supplies to clean or disinfect their cells when they are covered in sewage. Thus, Plaintiffs frequently have to move feces and raw sewage out of their cells by hand. The sewage mixes with trash that accumulates on the halls because TDCJ does not provide for frequent enough collection, creating a nauseating smell.

138.    The G4, G5, and ad seg cells are also frequently infested with bugs and pests. For instance, in the G4 wing at Wynne, ants covered Plaintiffs' cells, even eating the glue off of their envelopes. Cockroaches covered the walls and crawled on Plaintiffs while they slept. Wasps, bats, and raccoons were even able to get into their cells due to the broken windows. Plaintiffs have had similar experiences in other units.

139.    The prolonged state of isolation, danger, and extreme and unsanitary conditions that Plaintiffs and Class Members have been subjected to have resulted in the deterioration of their psychological and physical wellbeing. Plaintiffs have experienced hopelessness, lethargy, anxiety, depression, and other symptoms due to their prolonged and indefinite incarceration in these conditions. Plaintiffs have suffered pain and physical injuries due to assaults by other incarcerated individuals and staff and extreme temperatures. They have also suffered pain, migraines, and severe allergic reactions due to the exposure to harmful fumes.

***(iv)    Plaintiffs and Class Members Cannot Access Rehabilitative Programming and Are Less Likely to Be Granted Parole Due to Their SPD Codes.***

140.    Plaintiffs and Class Members are restricted from and routinely denied access to vocational, educational, religious, and rehabilitative programming due to their SPD codes.

141.    Because of their SPD codes, Plaintiffs have been precluded from participating in numerous programs including vocational courses, On-the-Job Training programs, Alcoholics Anonymous, Narcotics Anonymous, Kairos, Voyager, Bridges to Life, Overcomers, Discipleship programs, apprenticeships, marriage seminars, Day with Dads, college courses, financial literacy

courses, and GED courses. The availability of the programs varies across the units and is dependent on the whims of the warden in charge. In fact, in the years preceding the filing of this suit, the only program available on G4 at the Wynne Unit was the Cognitive Life Skills course taught by Plaintiff Gambill.

142.    Plaintiffs and Class Members are also severely restricted in jobs they are eligible for due to their SPD codes. Even when they are approved for a limited number of jobs on paper, some Wardens refuse to allow individuals with SPDs to work in those positions.

143.    In addition to negatively impacting their rehabilitation and wellbeing, the accompanying restrictions on programming have a profoundly negative and direct impact on their ability to obtain parole.

144.    The Board of Pardons and Paroles ("BPP") uses a Parole Board Guideline Matrix Score Assessment that assigns points based on various categories, with a high score weighing against granting parole. Incarcerated individuals are each given an Individual Treatment Plan ("ITP") setting out the programs they are expected to complete before being granted parole. ITPs usually include a series of educational or vocational programs. If a person completes no programs, their risk score increases. Their risk score also increases for higher custody levels. Thus, without access to programs, parole remains out of reach.

145.    For example, Plaintiff Reyna became eligible for parole in 2017 and was interviewed by a parole officer. The officer asked why he had not completed his ITP or other educational programs and explained that Plaintiff Reyna's lack of programming would negatively impact the parole board's decision. BPP gave Plaintiff Reyna a five-year setoff, meaning he could not be reviewed again for five years. When Plaintiff Reyna wrote to Warden Moore, Program Supervisor Hastings, and the unit principal to ask for access to his required programs, they denied

his request and told him that he could enroll after his custody was downgraded from G4. Plaintiff Fowler similarly had his requests for ITP-mandated programs denied because he was in G4 due to his SPD code.

146.    Plaintiff Spencer, who is incarcerated on possession of controlled substance charges, cannot enroll in any substance abuse programming because of his SPD, including the inpatient treatment required for his parole. At his last parole hearing, one of the reasons the BPP gave for denying him was his substance abuse. He has completed a Life Skills course, one of the two courses available to him on G4, and was even selected as the class's graduation speaker. Yet based solely on his SPD, he cannot attend educational or vocational programming, which he wants to complete both for his rehabilitation and to be able to demonstrate to BPP that he has used his time in prison well.

147.    The BPP's Parole Board Guideline Matrix Score Assessment also penalizes applicants based on their custody level. Applicants are given two additional risk points if they are in G4, G5, or ad seg at the time of consideration. Since TDCJ's SPD policy mandates that Plaintiffs and Class Members remain incarcerated in G4 at a minimum, their SPD codes increase their risk score making them less likely to achieve parole.

148.    In addition, an SPD can lead to indefinite placement in ad seg. Many individuals are told that they will not be released from ad seg until their SPDs are removed. The harms of extended isolation are extensive and well documented, with both physical and psychological symptoms common. Programming opportunities are at the whim of the official in charge. For example, for a time, Plaintiff Wingfield, a marine veteran, was allowed to participate in one-on-one programming from a veterans' group. But after a change in administration, the volunteers were no longer allowed into his housing unit, meaning his programming disappeared.

149.    The indefinite SPD placements put people with a documented gang affiliation in a particular bind. TDCJ places people in ad seg merely for being a member of a gang, or Security Threat Group ("STG"). The only way out of ad seg with STG identification is through the GRAD program, but an SPD makes a person ineligible for GRAD. This means some people in ad seg must wait 10 years or more before they can even *begin* the GRAD program—without regard to whether they have already renounced any affiliation with any group.

150.    Even after completing GRAD, however, an SPD can hold a person back. For example, Plaintiff Fowler had a previous STG confirmation. In 2009, he tried to enroll in GRAD and was told his SPD had to be removed before he could enroll. This denial meant he had no path out of ad seg before December 2017. In November 2018, an officer offered to enroll him in an ad seg diversion program similar to GRAD. He assumed that since 10 years had passed, his SPD had been lifted. He completed two phases of the program, but was still placed on G4, when others in his group were sent to minimum custody. Plaintiff Fowler was told Warden Strong was not lifting any SPDs.

151.    Plaintiff Gambill was told he would only be released from ad seg when his code was removed after 10 years. Every time his SPD removal was denied, it meant more time in ad seg, as he could not start GRAD with an SPD. Despite being disciplinary free for 12 years, Gambill spent over 13 years in ad seg. Even though he had ceased all affiliation with any gang by 2006, he still remained in ad seg because his SPD code prevented him from taking GRAD for an additional nine years. In 2015, Plaintiff Gambill had a UCC hearing, and Warden Bell denied removal of the code in anticipation of a reversal by the SPDRC. Plaintiff Gambill filed a grievance, after which he was permitted to take the GRAD program. He successfully completed GRAD, and everyone in his group was promoted to G2. Yet Plaintiff Gambill was sent to Wynne in 2016 and remained on

G4. His SPD code was inexplicably retained, and he learned that Warden Strong never downgraded SPD codes.

152.    Thus, Plaintiffs and Class Members with STG associations and SPD codes are stuck in a Catch-22. They cannot get out of administrative segregation until their SPD codes are removed, but their SPD codes remain for years and are even less likely to be removed due to their inability to disassociate from an STG.

## VI. CLASS ALLEGATIONS

153.    Plaintiffs bring this action on their own behalf and on behalf of all individuals similarly situated. The Plaintiffs propose the Court certify a single class seeking declaratory and injunctive relief under Federal Rule of Civil Procedure 23(a)(1–4) and 23(b)(2).

154.    Plaintiffs propose the Court certify the following class: "All individuals incarcerated by the Texas Department of Criminal Justice with Security Precaution Designators ES, HS, or SA for whom 10 or more years have passed since the incident for which the code was placed."

155.    The proposed class meets Rule 23(a)'s four requirements—numerosity, commonality, typicality, and adequacy—and certification is appropriate under Rule 23(b)(2).

**156.    Numerosity.** The proposed class is sufficiently numerous to render joinder impracticable. Fed. R. Civ. P. 23(a)(1). Based on public information provided by TDCJ, there are currently 1484 individuals with ES, SA, or HS SPD codes. Of those, nearly one-third, or approximately 486 people, have had their respective codes for more than 10 years since the date of the incident that prompted the imposition of the code. The class members are identifiable using records maintained in the ordinary course of business by TDCJ. Joinder of so many individual claims would be impracticable, and judicial economy would undoubtedly suffer. The proposed

class therefore satisfies the numerosity requirement.

157.   **Commonality.** The claims of the proposed class raise common issues of fact and law that will generate common answers. Fed. R. Civ. P. 23(a)(2). Although there need not be common issues of *both* law and fact under Rule 23(a)(2), here the entire case is pervaded by critical and dispositive issues of both fact and law that are common to the class and subclass. Among the most important, but not the only, common questions of fact are:

- Whether a person has notice or opportunity to be heard when given an ES, HS, or SA code;
- Whether TDCJ provides any opportunity to challenge the placement of an SPD in the 10 years after the underlying incident;
- Under what circumstances TDCJ retains 10-plus-year-old ES, HS, or SA SPDs;
- Whether TDCJ provides meaningful procedures surrounding a decision to retain a 10-plus-year old code;
- Whether enduring G4 or higher custody for more than a decade imposes hardships greater than the normal incidents of prison life; and
- Whether the SPDRC overrules, without notice, reasoning, or an opportunity to be heard, UCC decisions to remove an SPD in violation of TDCJ policy.

Common questions of law include:

- Whether confinement in G4 or higher custody for more than 10 years imposes an atypical and significant hardship implicating a liberty interest protected by the Due Process Clause;
- Whether the SPD Policy's presumption of SPD removal after 10 years, absent extraordinary circumstances or immediate security risk, creates a liberty interest in such removal;
- Whether TDCJ's processes for reviewing placement, removal, and retention of ES, HS, or SA codes violate the Due Process Clause; and
- What minimum procedural safeguards are required to maintain an SPD after a person has spent more than a decade in G4 or higher conditions.

158.   **Typicality.** The Named Plaintiffs have claims typical of people who are subject to Defendants' policies and practices with respect to SPD codes and the resulting conditions of confinement. Plaintiffs were injured in the exact same manner as all others who have ES, HS, and SA SPD codes for more than 10 years. Pursuant to a Policy implemented and maintained by

Defendants Collier and Lumpkin, TDCJ officials have placed SPD codes on Plaintiffs and proposed Class Members without any notice or opportunity to be heard. That decision caused both Plaintiffs and proposed Class Members to be held in punitive housing for more than a decade without any reviews of that placement or opportunity to be released to lower-level custody. Now, after enduring that punitive housing for more than a decade, Defendants Fitzpatrick, Bennett, Guerrero, the Regional Director Defendants, and other TDCJ officials who participate in the SPDRC continue to hold Plaintiffs and Class Members indefinitely in dangerous conditions with few, if any, opportunities for review. These practices fly in the face of TDCJ's own policy, which says a person should only endure punitive housing past the 10-year mark in "extraordinary circumstances." Ex. 1 at 3, 5. Plaintiffs' claims therefore share the same essential characteristics and legal theories as those of the class.

159.    **Adequacy**. The class representatives will "fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). Plaintiffs have demonstrated their commitment to the interests of the class while they prosecuted this action *pro se* while detained in miserable conditions. Even before this Court appointed counsel, Plaintiffs "vigorously pursu[ed] this suit," Dkt. 32, by filing a detailed complaint, motion to certify class, more definite statements, and a response to Defendants' Motion to Dismiss, *see* Dkts. 1, 6, 47–53, 62.

160.    Named Plaintiffs here are part of the class, share the class's interests, and suffer the same injuries as the class. In prosecuting this action *pro se*, they demonstrated a deep familiarity with the claims, Defendants' policies, and the impact these policies have on members of the putative class. There are no known conflicts between Named Plaintiffs and the class they seek to represent and no Named Plaintiff or member of the class would benefit from the challenged practices continuing.

161.     Further, Named Plaintiffs are represented by attorneys from Beck Redden, who this Court appointed to represent them, and Texas Civil Rights Project. Both firms have significant experience litigating complex civil rights cases in federal court and have extensive knowledge of Defendants' scheme and the relevant law applicable to Plaintiffs' claims. Class counsel has invested significant resources in familiarizing themselves with TDCJ's use of punitive housing, meeting with Plaintiffs and other putative class members, and meeting with experts in the relevant field. Beck Redden and Texas Civil Rights Project will fairly and adequately represent the interests of Plaintiffs and the class.

162.     As such, Named Plaintiffs and their counsel are adequate class representatives who will protect the interests of the class.

163.     **Fed. R. Civ. P. 23(b)(2).** The proposed class in this case is exactly the sort of class described in Rule 23(b)(2). Because the putative class challenges Defendants' scheme as unconstitutional through declaratory and injunctive relief that would apply identically to every member of the class, Rule 23(b)(2) is appropriate and necessary. *Allison v. Citgo Petroleum Corp.*, 151 F.3d 402, 411 (5th Cir. 1998) ("[I]f the plaintiffs [seek] only injunctive and declaratory relief, [the] case [can] readily be certified as a class action under Rule 23(b)(2)."). Plaintiffs seek only injunctive and declaratory relief that is designed to remedy the deficiencies of TDCJ's SPD practices in ways that apply to the class as a whole because Defendants have acted on grounds that apply generally to the class. A declaration and injunction stating that Defendants cannot enforce their current SPD classification policy would apply equally across the entire class.

## VII. CAUSE OF ACTION

### Fifth and Fourteenth Amendment – Denial of Due Process

*Brought by Plaintiffs and Plaintiff Class*

164.    Plaintiffs incorporate by reference paragraphs 1 through 163.

165.    The Due Process Clause of the Fourteenth Amendment, enforceable via 42 U.S.C. § 1983, provides that no state shall deprive any person of liberty without due process of law. U.S. Const. amend. XIV. To determine what process is due, a court considers whether a liberty interest exists that has been infringed by the state, and whether the procedures "attendant upon that deprivation were constitutionally sufficient." *Richardson v. Tex. Sec'y of State*, 978 F.3d 220, 228-29 (5th Cir. 2020). The constitutional sufficiency of procedures is determined by weighing three factors: (1) the private interest that will be affected by the official action, (2) the risk of erroneous deprivation of that interest through the available procedures, and (3) the state's interest, including the function involved and the fiscal and administrative burdens that additional or substitute procedures would entail. *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976).

166.    Plaintiffs have a liberty interest in removal of their SPD codes after 10 years. The "touchstone of the inquiry into the existence of a protected, state-created liberty interest in avoiding restrictive conditions of confinement is . . . the nature of those conditions themselves 'in relation to the ordinary incidents of prison life.'" *Wilkinson v. Austin*, 545 U.S. 209–223 (2005) (citing *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). To make this determination, courts look to the severity and duration of confinement. *Wilkerson v. Goodwin,* 774 F.3d 845, 855 (5th Cir. 2014). The Fifth Circuit has affirmed that there is a liberty interest in freedom from long-term and effectively indefinite confinement in restrictive housing conditions. *See id.*

167.    Plaintiffs have a liberty interest in being free from SPD codes. *See* Dkt. 70 at 5–6

(holding "Plaintiffs identify atypical and significant hardships with their SPD Codes and allege facts giving rise to a liberty interest in avoiding such classification."). The conditions of G4, G5, and ad seg housing are significantly harsher than those in minimum custody. And Plaintiffs have been placed in these harsh conditions for 20 to 40 times longer than the vast majority of individuals who are placed in punitive housing for mere months. Their lengthy and effectively indefinite confinement in these conditions, as compelled by Defendants through the SPD Policy, therefore creates an atypical and significant hardship when compared with the ordinary incidents of prison life. Plaintiffs regularly experience faulty plumbing leading to flooded cells and exposure to raw sewage; broken windows and ventilation exacerbating dangerous temperature extremes; and infestations of cockroaches and other vermin. Plaintiffs, particularly when in ad seg, experience significantly less out-of-cell time than do individuals in minimum custody—sometimes leaving their cells as little as a few hours per week. Plaintiffs are also unable to access education and other programs necessary for parole consideration, and have been told they cannot obtain parole without completing programs impossible to access with their codes. They also have an automatic mark against them in parole hearings simply for being classified in G4, G5, or ad seg. Under the current administration of SPD policy, individuals face indefinite placement in these conditions—in spite of the presumptive 10-year limit.

168.   On the face of its own policy, as authorized and controlled by the Executive Director and Director of the CID, and by the consistent statements of Defendants and other employees, TDCJ has created an interest in removal of an SPD code 10 years after the underlying incident. Plaintiffs have received assurances that their codes will be removed at this time, and expect the hardships they suffer based solely on their SPDs to end. Yet in practice, SPDs are indefinite, depriving individuals of their specific interest in having their codes removed after 10

years in accordance with A.D. 04.11.

169.    Prison officials must provide "meaningful" periodic reviews when they confine people in restrictive housing conditions. *See*, *e.g.*, *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). Reviews must amount to more than "perfunctory exchanges" *Wilkerson v. Stalder*, No. 00-304-JJB, 2013 WL 6665452, at *11 (M.D. La. Dec. 17, 2013), *aff'd sub nom. Wilkerson*, 774 F.3d 845, and are insufficient if the reviewer lacks or disclaims decision-making authority. *See Ruiz v. Estelle*, 503 F. Supp. 1265, 1366 (S.D. Tex. 1980), *aff'd in part, rev'd in part on other grounds*, 679 F.2d 1115 (5th Cir. 1982), *amended in part, vacated in part on other grounds*, 688 F.2d 266 (5th Cir. 1982).

170.    Plaintiffs face a high risk of, and some have experienced, erroneous deprivation of their liberty interest under the existing procedures controlled by Defendants Collier and Lumpkin. SPD codes were repeatedly imposed and retained without notice, opportunity to present a statement or evidence, notification of the decision, or any reasoning to justify the decision. Multiple Plaintiffs received erroneous codes for acts that did not meet TDCJ's definitions for the respective SPDs, and had no recourse to challenge those errors. No Plaintiff received notice of SPD placement, much less the opportunity to participate in, or even attend, a hearing. Plaintiffs received no meaningful hearings for the next 10 years after placement, if they received any hearings at all.

171.    Once they reached the 10-year mark, Plaintiffs encountered a host of infirmities in their SPD reviews. Some had to affirmatively request a hearing, and even then, were only reviewed in absentia. When they did receive hearings, the proceedings were far from meaningful. In many cases, they arrived to the review only to discover the outcome effectively predetermined. This lack of meaningful review by SPDRC participants including Defendants Fitzpatrick, Bennett, Guerrero,

the Regional Directors, and other TDCJ officials has resulted in the erroneous retention of SPD codes, as many Plaintiffs' underlying incidents do not meet the TDCJ's limited definition of "extraordinary circumstances."

172.   Plaintiffs regularly encountered officials who either disclaimed authority to remove SPDs or refused to exercise their authority to remove them. It was widely known that Former Director Bryant would overturn any decision to remove an SPD, and Wynne Warden Strong personally stated that she would not remove an SPD. Another warden explained that Huntsville told all wardens that if they removed any SPDs and the individuals were involved in subsequent incidents, the wardens would be held responsible. These uncompromising positions taken publicly and privately by prominent officials who maintained or enforced TDCJ's SPD policies made clear to other TDCJ staff that removal of codes was not a real option. Some UCC members felt compelled to check with their superiors before removing a code; others openly stated they were afraid of shouldering the responsibility and the consequences for their careers; some preemptively denied code removal because they could anticipate the inevitable outcome; and still others took the bold step of recommending removal only to find themselves reversed. Whatever the case, Defendants effectively instituted a policy against removing SPDs even well past the 10-year mark through their implementation and enforcement of the Policy. Given all these impediments, Plaintiffs had no opportunity for meaningful review of their indefinite placement in restrictive conditions.

173.   The government interest in maintaining Plaintiffs' SPD codes is minimal, given the extended length of time since the underlying incidents and the minimal disruption from providing meaningful hearings and review. Further, holding people in prolonged punitive housing impairs Defendants' interest by disincentivizing good conduct and wasting resources on closely

supervising people for which there is no basis in their punitive confinement.

174.    Defendants all "compel or constrain" the operation of A.D. 04.11. *See Hope v. Harris*, 861 F. App'x 571, 579 n.4 (5th Cir. 2021). Defendants Collier and Lumpkin compel or constrain SPD administration through their authority over the operation of the Policy and over the daily operation of TDCJ and its adult correctional facilities. *Id.* Defendants Fitzpatrick, Bennett, Guerrero, and the Regional Director Defendants compel or constrain SPD administration by their authority over classification processes and their final say in SPD retention decisions as members of the SPDRC. *Id.*

175.    Plaintiffs seek injunctive relief against all Defendants for violation of their right to due process of law in placing and indefinitely maintaining their SPD codes without any meaningful opportunity for review.

### Declaratory Judgment – 23 U.S.C. § 2201

*Brought by Plaintiffs and Plaintiff Class*

176.    All prior paragraphs are incorporated here by reference.

177.    Section 2201(a) provides: "In a case of actual controversy within its jurisdiction . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration."

178.    This case presents an actual controversy between the Plaintiffs and the Class and the Defendants as to whether Administrative Directive 04.11 violates their constitutional rights on its face and as applied to Plaintiffs and the Class. Specifically, Plaintiffs and the Class seek a declaration that:

> a.    Defendants' policies and practices of confining persons in G4, G5, or administrative segregation pursuant to Administrative Directive 04.11 creates a liberty interest wherein Plaintiffs and the Class have an expectation of the removal of their SPD codes 10 years after the underlying incident; and

b. Defendants' policies and practices of confining persons in G4, G5, or administrative segregation pursuant to Administrative Directive 04.11 for prolonged periods of time beyond the presumptive 10 years without due process violates the Fifth and Fourteenth Amendments to the United States Constitution.

## VIII. PRAYER FOR RELIEF

Plaintiffs and the Class they represent have no adequate remedy at law to redress the wrongs suffered as set forth in this Amended Complaint. Plaintiffs have suffered and will continue to suffer irreparable injury as a result of the unlawful acts, omissions, policies, and practices of Defendants as alleged herein, unless Plaintiffs and the Class they represent are granted the relief they request.

WHEREFORE, Plaintiffs and the Class they represent request that this Court grant them the following relief:

(a) Declare that this suit is maintainable as a class action pursuant to Federal Rule of Civil Procedure 23(a) and 23(b)(2);

(b) Declare that Defendants' policies and practices of confining persons in G4, G5, or administrative segregation pursuant to Administrative Directive 04.11 creates a liberty interest wherein Plaintiffs and the Class have an expectation of the removal of their SPD codes 10 years after the underlying incident;

(c) Declare that Defendants' policies and practices of confining persons in G4, G5, or administrative segregation pursuant to Administrative Directive 04.11 for prolonged periods of time beyond the presumptive 10 years without due process violates the Fifth and Fourteenth Amendments to the United States Constitution;

(d) Issue injunctive relief ordering Defendants to present a plan to the Court within 30 days of the issuance of the Court's order providing for:

a. The release from G4, G5, or administrative segregation of those persons who have spent more than 10 years in such punitive housing pursuant to an SPD code that is at least 10 years old;

b. Notice and a meaningful opportunity to be heard before an SPD code for ES, HS, or SA is placed on an individual's record;

    c.   Meaningful review of the decision to impose an SPD code for ES, HS, or SA;

    d.   Meaningful review of the decision to retain an SPD code for ES, HS, or SA beyond 10 years, including:

        i.   A definition, including elements, by which to determine if a person's situation constitutes "extraordinary circumstances";

        ii.   Notice and a written statement of reasons articulating TDCJ's non-conclusory justification for retaining an SPD code for ES, HS, or SA beyond 10 years;

        iii.   Specific steps a person can take that will ensure their SPD code is removed in a future hearing; and

    e.   All other relief necessary to ensure that TDCJ's SPD Policy complies with the Due Process Clause of the Fourteenth Amendment.

(e)  Award Plaintiffs the cost of this suit and reasonable attorneys' fees and litigation expenses pursuant to 42 U.S.C. § 1988, and other applicable law;

(f)  Retain jurisdiction of this case until Defendants have fully complied with the orders of this Court; and

(g)  Award such other and further relief as the Court deems just and proper.

Dated: May 6, 2024                                    Respectfully submitted,


**TEXAS CIVIL RIGHTS PROJECT**                  **BECK REDDEN LLP**

    Dustin Rynders                          By:  */s/ Alex Roberts*
    Texas Bar No. 24048005                      Alex Roberts
    Southern District No. 685541                Federal Bar No. 865757
    dustin@texascivilrightsproject.org          State Bar No: 24056216
    Christina Beeler                            aroberts@beckredden.com
    Texas Bar No. 24096124                      Maryam Ghaffar
    Southern District No. 3695627               Federal Bar No: 3710605
    christinab@texascivilrightsproject.org      State Bar No: 24120847
    Randall Hiroshige                           mghaffar@beckredden.com
    Texas Bar No. 24124299               1221 McKinney St., Suite 4500
    Southern District No. 3708688        Houston, TX 77010
    randy@texascivilrightsproject.org    Telephone: (713) 951-3700
    Molly Petchenik                      Facsimile: (713) 952-3720
    Texas Bar No. 24134321
    Southern District No. 3854546
    molly@texascivilrightsproject.org
    Travis Fife
    Texas Bar No. 24126956
    Southern District No. 3734502
    travis@texascivilrightsproject.org
1405 Montopolis
Austin, Texas 78741
Telephone: 512-474-5073

**ATTORNEYS FOR PLAINTIFFS**


**CERTIFICATE OF SERVICE**

    I hereby certify a true and correct copy of the foregoing has been served through the
Court's ECF system on May 6, 2024 on all counsel of record.


                      /s/ Alex Roberts

# EXHIBIT 1



| | |
|---|---|
| TEXAS DEPARTMENT | **NUMBER:** AD-04.11 (rev. 5) |
| OF | **DATE:** January 6, 2015 |
| CRIMINAL JUSTICE | **PAGE:** 1 of 15 |
| | **SUPERSEDES:** AD-04.11 (rev. 4) July 1, 2013 |

# ADMINISTRATIVE  DIRECTIVE

**SUBJECT:**       **SECURITY PRECAUTION DESIGNATORS**

**AUTHORITY:**    Tex. Gov't Code §§ 494.002(a), 498.002

Reference:  American Correctional Association Standards 4-4301, 4-4303

**APPLICABILITY:**  Texas Department of Criminal Justice (TDCJ) and Private Facility Contract Monitoring/Oversight Division (PFCMOD)

**POLICY:**

The TDCJ shall assign each offender to a custody designation that provides appropriate, adequate supervision and housing commensurate with the needs and requirements of the offender during the entire period of incarceration.  Custody designations shall be made on the basis of the offender's entire record.

Certain behaviors warrant special consideration; therefore, serious behavioral infractions shall be identified and communicated with staff to ensure offenders receive the appropriate levels of supervision.

**DEFINITIONS:**

The following definitions are provided for the purpose of this directive and are not intended to be applicable to other policies and procedures.

"Additional Information Report" is a report created by the sociologist at an intake facility or an intake interviewer at a substance abuse felony punishment facility (SAFPF) during an offender's intake processing.  This report contains non-verified information of possible security concerns, such as homosexuality, gang membership, enemies, or escapes, as reported by the offender.

"Escape" is the intentional commission of an overt act that results in the unauthorized departure from any part of a secure adult correctional facility, work assignment, or extended limits of the facility, including during a transport or an escorted emergency absence, climbing a perimeter fence, or departing without authorization from a community work project.

**GambillDef629**

"Escape Attempt" (EA) is a code used to document attempted escapes. This code shall not: (1) be placed on the Security Precaution Designator (SPD) card (Attachment A); (2) require committee action; or (3) affect the computer recommended custody. This code shall be used for offenders who have attempted an escape from a secure adult correctional facility when the attempted escape does not meet the definition of the Escape Precaution Designator.

"Escape Precaution Designator" (ES) is a code documented in the record of an offender who has a history of escape from secure adult correctional facilities. This code shall be used for incidents that occurred no more than 10 years from the date of review unless extraordinary circumstances are documented. These offenders shall not be assigned to a custody designation less restrictive than G4/J4.

"Escape Precaution Designator More than 10 Years Old" (EZ) is a code used to document escapes from a secure adult correctional facility when the escape occurred more than 10 years from the date of review and there were no extraordinary circumstances documented. This code shall not be placed on the SPD card and shall not affect the computer recommended custody; however, committee action may be required if the code is changed from ES to EZ.

"Escape Precaution Designator Removed" (NE) is the removal code used to document that an ES code was removed by the SPD Review Committee in accordance with Section IV of this directive. These offenders shall not be assigned to a custody designation less restrictive than G3/J2.

"Extraordinary Circumstance" is any significant justification unit staff uses to remove the SPD, before it has been on the offender's record for 10 years, that does not specifically fit into criteria established by Section IV.A of this directive. Extraordinary circumstances may also justify keeping the code on the offender's record longer than 10 years if, for example, a staff assault resulted in death, the offender was involved in multiple escapes, or the offender injured hostages.

"Hostage Precaution Designator" (HS) is a code documented in the record of an offender who has a history of taking any individual hostage. A hostage situation has occurred if any individual has been held captive by an offender who threatens to kill or harm that individual if one or more demands are not met. This code shall be used for those incidents that occurred no more than 10 years from the date of review unless extraordinary circumstances are documented. These offenders shall not be assigned to a custody designation less restrictive than G4/J4.

"Hostage Precaution Designator More than 10 Years Old" (HZ) is a code used to document an offender's history of involvement in hostage situations that occurred more than 10 years from the date of review. This code shall apply to those offenders who took a hostage, but the incident was more than 10 years from the date of review and there were no extraordinary circumstances documented. This code shall not be placed on the SPD card and shall not affect the computer recommended custody; however, committee action may be required if the code is changed from HS to HZ.

"Hostage Precaution Designator Removed" (NS) is the removal code used to document that an HS code was removed by the SPD Review Committee in accordance with Section IV of this

GambillDef630

directive. These offenders shall not be assigned to a custody designation less restrictive than G3/J2.

"Life Without Parole" (LWOP) is a code used to document offenders serving time for a sentence of life without the possibility of parole. This is a permanent code and these offenders shall not be assigned to a custody designation less restrictive than G3.

"Other Escapes" (EX) is a code used to document escapes that do not fit the criteria of ES or EA. This category includes those escapes that are not from a secure adult correctional facility, but are from a juvenile facility or halfway house, failure to return from furlough, or failure to return from an unsupervised work release program. This code shall not be placed on the SPD card and shall not affect computer recommended custody.

"Secure Adult Correctional Facility" (ACF) is a secure TDCJ Correctional Institutions Division (CID) unit, privately operated facility, pre-parole facility, intermediate sanction facility, federal facility, other state's department of corrections facility, county jail, city jail, or city police substation that incarcerates adult offenders.

"Security Precaution Designator" (SPD) is a code documented in an offender's record that identifies the offender as a special management risk. This designator shall be used for offenders who have a history of escape (ES), taking hostages (HS), assaulting staff (SA), defeating restraint devices (SR), or sentenced to life without parole (LWOP).

"Security Precaution Designator Review Committee" (SPDRC) is the committee comprised of the regional director, warden, and the chairman of Classification and Records. For privately operated facilities, the regional director of the geographic region where the facility is located shall be the voting authority. The committee shall be the authority for removal of the SPD when the offender meets the criteria outlined in Section IV.A of this directive, or for retaining the SPD past the designated period. Decisions that are not unanimous shall be referred to the appropriate CID deputy director or PFCMOD deputy director.

"Security Restraint Precaution Designator" (SR) is a code documented in the record of an offender who has a history of defeating restraint devices, such as intentionally slipping out of hand restraints or leg irons, or defeating a secure cell by physically leaving or showing the ability to leave the cell. This is a permanent code that shall not affect the computer recommended custody.

"Staff Assaults More than 10 Years Old" (SZ) is a code used to document staff assaults that occurred more than 10 years from the date of review. This code shall apply to those offenders who have committed a staff assault involving serious injury, but the incident was more than 10 years from the date of review and there were no extraordinary circumstances documented. This code shall not be placed on the SPD card and shall not affect the computer recommended custody; however, committee action may be required if the code is changed from SA to SZ.

"Staff Assault Precaution Designator" (SA) is a code documented in the record of an offender who has a history of serious staff assault. A serious staff assault has occurred if an offender intentionally strikes a staff member resulting in serious injury, as determined by unit medical staff.

GambillDef631

Serious injury requires treatment beyond first aid, such as sutures, a fracture, or hospitalization. If the unit classification committee (UCC) determines that an offender's behavior was such that serious bodily injury was imminent to staff had it not been for an intervening factor, for example the offender tried to stab a correctional officer, but the correctional officer's thrust vest prevented serious bodily injury, the UCC may recommend placement of an SA code. This code is only to be used in extraordinary circumstances where the intent and probable outcome of the assault are clear. In addition, if an offender has committed three or more staff assaults in a 12-month period where injuries occurred but only required first aid, the UCC may also recommend the placement of an SA code. The code shall be used for those incidents that occurred less than 10 years from the date of review unless extraordinary circumstances are documented. These offenders shall not be assigned to a custody designation less restrictive than G4/J4.

"Staff Assault Precaution Designator Removed" (NA) is the removal code used to document that an SA code was removed by the SPDRC in accordance with Section IV of this directive. These offenders shall not be assigned to a custody designation less restrictive than G3/J2.

"Staff Member" is an employee of the TDCJ, county or city jail, Texas Juvenile Justice Department, any other state department of corrections, or Federal Bureau of Prisons employee, an employee working under contract with the TDCJ, or an approved volunteer.

"Unit Classification Coordinator" is the staff member responsible for reviewing unit recommendations for placement of SPDs and updating the mainframe UC00 07 screen and all appropriate Classification and Records documents.

**PROCEDURES:**

I.      Placement of Security Precaution Designators

      A.      SPDs shall be placed in the record of each offender sentenced to life without parole or found to have engaged in any of four activities: escape, taking a hostage, staff assault resulting in serious injury, or defeating restraint devices. Refer to sample Security Precaution Designator card (Attachment A). SPDs may be recommended for placement by a sociologist, an intake interviewer at a SAFPF, the UCC, or central administration staff.

            1.      Sociologists shall have the authority to recommend the placement of an SPD by completing an Additional Information Report regarding the incident for which placement of the SPD is recommended.

                  a.      At intake facilities, during the sociological interview (see Attachment B), the sociologist shall review the offender's previous incarceration history to determine whether the offender has engaged in any of the four activities or is sentenced to life without parole. When such an offender has been identified, the sociologist shall complete an Additional Information Report.

**GambillDef632**

b.   The sociologist shall then notify the warden, chief of unit classification at the intake facility, and the appropriate unit classification coordinator in Huntsville via e-mail of the recommendation for placement of the SPD. The e-mail shall include details of the incident to enable the unit classification coordinator to complete a thorough review regarding possible placement of the SPD. The offender shall not be transferred to another unit until the SPD is processed.

c.   The unit classification coordinator shall notify the offender's unit of SPD placement or denial within three working days and update the UC00 07 screen, if appropriate. Once notification is received from the unit classification coordinator that an SPD has been placed, the chief of unit classification or designee shall ensure the offender is appropriately classified, attach the SPD card inside the travel card, and document all appropriate records.

2.   During classification reviews (see Attachment B), the UCC shall review an offender's records to determine whether the offender has engaged in any of the four activities. If it is determined that an offender has engaged in any such activity, the UCC shall submit an e-mail to the appropriate unit classification coordinator requesting placement of an SPD on the offender's record. The unit classification coordinator shall respond within three working days to the requesting UCC. The unit classification coordinator shall notify the offender's unit of SPD placement or denial and update the UC00 07 screen, if appropriate. Once notification is received from the unit classification coordinator that an SPD has been placed on an offender's record, the chief of unit classification or designee shall ensure the offender is appropriately classified, attach the SPD card inside the travel card, and document all appropriate records.

3.   Central administration staff who discovers information within an offender's record that may require an SPD shall deliver the information to the appropriate unit classification coordinator for a review regarding the placement of the SPD on the offender's record. The unit classification coordinator shall proceed as outlined in Section I.A.1.c.

B.   The sociologist, UCC, and central administration staff shall strictly adhere to the definitions provided in this directive (see examples in Attachment C) to determine if placement of an SPD in an offender's record is necessary. SPDs are intended to identify only the most serious infractions.

The sociologist, UCC, and central administration staff shall determine whether an offender meets the criteria for placement of an SPD, whether extraordinary circumstances exist, and if the offender meets the criteria for the assignment of any other SPD codes. The recommendation of the sociologist, UCC, and central administration staff for placement of one of these codes shall be based on the

GambillDef633

circumstances surrounding the activity and the length of elapsed time since the incident occurred. Activities that occurred more than 10 years before the date of review are not automatically excluded from recommendation for placement of an SPD. These codes are for informational purposes only and shall be reflected on the UC00 07 screen. Sociology and unit classification staff have the authority and responsibility to add the EX and EA codes to the UC00 07 screen. The EZ, HZ, and SZ codes shall be added to the UC00 07 screen by a unit classification coordinator, if approved by the central administration staff.

C.  Combinations of SPDs for the same incident are used only in extraordinary situations where the offender caused a security incident through multiple acts, for example if the offender defeated hand restraints and attacked a correctional officer causing serious injury.

When an offender is found to have separate incidents that warrant the placement of an SPD, the incidents shall be documented separately on the UC00 07 screen. For example, an offender who has three separate escapes from a secure ACF shall have three ES codes indicating the appropriate date for each escape.

D.  The warden or designee shall have the authority to place an SPD in an offender's record, housing area, or on the offender's cell door at any time the warden or designee determines a security risk exists. In these cases, the SPD review shall be held at the next available UCC hearing.

II.  Special Needs Status

An offender may have a special need, such as medical, geriatric, mental health, or intellectual impairment that requires placement in a special status on a specific unit. The parameters of the treatment associated with the special status would prevail over the offender's custody designation despite the placement of an SPD code on the offender's record. When the special need is no longer applicable, the offender shall be returned to the security parameters associated with the offender's custody designation and SPD.

III.  Documentation of Offender's Unit Records and Notification of Staff

A.  The chief of unit classification, a unit classification case manager, or a staff member designated by the warden shall ensure the proper documentation of SPDs.

When approval of an SPD has been granted by a unit classification coordinator, the unit classification office shall be notified and shall be responsible for documenting the SPD in the following records:

1.  Offender travel card;

2.  SPD card (CL-148); and

**GambillDef634**

3.    I-201, Segregation Confinement Record - If the offender is confined to administrative segregation, SPD information shall be forwarded to administrative segregation staff who shall record and highlight the information at the top of the I-201 form. Recording and highlighting designators on the I-201 form provides correctional officers and other staff with the information necessary to manage offenders who require the highest degree of precaution.

B.    The warden shall use additional methods to notify staff, including rosters or the standardized cell door markers, to ensure staff is notified and aware of offenders with SPDs.

IV.    Review for Removal of Security Precaution Designators

A.    Removal of the SPD by the SPDRC may occur if an offender has an SPD of ES, HS, or SA and fits into one of the following situations:

1.    Release Date

a.    The offender is within 18 months of a firm release date designated by a Board of Pardons and Paroles vote, mandatory supervision, or discharge, has an aggravated or non-aggravated sentence with no major disciplinary convictions within the last 12 months, and it has been at least three years since the incident that caused the placement of the SPD. Should circumstances arise that extend the release date beyond the required 18 months, the UCC shall review the offender for possible reinstatement of the SPD.

b.    The chief of unit classification shall review the infopac report IUCR690C-B, Security Precaution Designator-Removed, monthly to determine if there are any offenders on the unit whose SPD was removed due to a firm release date and whose release date has changed, resulting in the need for reinstatement of the SPD.

2.    Non-aggravated sentences

The offender has a non-aggravated sentence and no major disciplinary convictions for the past three years, and it has been at least five years since the incident that caused the placement of the SPD.

3.    Extraordinary Circumstances

An offender has an extraordinary set of circumstances for which the UCC deems the request for removal of the SPD appropriate.

GambillDef635

B.   The UCC shall make the initial recommendation for SPD removal.  The removal of an SPD shall only be requested for one of the reasons listed in Section IV.A of this directive and shall be forwarded to the SPDRC for review as follows:

    1.   The chief of unit classification shall send an e-mail request to the warden, including the offender's name and TDCJ number, date, and details of the incident;

    2.   The warden shall respond by indicating concurrence or non-concurrence within five working days via e-mail to the regional director;

    3.   The regional director shall respond by indicating concurrence or non-concurrence within five working days via e-mail to the chairman of Classification and Records;

    4.   The chairman of Classification and Records shall instruct the unit classification coordinator to notify the unit via e-mail within five working days of the approval or denial for removal of the SPD.  If approved for removal, the appropriate CRO documentation shall be made by the unit classification coordinator;

    5.   Unit classification staff shall update the appropriate unit records and classify the offender appropriately.  The removal code shall be deleted, and the offender shall be reclassified 10 years after the date of the documented incident; and

    6.   If the decision is that the SPD shall remain in effect and not be removed, the offender shall be reviewed annually for possible removal of the SPD.

C.   If it has been more than 10 years since the incident that caused the placement of the SPD, ES, HS, or SA only, and the offender is no longer considered an immediate security risk, the SPD shall be removed unless extraordinary circumstances exist.  The procedures listed below shall be followed:

    1.   During routine classification committee meetings and annual reviews, unit classification staff shall determine whether a recommendation for removal is necessary.  The offender shall be scheduled for UCC review as a change in custody designation may be appropriate. The warden shall be notified of the UCC recommendation of removal for concurrence.  Unit classification staff shall notify the appropriate unit classification coordinator to update the ES, HS, or SA code.

    2.   The unit classification coordinator shall appropriately code the incident as being more than 10 years old using the following entries on the UC00 07 screen:

        a.   An escape more than 10 years old shall be coded as EZ;

**GambillDef636**

       b.     A staff assault more than 10 years old shall be coded as SZ; and

       c.     A hostage situation more than 10 years old shall be coded as HZ.

   3.     The unit classification coordinator shall notify the chief of unit classification of the updates.

D.     Extraordinary circumstances may exist under which the UCC would request that the SPDRC retain an offender's SPD. Such circumstances must be fully documented and approved by the SPDRC. If retention of the code is approved by the SPDRC, the offender shall be reviewed annually by the UCC to determine whether the offender is eligible to have the SPD removed. The UCC shall submit a recommendation to the SPDRC to either retain or remove the SPD. SPDRC decisions that are not unanimous shall be referred to the appropriate deputy director.

E.     If the UCC votes to remove the SPD during the annual review, the process described in Section IV.C.1-3 of this directive shall be followed.

F.     If an SPD is erroneously indicated on an offender's record, such as a juvenile escape coded as ES, the chief of unit classification or the sociologist shall send an e-mail to the appropriate unit classification coordinator to remove the SPD. The offender shall be scheduled for UCC if a custody designation change is appropriate.

V.    Operational Procedures

A.     Offenders with one or more of the following SPDs are not eligible for assignment to a custody designation less restrictive than G4/J4:

   1.     Escape Precaution Designator (ES);

   2.     Hostage Precaution Designator (HS); or

   3.     Staff Assault Precaution Designator (SA).

B.     Offenders with an SPD of SR or LWOP are identified to alert correctional staff to use certain precautions in the management of these offenders. Once an SR or LWOP code is placed on an offender's record, it shall remain on the record permanently.

C.     Offenders with SPDs shall generally be assigned to the field force and secure jobs inside the perimeter as designated by the warden.

D.     The warden or designee, major, administrative segregation supervisor, and the chief of unit classification shall maintain a list of all offenders assigned to the unit

GambillDef637

who have SPDs.  Security supervisors shall ensure correctional officers are aware of each offender with a recorded SPD who is assigned at the correctional officer's duty post.  The following reports enable correctional officers to easily identify offenders with SPDs:

    1.      Infopac report IUCR690C-A;

    2.      Job turnout reports; and

    3.      Housing locator reports.

E.    When transporting an offender, the correctional officers at the departing unit shall ensure transportation staff are made aware of offenders in their custody who have SPDs by ensuring the SPD card is documented appropriately and securely attached inside the offender travel card.

F.    All offenders, with or without an SPD, shall be managed in accordance with established security procedures according to custody designation.

VI.    Offender Request for Removal of Security Precaution Designator

A.    An offender who seeks to have an SPD removed from the offender's record may do so by requesting a review by the UCC.  Offenders may request such a review no more than once every 12 months.

B.    If the offender disagrees with the results of the UCC hearing, the offender may seek relief through the offender grievance procedures.

Brad Livingston
Executive Director

**GambillDef638**

## SAMPLE SECURITY PRECAUTION DESIGNATOR CARD

8" by 5 ¼"

---

### Security Precaution Designator

☐ **Escape Precaution Designator (ES)**

☐ **Hostage Precaution Designator (HS)**

☐ **Staff Assault Precaution Designator (SA)**

☐ **Security Restraint Precaution Designator (SR)**

☐ **Life Without Parole Designator (LWOP)**

**Offender Name:** _____   **TDCJ Number:** _____

_____   _____   _____
**UCC Chairperson**        **Date**                 **UC Coordinator Name**

CL-148

---

Color - Bright Green

**GambillDef639**

AD-04.11 (rev. 5)
Attachment B
Page 12 of 15

## SOCIOLOGICAL INTERVIEW



GambillDef640

## CLASSIFICATION REVIEW



**GambillDef641**

## INTERPRETATIONS OF SECURITY PRECAUTION DESIGNATORS

**CODE**   Examples of situations or criteria for placement of an SPD

**ES**   Escape from an ACF, including state, federal, city, county, and secure pre-parole facilities. If an offender is incarcerated at an ACF and being transported for medical or other reasons when the escape occurs, the incident shall be classified ES. Escape requires the commission of an overt act, such as cutting a hole in a fence, running from a field squad, or climbing through a window. These offenders shall not be assigned to a custody designation less restrictive than G4/J4.

**SA**   Staff injury must have required more than treatment by first aid. This code assignment does not include "chunking" or injuries occurring when arresting officers have a conflict with the offender. The intent or threat to injure is not enough; staff must sustain a serious injury. The fact that an offender was charged with or convicted of assaulting a correctional officer does not mean the SA code shall be placed. However, if the offender has committed three or more staff assaults in a 12-month period, and the assaults caused injuries that were treated with first aid, the UCC may recommend placement of an SA code. The offender shall not be assigned to a custody designation less restrictive than G4/J4.

**HS**   Taking any individual captive with threats to kill or harm that individual if one or more demands are not met. This does not include staff assaults or the use of restraining devices on staff, or securing staff in an area to facilitate an escape or attempted escape. These offenders shall not be assigned to a custody designation less restrictive than G4/J4.

**SR**   Defeating hand restraints or secure cell doors. This does not include food slots nor should the SR be automatically placed when an offender is charged with tampering with a locking device. The key word is "defeating." The offender has defeated a secure cell door when the offender has the ability to or has physically exited the cell.

**LWOP**   The 82nd Legislature passed House Bill 3, which allows a punishment of life without the possibility of parole. This bill enhanced the punishment for anyone convicted of certain sexual offenses, specifically a repeated and habitual felony, to life without parole. Offenders sentenced to life without parole shall not be assigned to a custody designator less restrictive than G3.

## The following codes are not considered security precaution designators, but are used for informational purposes:

**CODE**   Examples of situations or criteria for placement of code

**EX**   Failure to return from an authorized leave, such as a work release program or furlough; escape from a juvenile facility or non-secure halfway house, including when the offender fails to return or walks away; or any other escape that does not meet the criteria for ES or EZ. The unit classification coordinator shall be contacted if guidance is needed.

**EA**   A non-overt act indicating that an escape might be forthcoming, such as planning an escape or having items related to an escape in the cell. Even if the offender was charged with escape, if the act was not overt and was only an attempt, it should be coded as EA.

**EZ**   Over 10 years since escape from a secure ACF.

**SZ**   Over 10 years since staff assault with serious injury.

**HZ**   Over 10 years since a hostage situation.

**GambillDef642**

**The following are security precaution designator removal codes:**

NE   The code was removed prior to 10 years from the occurrence of the escape by the SPDRC in accordance with Section IV of this directive.  These offenders shall not be assigned to a custody designation less restrictive than G3/J2.  Code shall be removed 10 years from the documented incident.

NS   The code was removed prior to 10 years from the occurrence of the hostage situation by the SPDRC in accordance with Section IV of this directive.  These offenders shall not be assigned to a custody designation less restrictive than G3/J2.  Code shall be removed 10 years from the documented incident.

NA   The code was removed prior to 10 years from the occurrence of the staff assault by the SPDRC in accordance with Section IV of this directive.  These offenders shall not be assigned to a custody designation less restrictive than G3/J2.  Code shall be removed 10 years from the documented incident.

**GambillDef643**